## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DAVID SMITH, | ) | |
|       Plaintiff, | ) | |
| | ) | Case No.: |
|   vs. | ) | |
| | ) | **JURY TRIAL** |
| BROWN UNIVERSITY, | ) | **DEMANDED** |
| | ) | |
| DAVIS CONSULTING GROUP, LLC, and | ) | |
| | ) | |
| DONNA DAVIS, Individually | ) | |
| | ) | |
|       Defendants. | ) | |
| _____ | ) | |

## <u>VERIFIED COMPLAINT</u>

### I.   NATURE OF THE ACTION

1.    This action stems from a grievously mishandled and biased student disciplinary proceeding at Brown University ("Brown") in which Plaintiff David Smith[1] was falsely accused of sexual assault by a female Brown student (referred to as Jane Roe), found responsible and suspended by Brown. At every turn, from the inception of the disciplinary process that began over ten months ago, through the investigation and hearing, Brown and its privately retained investigator did everything in their power to strip the process of any semblance of fairness, including by withholding exonerating medical evidence from the investigative record and by

---

[1] Plaintiff is referred to in this complaint as "David Smith" or "David," a pseudonym. With the filing of this Complaint, Plaintiff also is filing a motion to proceed under pseudonym for himself, complainant (referred to as Jane Roe), and other students involved in the underlying disciplinary proceeding. Defendant knows the identity of the students and does not oppose the motion. This Court previously granted David Smith's motion to proceed under pseudonym in a related action. *David Smith v. Brown University*, Civ No. 1:22-cv-24-JJM-PAS  (Text Order entered  01/18/2022).

fabricating alleged "admissions" by David that were relied on by a hearing panel to hold him responsible.[2]

2.     David is an outstanding student, athlete, co-head of a club on campus, and a teaching assistant for multiple classes. He is an impactful, engaged member of the Brown community and has never been accused of wrongdoing in his life. From the outset, David has maintained his innocence, insisting that the entire encounter with Jane was unequivocally consensual. His accounting of what happened has never waivered, including on multiple occasions when David had been covertly recorded by Jane and her friends before he was aware of any complaint.

3.     Brown set the tone for the entire disciplinary process by immediately suspending David based solely on Jane Roe's written complaint, before he could even answer the charges leveled against him, and without honoring the presumption of innocence he was promised under Brown's policies. Only after David filed a federal lawsuit (on January 14, 2022)[3], and after Rhode Island District Judge McElroy (on January 25, 2022) enjoined Brown from imposing an interim suspension on a different male Brown student faced with sexual misconduct accusations[4], did Brown allow David to return to campus pending the outcome of the disciplinary investigation.

4.     Brown insisted on adjudicating David's case under an inapplicable policy and procedure Brown employs whenever the University believes it is not jurisdictionally obligated to

---

[2] This lawsuit is at least the second time that Defendant Donna Davis, the investigator in the underlying disciplinary matter, has been accused of fabricating testimony during an investigation. She was previously accused of similarly shocking conduct in a Title IX lawsuit brought by another male student against Case Western Reserve University, at a time when she identified by a different name—Donna Davis-Reddix. See *infra* at ¶ 113.

[3] *David Smith v. Brown University*, Civ No. 1:22-cv-24-JJM-PAS

[4] *David Stiles v. Brown University*, Civil No. 1:21-cv-00497-MSM-LDA

comply with Title IX.[5]  Brown maintains two sets of policies for adjudicating sexual misconduct

cases—one that is designed to be Title IX compliant, and another watered-down policy that is not.

Brown designed a separate "Sexual and Gender-based Misconduct Policy" (hereafter, "Non-Title

IX Policy") by cutting and pasting its Title IX Policy, then deleting basic due process protections

including the right to present witnesses and question one's accuser at a hearing. This is Brown's

procedure of choice because this process makes it virtually impossible to question accusers (who

are overwhelmingly female) while eliminating any semblance of due process and fairness to the

accused (who are overwhelmingly male).[6]

5.      Brown had no rational basis for refusing to adjudicate David's case under its Title

IX policy, which by its express terms applies to any off-campus conduct that occurs at a location

in which Brown exercised "substantial control."  The alleged assault occurred at David's house,

during a Halloween party. Brown campus police, not local law enforcement, were called to the

party to address a noise complaint at David's house. Campus police met with David and threatened

to break up the party unless it was quieted down. If that were not proof enough of Brown's

substantial control of the location, a Brown Dean formally investigated and disciplined David and

nearly all his housemates for noise and trash violations associated with the same party. In other

words, Brown exercised its power to tell David what he can and cannot do in his home—in

connection with the party at issue in the underlying disciplinary matter—and punished him for

non-compliance. David repeatedly objected to proceeding under Brown's inapplicable non-Title

---

[5] 20 U.S.C. §§1681 – 1688.

[6] Notably, Brown's newly appointed Title IX Director has publicly stated that she opposes the 2020 Department of Education Title IX regulations' cross-examination requirement. True to form, Brown's new Title IX Coordinator told David Smith and his advisor that in the five months she has been with Brown, the university has not adjudicated a single case under its Title IX Policy. All cases have been handled under its Non-Title IX Policy where cross-examination is prohibited.

IX policy, but Brown, determined to deny David a fair process and the right to adequately challenge the lies of his accuser, irrationally insisted it does not substantially control his house.

6.      Brown brought in an outside investigator, Donna Davis, who had a newly-formed consulting firm (less than three months old), and who had been repeatedly criticized for investigative misconduct and bias in lawsuits and in media articles associated with her positions at other colleges. Despite the fact that the alleged assault occurred during a party with about one hundred guests, the investigator did virtually nothing to independently investigate the matter—in more than six months the investigator spoke to only three witnesses, two of whom were Jane's best friends, and the third was also suggested by Jane.

7.      David was told from the outset by Brown's Title IX Office and by the outside investigator that the investigation was strictly confidential, and that he was not allowed to speak with anyone about the case. He was specifically instructed by the investigator not to speak to potential witnesses and assured that the investigator would interview all relevant witnesses. However, the investigator only interviewed the three witnesses that Jane asked her to (David had also suggested speaking with the third witness). David later learned that the investigator was aware of, but declined to interview, several relevant witnesses who may have been favorable to his defense.

8.      David repeatedly objected to this "gag rule," which prevented him from identifying potential witnesses that may have information relevant to his defense. Because of David's inability to speak with students who were present on the night in question, he could not identify individuals with relevant knowledge for the investigator to interview. As such, David was only able to identify one witness.

9.      The investigator went out of her way to discredit the only witness David did

suggest. Unlike the investigator's blanket support of Jane's witnesses, the investigator's summary of the information obtained from the only witness David named was prefaced by a lengthy discussion of the fact that the witness obtained counsel who limited the witness' responses to certain questions. In reality, this witness, who also had an ongoing sexual history with Jane, presumably relied upon his own lawyers to protect him against the Complainant and Brown given the university's demonstrated pattern of immediately suspending male students if they are accused of sexual assault.

10.     In contrast, the investigator accepted statements from Jane's two witnesses (referred to as Witnesses 1 and 2) at face value, without questioning or analyzing their blatantly inconsistent and illogical stories. For example, the investigator ignored that Jane's description of her interactions with David before the alleged assault were completely at odds with the accounts of Witnesses 1 and 2—Jane said that she was kissed against her will, spat on, and dragged upstairs to David's bedroom, while Witnesses 1 and 2 confirmed that Jane was happy and excited after kissing David and that she willingly went to his room. Worse, the investigator (and later the hearing panel) relied on Witnesses 1 and 2's facially implausible descriptions of Jane's physical and emotional condition immediately after leaving David's bedroom to corroborate Jane's claim of a violent sexual assault. The descriptions were implausible because, while both witnesses claimed that Jane was in a frightful condition after leaving David's bedroom—she was allegedly bruised, bleeding, hysterical, frantic and visibly traumatized—the record also revealed that Witnesses 1 and 2 decided to leave Jane in David's house shortly after observing her in this alleged condition. They left her because they wanted to go out for late night snacks at a popular sandwich shop. Witnesses 1 and 2 explained that Jane chose to stay behind (in David's house) because she wanted to dance. The investigator never questioned either witness as to why they made the inconceivable and

inhumane decision to ditch their injured and traumatized friend at a party in the house with her alleged assaulter, simply to get food.

11.     In fact, Jane did remain at the party for at least another half hour, dancing and socializing with numerous individuals all while supposedly having just minutes before been violently assaulted for over an hour. She almost certainly interacted with multiple people that could have disputed the descriptions provided by Witnesses 1 and 2. But because of the gag order Brown placed on David, he was unable to speak to any of the party guests to determine if they interacted with Jane and observed her condition.

12.     David later learned that Jane Roe was given an entirely different set of confidentiality instructions. The investigation report made clear that Jane Roe had openly discussed her case with others and had enlisted the help of several friends to help her gather evidence, including by obtaining written statements and by secretly recording David in multiple conversations. Far from reprimanding Jane for this conduct, the investigator rewarded it by incorporating the evidence into her report. When David questioned this double standard, Brown explained to David that it could not prevent Jane from "telling her story" even though David was explicitly told he could not tell his.

13.     Because of David's inability to speak even with students who were present on the night in question, he could not identify individuals with relevant knowledge for the investigator to interview. And because the investigator chose to interview only the 3 witnesses suggested by Jane (one of whom was also suggested by David), critical witnesses who observed Jane Roe before and after the alleged assault were not interviewed. Worse, the investigator identified and then ignored multiple witnesses in her report, including a teammate of David's, whom the investigator acknowledged was with Jane immediately after the alleged assault, yet she failed to interview him

or any others. The report also identified at least one (now graduated) senior who was a potential witness, and there were several more graduated seniors at the party as well. As a result, the investigator's purposeful decision not to interview relevant witnesses has caused damage that is now beyond repair.

14.     While the investigator's failure to interview relevant witnesses was inexcusable, her misrepresentation of the evidence she did obtain, particularly of David's own interview, was egregiously deceptive and malicious. Given the blatant demonstrations of bias David experienced in being suspended based solely on an allegation, Brown's refusal to afford him a fair process under its Title IX procedures, and the investigator's checkered past, David and his advisor were distrustful of the process and felt compelled to record his interview with the investigator to protect himself.[7] David's decision proved prescient, because the investigator wrote an investigation report (which served as virtually the entire evidentiary record for David's hearing) that was replete with mistakes, omissions, and demonstrably false statements attributing admissions to David that were carefully designed to ensure a hearing panel would find him responsible. These mistakes were not remotely random: every single misstatement of David's words and thoughts—and there were approximately 60—served to undermine David's statements and defense.

15.     Brown's policies require the investigator to produce an initial draft of the investigation report to the parties so that they may review and respond before it is finalized. Accordingly, David submitted a 49-page document to the investigator and to Brown's Title IX Coordinator (who is charged in Brown's policies with ensuring the investigation report's thoroughness and accuracy) in which he documented a litany of inaccuracies and outright lies in

---

[7] David made this recording at the direction and under the guidance of counsel and from a location where consent from the recorded party was not required by law.

the report—over sixty in total. All of David's requests for corrections to the report were rejected based on the Investigator's determination that his corrections were simply "preferences to verbiage" and "didn't constitute material substantive facts." To underscore the investigator's bias, while the investigator made none of the changes David suggested, she did make approximately 19 changes at the request of Jane Roe, all of which strengthened Jane's version of her story from the initial to the final report.

16.     Far from quibbling over "verbiage," however, David's written response documented blatant factual misrepresentations throughout the report. While the examples of the report's inaccuracy and titled presentation of the facts are legion, the worst example of its bias was the manipulative and dishonest way it recounted David's testimony to ensure he would be found responsible.

17.     Throughout the investigation, David had consistently described every aspect of his sexual interactions with Jane Roe as unambiguously consensual.[8] For example, in his written response to the complaint he provided:

> throughout our encounter, [Jane Roe] was literally shouting encouragement (I apologize for the nature of the words in this letter): "fuck me! "fuck me harder!" "oh fuck me you fuck!" […]
>
> But during all this activity she was saying things like "you fucking fuck, fuck me" again further urging me on.
>
> [Jane Roe was] exuberant in our activity to an extent I have never experienced – I vividly recall striving to keep up with her own intensity during our activity as she continued to encourage my physicality in the clearest terms possible.
>
> she indicated her pleasure in words and actions that were excessive… I cannot conceive of someone giving clearer indications of consent and pleasure than what occurred.

---

[8] As Mark Twain noted: "If you tell the truth, you don't have to remember anything."

And in his interview with the investigator, David reiterated over and over again that:

> [Jane Roe was] much more vocal; much more dirty talk on her end. I was-- honestly did not say a whole lot during this encounter. Her leg – her legs were wrapped around me; her arms were wrapped around me. […] she gave me the strongest reaction of the entire time. And she still said the same thing. It was still -- like, "fuck me, you fuck" is what she said, but it was the loudest, most evident, most clear, and I have that stapled in my mind. The reason -- and the reason it's so stapled is because I was shocked at how much she liked it.

> From the bottom of my heart, there is absolutely no way that she did not want to be there. There's -- the way she was looking at me, the way she was kissing at me – kissing me, the way she was engaging, the way she was touching me, wrapped around me, the way that she was moaning, it was just somebody who wanted to be there. I don't-- I don't know how else to just, like -- she just wanted to be there

> This is about everything that she was doing was -- from the first moment that I kissed her, when I asked her if I could kiss her downstairs until-- and when she took off her clothes, the whole process, it was all just a yes, yes, yes, yes, yes, yes, at every step. It was an enthusiastic -- everything she did was enthusiastic, and it was just a series of yes, yes, yes, demonstrations of I want to be there.

18.     Despite the clarity of David's written and oral statements, the investigator presented a report to the hearing panel falsely representing that David had made the following admissions during the investigation:

- "At no point did [David Smith] reflect [Jane Roe] spoke or otherwise motioned for a continued sexual encounter with him."

- "[David Smith] acknowledged…that he never checked during the first or second sexual encounter to determine if the continued sexual activity was mutually agreed upon."

- "[David Smith] claimed [Jane Roe] gazed up at him from a lying position more than once, as if she wanted to continue having sexual intercourse, but he didn't offer that she affirmatively provided indications through an outward demonstration of her wishes."

- "[David Smith] claimed [Jane Roe] wanted to have sexual intercourse with him, which was evidence by her looking at him, and actively participating in kissing."

- "According to [David Smith], [Jane Roe] stated twice, 'Fuck me, fuck', but otherwise didn't speak."

- "[David Smith]…only provided [Jane Roe[ shouted, 'Fuck me, Fuck' a couple of times and otherwise he affirmed [Jane Roe] never spoke audibly other than moaning."

19.      These alleged—and false—admissions by David were pivotal to Brown's ultimate decision to find him responsible. At Brown, and particularly under its Non-Title IX Policy, the investigator is responsible for assembling the entire evidentiary record for the hearing panel. The parties may not present evidence at the hearing, they may not call witnesses to testify, and they may not question each other or the investigator. The parties are not even permitted to suggest questions for the hearing panel to ask. Thus, nearly all the facts the hearing panel is likely to know are contained within the investigation report. To further signal to the panel the significant role of the investigator, she was called as the first and only non-party witness at the hearing. And, to secure the judgment she wanted, the investigator decided to replace David's overwhelmingly consistent and clear-headed account of what occurred with her own alternative version of David's account, one in which she changed virtually all of David's words so as to have him admit he never obtained Jane's affirmative consent for their sexual activity.

20.      During his review of the draft investigation report David also learned for the first time that Jane had submitted photographs of markings on her neck and cheeks that she claimed were bruises from being choked. As a result, David retained two forensic pathologists to independently review the photographs Jane submitted. Both medical experts independently concluded that the marks were hickeys and were inconsistent with choking or any type of trauma. David timely submitted both medical opinions in response to the draft report to refute Jane's claims of physical injuries. Rather than incorporating their findings into the report or interviewing the experts concerning their findings, the investigator and/or the Title IX Coordinator excluded this evidence from the case, without any explanation to David for why his evidence was rejected, and

without even advising the hearing panel that it had been submitted. The relevance of this evidence became even more pronounced at the hearing because the panel asked Jane if she believed the marks on her neck were from being choked by David. Jane stated that she did believe that was the case. David was not permitted to counter this claim with the medical expert testimony he had submitted and that was withheld from the record.

21.     The investigator also acted unethically in assisting Jane Roe cover up the fact that she had tampered with evidence during the investigation. Before David received notice of Jane Roe's complaint, Jane had enlisted a friend (referred to in the investigation report as "Undergraduate E") to covertly record her conversation with David in which they discussed David's sexual encounter with Jane Roe. Jane Roe then chopped up the recording of David's conversation with Undergraduate E and submitted only four short excerpts in four separate audio files, some of which were out of order. It was obvious from the four audio files that the recordings Jane submitted were incomplete and part of a longer conversation. However, the investigator never asked Jane to submit the full conversation. Rather, David had to submit a request to Brown's Title IX Coordinator to gain access to the full conversation. Ultimately, Jane was easily able to share the full file, belying Ms. Davis' initial claim that Jane claimed the full file was too large to submit. Upon review of the full recording, it was obvious why Jane had excised large portions of the conversation—because the full conversation supported David's defense.

22.     At that point, the investigator needed to do serious damage control to avoid any damage to Jane Roe's credibility; she also needed to hide her own role in the attempted cover up. First, the investigator stated in her report that she asked for the full recording, when in reality David had gone to the Title IX Coordinator to insist upon gaining access to it. Second, the investigator explained in the report that Jane had submitted the recording in four files because it

was too large to email in a single file. However, the investigator was aware this was not true, as the recording was only 6 minutes long and Jane was easily able to send the full file via email when the Title IX Coordinator requested it. Third, the investigator described the original four audio clips in the report as if they were the full recording, simply broken up into four parts, yet the clips totaled only one minute and 15 seconds vs. the full 6-minute-long recording. This was a deliberate attempt to discourage the panel from listening to the full recording. Finally, despite the lengths David went through to obtain the full recording, the investigation report selectively quotes only the passages in the recording that Jane Roe originally selected, purposefully excluding any exonerating statements David made in the newly-obtained, complete recording. Brown's Title IX Officer was fully aware all of this happened. She is charged in Brown's policies with ensuring the thoroughness and accuracy of the investigation report, but allowed the investigator to present her false narrative of the recording nonetheless.

23.     Brown allowed David's hearing to move ahead based on the false and incomplete record its investigator put forward. This made it impossible for David to defend himself. Under Brown's Non-Title IX Policy, the report serves as the entire evidentiary record. It determines the facts, and the Hearing Panel's job is simply to determine whether "the facts" as presented in the report constitute a policy violation. The Non-Title IX Policy instructs Hearing Panel members to *presume* "that the investigator has identified and interviewed all relevant witnesses and supplied the information necessary for the Hearing Panel to render its decision and determine sanctions." Brown sets aside only one hour for Non-Title IX hearings (and David's took far less than that), underscoring Brown's expectation that the hearing is not intended to be a robust or searching

proceeding.[9]  The parties are only allowed to present once for a maximum of seven minutes apiece. With a report falsely representing as a fact that David Smith admitted Jane Roe never demonstrated consent, his fate was sealed.

24.     David's "hearing" was little more than a formality—it was a thirty-seven-minute event in which David was asked only five questions by a panel whose knowledge of the case was exclusively limited to the investigator's report. Not surprisingly, one of the questions David was asked highlighted how badly the panel had been misled by the investigator: David was asked why he inferred consent from Jane given his acknowledgment of how little they communicated. David responded that the panel had been misinformed on that point and that he has always maintained that Jane verbally encouraged and directed him throughout their encounter. The panel did not ask a single follow-up question in response to David's statement. No witnesses were allowed, and the parties were not allowed to pose questions to one another. David used his seven-minutes of permitted speaking time attempting in vain to convince the panel that both Jane and the investigator had lied, that there was critical evidence they had not seen, that the multitude of inconsistent statements by Jane that he had exhaustively detailed for the investigator were left out of the report, and that his entire defense including his explanation for Jane's motivation to lie, had been excluded from the record before them.

25.     Jane similarly relied on the false statements attributed to David that are contained in the investigation report as part of her 7-minute statement, explaining to the panel that David had to be found responsible based on his own admissions, including that he inferred consent from a

_____

[9] In comparison, Brown's Title IX Policy allows the parties to question each other for 45 minutes, to question the investigator for 15 minutes, and to call and cross-examine witnesses for fifteen minutes per witness. In David's case, this would have allowed for at least 2.5 hours of questioning. During David's 37 minute hearing, only 17 minutes were devoted to questions posed by the panel.

"gaze."

26.     Not surprisingly, the hearing panel found against David and issued its written decision on August 4, 2022, which imposed a two-year suspension. The Hearing Panel's rationale for finding David responsible was limited to two short paragraphs describing why the panel believed Jane was more credible than David, and all of it was infected by the inaccurate and incomplete record the investigator assembled. As a result of the investigator's misrepresentations, the hearing panel that adjudicated David Smith's case was led to believe he essentially admitted the facts necessary to find him responsible—as far as the hearing panel was aware, *David Smith admitted* that: he relied on the fact that Jane Roe never said no to infer consent; Jane Roe was mostly silent during their sexual activity; and he primarily inferred consent from the way she looked at him. These purported admissions were outrageously false statements fabricated by the investigator and attributed directly to David.

27.     The hearing panel was also led by the investigator to believe that Jane provided one consistent account that was corroborated by her actions after the fact as well as the observations of her friends. The hearing panel members believed Jane was more credible because the investigator never forced them to confront the substantial evidence that would have called her allegations into question. The report never identified, much less analyzed the multitude of contradicting and irrational stories Jane and her friends told throughout the process. Instead, the investigator advised the panel through her report that David had identified some inconsistencies (without stating what they were) but that everything he identified was "perceived" and "minor" – in other words, the investigator explicitly told the hearing panel that Jane was credible and that they should ignore David's defense

28.     In fact, Jane did assert her story multiple times, and it changed meaningfully with

every telling. She first reported the alleged assault to the Providence Police. She then amended her story in an interview with a Providence Police detective three days later. And that same day she told a different story still when she submitted her formal written complaint to Brown. Her story continued to evolve when she was interviewed by the investigator (with different stories in the initial and the final report), and even then, her story did not match up with much of what her own two witnesses said about the evening. Finally, her story at the hearing presented yet another version of the events. None of this would have been apparent to the hearing panel because anyone reading the investigator's report would never know for example that:

- Jane initially claimed that when David asked her to kiss him during the party, she said no and he spit in her face. She later said that she agreed to kiss him because it would have been awkward to say no. Her friends reported that she was obviously happy and excited when she told them she had kissed David. Jane also claimed in one of her different versions of the night that David spat in her face during the party while they were engaged in conversation, but that she "didn't think anything of it."

- Jane initially claimed David dragged her from the party and up three flights of stairs to his bedroom, but later altered this allegation when it did not match up with her friends' accounts who reported that she went willingly to David's bedroom, and after David submitted a video of the party room and stairs depicting the impossibility of what she alleged.

- Jane initially claimed to the Providence Police that David forced her to perform oral sex on him. Three days later to the Police, she claimed David aggressively tried to get her to perform oral sex while blocking his bedroom door, after she was dressed and trying to "escape." Jane later told Brown *on the very same day* in her formal complaint that David

asked in pornographic terms for oral sex while they were both naked, having for some bizarre reason walked naked all the way across the room, and were "face-to-face" by the door." Jane stated that she refused, and then went back to the bed in the main part of the room, got dressed, and then used David's bathroom, which flies fully in the face of any notion of trying to "escape."   David vehemently objected to these allegations from the beginning and has consistently stated that there was no element of oral sex whatsoever.

- Jane initially told police that she went straight home after leaving David's bedroom and immediately showered. She later told Police that she left the party with Witnesses 1 and 2 to get food before going home and showered the next day. She then reported in her written complaint to Brown (on the same day she met with Police) that she left the party with Witnesses 1 and 2 and went straight home. She later conceded at her interview that Witnesses 1 and 2 left the party without her, and that she remained at the party for at least thirty more minutes to dance (after allegedly being violently assaulted for over an hour, and in a bruised, bleeding and traumatized condition), before walking in her allegedly torn and revealing costume with a different friend to meet up with Witnesses 1 and 2 at the sandwich shop.

- Jane's friends purportedly corroborated that she was injured and in a frantic state immediately after leaving David's bedroom, but were never questioned as to why they had been comfortable leaving her in that condition, in the home of her alleged attacker. And no witnesses were asked to corroborate Witnesses 1 and 2's descriptions of Jane.

- Jane told the investigator during her interview that she called a sexual assault hotline later the day of  the assault, but Jane had previously told the police she did not call any advocates until at least five days after the alleged assault. Jane told the hearing panel again that she

called Brown's sexual assault hotline the day after the alleged assault and referred to phone records that the investigator withheld from the investigation report. In contrast, those phone records confirmed that Jane did not call Brown's sexual assault hotline until 5 days after the alleged assault.

- In the days immediately after claiming to be sexually assaulted, Jane posted pictures of herself on multiple social media sites from all three nights of that weekend. In each case, Jane wore revealing costumes including her costume from the night she claimed to have been assaulted. She also was actively posting on her Tinder profile in the period following the alleged assault with a tagline of "flexible." The panel found Jane's behavior following the assault to be consistent with trauma, yet Jane was actively seeking matches on Tinder, a site designed specifically to facilitate one-time hook-ups among strangers.

29. The only written submission in which David was able to lay out all of Jane's inconsistent statements was in his response to the draft investigation report. That is because David only learned of what Jane and her two witnesses stated during their interviews upon reading the draft report. But the investigator refused to include his response to the draft report as an exhibit, despite David's request. As a result, there was no single document the hearing panel could review to synthesize Jane's multiple conflicting stories – something the investigator herself should have done.

30. The investigator also did not present another significant aspect of David's defense in her investigation report, and it concerned Jane Roe's motivation to have lied about their sexual experience. Unbeknownst to David, Jane Roe had an ongoing sexual relationship with his good friend and teammate. According to Jane, Jane Roe's friends had warned her before and/or during the party not to hook up with David because of the conflict it would create. They were right. The

next morning David's friend learned that David and Jane had hooked up, became enraged and angrily texted Jane Roe demanding an explanation. Several hours after receiving that text, after she got together with Witnesses 1 and 2, Jane responded with her excuse – "I didn't fucking want it."   While these facts theoretically could be gleaned from information scattered throughout the report and its exhibits, the investigator did not summarize them in such a way that the panel was likely aware that David had overtly accused Jane of inventing her story of sexual assault to avoid accountability for her decisions and that substantial evidence supported this defense. Jane has since clearly acknowledged that her initial claim of force used by David downstairs was a lie, yet the investigator did not point out to the panel that Jane falsely accused David of use of force even before they arrived in his room. Jane clearly tried to fabricate use of force even downstairs because her statement to David's friend—that "she didn't fucking want it"—does not work if Jane went upstairs with David eagerly and voluntarily.

31.     David submitted an appeal on August 11, 2022 in which he attempted to explain all the ways in which the investigation and hearing process failed him, and all hidden evidence which would have led the hearing panel to find him not responsible. His appeal, like all his objections throughout Brown's Kafkaesque proceeding, fell on deaf ears and Brown's appeal panel attempted to reshape the record evidence to make David look culpable and to justify the finding against him. Despite its obligation to decide appeals within five days, Brown waited a month to issue its decision. Brown denied his appeal on September 7, 2022 — the day David returned to class for the fall semester and one day after he paid his substantial tuition deposit, which (of course) is non-refundable under Brown's policies. David received the decision after attending two classes and as he was on his way to a third.

32.     The First Circuit Court of Appeals recently noted in another sexual misconduct case

brought by a male student against Brown University that "a student stands in a particularly vulnerable relationship vis-à-vis [the] University" and that a university can "fairly be expected" to act "maturely and even with some tenderness and solicitude – toward" its students.[10]  Despite this obligation, the court noted that "Brown persecuted [the male respondent] with unreasonable zeal and on occasion, with no fair process."  As David learned in the underlying disciplinary process, this is Brown's modus operandi: convict first, ask questions never.

33.     David's suspension is now in effect, and he is no longer permitted to attend classes, participate in his varsity sports team, participate in his club, serve as a teacher's assistant, or set foot on Brown's campus. He brings this complaint against Brown and its outside investigator seeking redress from the courts for the outrageous and unjust conduct of the defendants.

## II.   PARTIES AND RELEVANT PERSONS

34.     Plaintiff David Smith ("David Smith") is a natural person who is domiciled in and a citizen of a State that is not Rhode Island. He is a Brown student, a member of a Brown varsity sports team, and the accused respondent in the underlying sexual misconduct proceeding.

35.     Defendant Brown University ("Brown") is a non-profit corporation organized under the laws of the State of Rhode Island operating as a private university in Providence, Rhode Island.

36.     Davis Consulting Group, LLC is a Texas Limited Liability Company formed in September 2021 and retained by Brown University to investigate the complaint against David.

37.     Upon information and belief Donna Davis is an individual who resides in Texas and who acted as the investigator in the underlying disciplinary proceeding.

---

[10] Doe vs. Brown Univ., No. 20-2023, 2022 WL 3095288 (1st Cir. Aug 4, 2022)

38.     Jane Roe is a non-party to this action. She is David Smith's accuser and the complainant in the underlying administrative sexual misconduct proceeding.

## III.    JURISDICTION AND VENUE

39.     This Court has original jurisdiction over Count II, David Smith's Title IX claim, pursuant to 28 U.S.C. § 1331 because the claim arises under the laws of the United States. This Court has supplemental jurisdiction over Counts I, III – VII pursuant to 28 U.S.C. § 1367 because those claims are so related to David's Title IX claims that they form part of the same case or controversy under Article III of the United States Constitution.

40.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1331, as all parties are residents/domiciled in different states and the amount in controversy exceeds $75,000.

41.     This Court has personal jurisdiction over Brown on the grounds that it is a citizen of Rhode Island and conducts business within the District of Rhode Island.

42.     This Court has personal jurisdiction over Davis Consulting Group, LLC and Donna Davis (collectively referred to as "Davis") on the grounds that both conduct business within the District of Rhode Island and engaged in conduct within Rhode Island that gave rise to this lawsuit.

43.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## IV.    FACTUAL BACKGROUND

44.     In the winter of 2018, Brown offered David Smith admission into the Class of 2023 based on, among other things, his outstanding academic record and athletic talents. David Smith accepted Brown's offer, paid tuition, and enrolled in Brown in the fall of 2019 with the overarching goal of obtaining a world-class education to prepare him for a meaningful career, in addition to

further developing his athletic talents, elevating Brown's varsity sports team, and making connections with professors, mentors, and peers who would form his lifelong network.

45.     David Smith's first two years at Brown, prior to this incident, were enriching and productive for both David Smith and Brown. Over his three years at Brown, he has earned an overall 3.9 GPA while becoming a respected member of Brown's academic and social community. He became an extraordinarily accomplished member of a Brown varsity sports team. He also serves in a leadership position for a university club and has been a teacher's assistant multiple times.

A.      **The Evening of October 29–30, 2021**

46.     On the evening of October 29, 2021, David Smith and his housemates held a Halloween party at their shared residence very close to the perimeter of Brown's campus.

47.     Jane Roe attended that party with several friends.

48.     David Smith and Jane Roe had not previously met.

49.     Both David Smith and Jane Roe consumed some alcohol before the party began, but neither were overly intoxicated. Jane Roe admitted she had only two drinks before the party, and one drink during the party.

50.     David Smith was not intoxicated or "drunk" at any point in the evening. In fact, within one hour of the time that Jane Roe alleged that she was assaulted on October 30, 2021 (12:30 a.m.), officers from Brown's Department of Public Safety (hereinafter "Brown University Police") showed up to David Smith's residence to respond to a noise complaint from neighbors. As the person who arranged for security (bouncers) that night, David Smith met with the officers and addressed their concerns about the noise, and the reporting officer specifically noted that David

Smith was "extremely cooperative and understanding of the complaint." The officer's report made no suggestion that David Smith was intoxicated.

51.     Jane Roe did not appear to David Smith to be intoxicated or "drunk" to the point of being even marginally incapacitated or unable to make informed, rational judgments at any point in the evening, and Jane Roe confirmed in her Formal Complaint that she was only "tipsy" and was "aware of [her] surroundings."  During her interview with the investigator, Jane stated that before she arrived at the party she drank one hard seltzer, half a mixed drink and half a shot of tequila. The investigator did not ask Jane any questions about whether she drank at the Halloween party, nor did she question any of Jane's friends or other party guests concerning Jane's level of intoxication. Jane later admitted at the hearing that she only had half a mixed drink at the party, which she estimated to be the equivalent of roughly one shot of alcohol.

52.     At the party, David Smith and Jane Roe met for the first time and struck up conversation.

53.     David Smith asked Jane Roe if she wanted to kiss him, and she said yes. David Smith and Jane Roe kissed in the crowded party.

54.     Unbeknownst to David, Jane Roe was romantically involved with one of his good friends and teammates, referred to here as "James Doe."  Jane Roe's friends saw Jane and David kissing and had a side conversation with Jane during the party to warn her not to hook up with David because of the conflict it might create with James Doe. Jane ignored her friends' advice and continued to make out with David while downstairs at the party. Jane's friends noted that she appeared to be excited about hooking up with David.

55.     As the party progressed, David Smith and Jane Roe decided to leave the party and to go upstairs to David Smith's bedroom. Jane Roe followed David Smith up multiple flights of winding stairs, in the middle of the house, to his third-floor bedroom.

56.     In David Smith's bedroom, David Smith and Jane Roe began kissing and touching each other.

57.     David Smith and Jane Roe had consensual sexual intercourse three times over the course of approximately an hour during the evening of October 29–30, 2021. The lights remained on in the bedroom during the entire encounter, and the two could clearly see each other the entire time. Jane Roe was an extremely active, enthusiastic, and exuberant participant in each sexual act that she engaged in with David Smith. She actively encouraged David Smith to have sex with her by, for example, challenging him with active and intense "dirty talk" such as, "fuck me," "fuck me harder," and "fuck me you fucking fuck." David Smith attempted to match Jane Roe's level of intensity during sexual intercourse. Jane Roe gave clear and unmistakable verbal and physical signs of encouragement for each sexual act that she engaged in with David Smith.

58.     When David Smith and Jane Roe had sexual intercourse the first time, the condom that David Smith was wearing broke. David Smith panicked at the broken condom and immediately told Jane Roe that he was concerned about pregnancy. Jane Roe responded by assuring David Smith that there was nothing to worry about because she had an intrauterine device ("IUD") to prevent pregnancy and she encouraged him to "keep going." David Smith then asked her if she had any venereal diseases that he should be concerned about, and Jane Roe assured him that she was disease free.

59.     After finishing the first round of intercourse, David Smith walked to the bathroom located by the door in his bedroom, disposed of the broken condom, and relieved himself. When

he returned, Jane Roe was still lying naked in his bed waiting for his return. The two resumed kissing and touching, and eventually had sexual intercourse a second time. Jane Roe was even more enthusiastic and continued to encourage David Smith in the clearest of terms—repeatedly shouting at David to "fuck me!" and "fuck me harder!"

60.     After some time passed, David Smith and Jane Roe had sexual intercourse a third time during the evening of October 29–30, 2021. Jane shared in written submissions and later confirmed with the investigator that she had a specific recollection that David used a condom each of the three times they had sex. David does not recall whether he used protection during the second and third times, but has no reason to dispute Jane's recollection of this fact since it was his normal practice to use protection.

61.     During the third instance of intercourse, Jane Roe suggested that they go downstairs to return to the party. This was the first verbal or nonverbal signal that Jane Roe no longer wanted to continue their sexual activity. David immediately ceased having intercourse with Jane the moment she made this request. In a moment of panic, using a poor choice of words, he asked Jane whether she was ok in that moment given her sudden shift in demeanor. Jane responded that there was no problem with their prior activity, dressed, and went to the bathroom that was inside his room for about ten minutes. Jane repeated her request that they return to the party together. David Smith was exhausted from the sexual activities that had occurred up to that point, and he declined Jane Roe's request to return to the party together and instead stayed behind in his room while Jane went downstairs to the party. When Jane Roe left the bedroom, David Smith did not believe, and had absolutely no reason to believe, that Jane Roe was anything other than a willing, desirous participant. After some time, David did return to the party where he saw Jane standing with a group of friends, however, he did not interact with her.

B.   <u>Post-incident conduct</u>

62.   On October 30, 2021, at 9:16 a.m. the morning after the party, David Smith called his friend and teammate, James Doe. David Smith had come to realize that Jane Roe was among the many individuals whom James Doe had invited to the party and that James may have had some interest in Jane. But David had no idea there was any prior relationship between Jane and James. David Smith told James Doe that he (Smith) had been together with Jane Roe and asked him (James Doe) for her phone number. David's intention was to reach out to Jane because he felt awkward about the way he neglected her feelings after they had sex. David Smith did not provide James Doe with any details regarding his (Smith's) and Jane Roe's sexual activities, beyond merely stating that they had been together.

63.   James Doe became very angry upon learning that David Smith and Jane Roe had been together and refused to provide Jane's number. James Doe abruptly ended the call after approximately two minutes. At 9:22 a.m., David Smith attempted to call James Doe back, but James Doe would not answer his calls and refused to speak with him for the next week.

64.   Immediately after speaking to David Smith, on October 30, 2021, at 9:22 a.m., James Doe texted Jane Roe: "Why did you get with my teammate?" Jane Roe responded several hours later, at 12:25 p.m.: "you don't know anything," "i didn't fucking want it."

65.   In her Formal Complaint, Jane Roe claimed that this October 30, 2021 text exchange with James Doe "put [her] under the impression that [David Smith] purposefully sought [her] out to have sex with [David Smith] because [David Smith] knew about [her] history with [James Doe]." She claimed that, "[e]ven if that wasn't true, [David Smith] clearly bragged about having sex with me to [James Doe]."

66.     Upon belief, James Doe's angry text message caused Jane Roe to become embarrassed, as she believed that David Smith told James Doe intimate details regarding her and David Smith's very vigorous sexual activities.

67.     Upon belief, Jane Roe was already upset with David Smith for his behavior in ignoring her requests to continue hanging out after they had sex, and was further embarrassed that she had been caught by James Doe and that it had caused the exact conflict her friends had warned of during the party. Upon belief, Jane Roe concocted her incredible and false account of sexual assault to deflect responsibility for her own decisions, and to punish David Smith for slighting her.

**C.      Jane Roe's Social Media Activity Demonstrates She Was Actively Engaged Socially and Attending Parties for the Following Two Nights after the Alleged Assault**

68.     Jane Roe's conduct after her sexual acts with David Smith on October 29–30, 2021, belies her accusations.

69.     In the hours and days that immediately followed the alleged assault, Jane Roe posted on social media sites photographs from the evening of the incident in the very costume she was wearing during the alleged assault, as well as from other Halloween parties that she attended in revealing costumes the following two nights.

70.     On October 30, 2021, approximately one hour after her text exchange with James Doe, in which she said "I didn't fucking want it," and approximately twelve hours after she claims that she was violently sexually assaulted, Jane Roe posted a picture of herself in the very distinctive and revealing costume that she wore to the party at David Smith's residence. The picture is from earlier in the same night of the alleged incident and was posted with a witty and suggestive caption.

71.     On October 31, November 1 and November 3, 2021, Jane Roe posted more pictures of herself in costumes showing that she attended a second and third Halloween party on separate nights over the course of that same weekend after she alleges being violently sexually assaulted.

**D.      Jane Roe files Multiple Inconsistent Complaints and Enlists Friends to Assist her in Secretly Recording David Smith in an Attempt to Obtain an Admission of Wrongdoing**

72.     On November 9, 2021, Jane Roe went to the Providence Police station at 325 Washington Street to report her alleged sexual assault. There she met with a detective who memorialized Jane Roe's complaint in a "field case report." She reported that she attended a party at David Smith's house and that David Smith "began talking to her, he then asked to kiss her and when she refused he spit in her face."  The field case summary goes on to describe that David "grabbed her hand and led her upstairs and then pushed her down on the bed" where he proceeded to penetrate her while telling her to "shut up while calling her a slut."  She also reported that David Smith "forced her to perform oral sex on him." Finally, she reported that "she text[ed] her friends and they left the party where she went home and took a shower."

73.     On November 12, 2021, two weeks after the incident, Jane Roe was interviewed again by a detective where she supplied a "formal statement" of the incident. Her description of the incident changed in several significant respects. For example, she admitted that she agreed to kiss David Smith during the party, and she admitted to speaking with her friends during the party after kissing David Smith and that her best friends expressed concern that she would create conflict between David Smith and James Doe. She further altered her allegations of forced oral sex and explained that David Smith had only attempted to force her, but that she was able to escape from his bedroom. Finally, rather than leaving immediately with her friends to return home and shower, Jane Roe told the police detective that she left the party with her friends and stopped to eat at East Side Pockets (a popular and typically crowded late night sandwich shop near campus). She explained to police that she woke up the next morning, showered and washed her costume. She further explained to the police that she spoke with sexual assault advocates more than five days after the alleged incident (though she would later tell Brown's investigator that she called and

spoke to a sexual assault advocate the morning after the alleged assault, who instructed her to shower). Police records reflect that the case was closed due to lack of cooperation from Jane Roe.

74.     That same day, November 12, 2021, Jane Roe also filed a formal complaint with Brown. She again alleged a violent sexual assault that left her with bruises, bright red marks, torn and bleeding ear lobes, and with chunks of her hair torn out. While consistent in her description of a violent, nonconsensual encounter, her complaint to Brown differed from the prior two police reports in significant ways, thus creating her third story in as many days. For example, Jane Roe altered her descriptions of what she and David Smith discussed about James Doe, how she and David Smith went upstairs together, and what preferences she provided to David about kissing and hickeys once in his bedroom. She also altered her description of when and where David supposedly attempted to force her to perform oral sex. Finally, she omitted any reference to stopping to get food on her way home, likely recognizing how implausible it would seem to go get food immediately after purportedly experiencing a violent sexual assault for over an hour that supposedly left her traumatized, bruised and bloodied. She also claimed to have left the party with her friends, presumably not wanting to acknowledge that her friends left her at the party to get food.

75.     Later that same day (Friday, November 12) after submitting her formal complaint to Brown and after meeting with the Providence Police, Jane claimed that her friends advised her they were attending another social gathering at David Smith's house and (inexplicably) encouraged her to attend. While she would later claim to Brown that she attended merely seeking an apology from David, she in fact attended with the intent of obtaining incriminating evidence against David by secretly recording their conversations. Upon information and belief, Brown likely

advised Jane against coming into contact with David after filing the complaint as a No Contact Order typically goes into effect immediately.

76.     Once Jane arrived at the party, she saw David and said "get the fuck away from me." She then spoke with James Doe and began to accuse David of forcing her to have sex. David told his friends not to talk to her because she was lying about everything. However, despite telling David to get away from her mere moments earlier, she effectively demanded that David speak with her; for a prolonged period David stood in silence, but Jane was insistent -- as it later turned out she was recording the conversation. While Jane Roe did not obtain any admissions from David, he did apologize to Jane if she was upset and told her that he wished she had said something to him if anything they did together made her uncomfortable. Jane responded that "she didn't know how to say no."  This came as a surprise to David given her exuberant vocal and physical participation in their sexual activity. He was immediately aware that Jane Roe was being dishonest and now understands she was attempting to lure him into saying something incriminating on tape, which did not happen as he had not done anything wrong.

77.     Jane Roe spent several hours at David Smith's house, during which time she boldly taunted David and told his friends of her intent to file a complaint and get David kicked out of Brown. She also spent a significant amount of time speaking with James Doe, likely attempting to smooth things over and convince him that she did not choose to sleep with David.

78.     On Saturday, November 13, 2021, David Smith and Jane Roe encountered each other and spoke briefly at a Brown library. David was not yet aware that Jane Roe had filed a complaint against him with Brown or the police. After refusing to speak with David, Jane Roe enlisted the help of a female friend, Undergraduate E, who was with her at the library to again try to record a conversation with David. Jane's friend, Undergraduate E, and David Smith spoke

outside and she secretly recorded their conversation. Despite not knowing about Jane's complaints or that he was being recorded, everything David said during the recorded conversation was consistent with his later statements to Brown and the investigator. As explained in more detail below, Jane Roe would later produce only 4 spliced portions (1 minute 15 seconds) of this (6 minute 10 second) recording in the investigation—only the few moments she believed would help her, once taken out of context, and reflect poorly on David Smith.

79.     On Sunday, November 14, 2021, Jane Roe texted David Smith, and she asked him to meet with her in person. David Smith, still unaware that she had filed a complaint against him, agreed but only if they met in a public place—the college green—given her threats from the preceding Friday night at his house. Jane Roe again recorded their conversation, still intent on obtaining incriminating statements from David, which she did not. During the recorded conversation, David apologized to Jane for ignoring her downstairs at the party after they had sex, believing that this was the likely cause of her anger. Jane responded by lying and stating that she left the party "immediately" after she left his room and questioned his apology—attempting to get him to say something more about their consensual sex. As her friends would later report in the investigation, she in fact did remain at the Halloween party for some 30 minutes after leaving David Smith's bedroom, despite her multiple claims to the Police and to Brown that she left immediately with her friends.

80.     David Smith and Jane Roe had no further interactions after this meeting.

E.    **Brown's Notice of Complaint**

81.    On November 16, 2021, David Smith received a Private Message from Brown's Interim Title IX Program Officer, titled "Notice of formal complaint submitted to the Title IX and Gender Equity Office" (hereafter, "Notice of Complaint").

82.    The Notice of Complaint stated that Brown received a "Formal Complaint" from Jane Roe alleging that David Smith engaged in "Prohibited Conduct" in violation of the Non-Title IX Policy. The Notice attached a copy of Jane Roe's Formal Complaint and stated that the matter would be resolved through processes described in Brown's "Sexual and Gender-Based Misconduct Complaint Procedure" (hereafter, the "Non-Title IX Procedure"). Brown's Sexual and Gender Based Misconduct Policy and Complaint Procedure are attached hereto as **Exhibits A and B**.

83.    Shortly after receiving this notice, Brown advised David on the complaint procedures and the investigation process. David Smith was instructed that the disciplinary proceeding was confidential and that he was not permitted to speak with other students about the complaint or the investigation.

84.    David Smith filed his timely Response to the Complaint on November 23, 2021.

85.    The Response included five pages of David Smith's detailed and factually-accurate account of his interactions with Jane Roe on the evening of October 29–30, 2021. The Response noted Jane Roe's actions and strong erotic language that demonstrated her unequivocal desire to participate in all aspects of their sexual activity of that evening. The Response also noted that Jane Roe's Formal Complaint contained several implausible allegations, such as the fact that she claimed that he "spat in [her] face" in a crowded party surrounded by friends, that she claimed that she "didn't think anything of [that]," and that she claimed that she continued to talk with him, continued to kiss him and was somehow "pulled" up two flights of winding stairs to his third-floor bedroom after kissing him. He also pointed out how unlikely it was that after all this alleged

aggressive behavior, Jane admitted in her complaint that she voluntarily removed her own clothes. He also noted that Jane had reassured him during sex that they were safe to continue sexual intercourse after his condom broke because she had an IUD (a fact Jane never disputed).

86.     The Response also attached six pages of demonstrative evidence, including photographs of Jane Roe taken the evenings of October 29, 30, 31, 2021. The photographs show Jane Roe leading an active and healthy social life without any of the signs of physical injury or emotional trauma that she alleged and described in the Formal Complaint.

### F.     Brown Immediately Suspends David and Bans him from Campus after Receiving Jane Roe's Complaint

87.     Brown informed David Smith of Jane's complaint on November 16, 2021. On November 18, 2021, before David's deadline to respond to the complaint, Brown summarily banned him from campus and suspended him until the allegations against him were resolved, without any indication as to when that may be. Brown's actions immediately barred him from participating in any Brown activities or classes, including taking his end-of-semester exams that were quickly approaching. All this occurred despite Brown's written policy, which promises accused students a presumption of innocence throughout the investigation of a complaint.

88.     Only after David Smith filed multiple petitions for limited relief from these conditions did Brown allow him to complete the fall semester remotely and to take one exam on campus before resuming his interim suspension.

89.     After David filed his response to the Complaint on November 23, 2021, and submitted photos of Jane Roe showing she was without any of the injuries she alleged, David asked Brown to reconsider its interim suspension and filed a formal appeal of that decision. All his requests and his appeal were denied without explanation. David obtained records of the process Brown used to determine his interim suspension and appeal through a request under the Family

Educational Rights and Privacy Act (FERPA) and confirmed that Brown's decision to suspend him was based exclusively on Jane Roe's formal written complaint. Brown had no other evidence to corroborate Jane's written allegations.

90.     David Smith's interim suspension resumed in full force on January 7, 2022, despite its clear obligation under its own policies to afford David Smith with a presumption that he is not responsible throughout the disciplinary process. This resulted in a complete ban from campus for any purpose including taking classes or participating in his varsity sport.

91.     David filed a lawsuit against Brown on January 14, 2022, in Federal District Court for the District of Rhode Island challenging its interim suspension, in the matter captioned *David Smith v. Brown University*, Civ No. 1:22-cv-24-JJM-PAS. Brown was faced with a similar lawsuit, filed one month before in this Court, where Brown again suspended a male student accused of sexual assault based solely on a female student's complaint.[11]  This Court granted a preliminary injunction in favor of the plaintiff and ordered Brown to lift the suspension and to allow the student to resume his studies as a student in good standing pending the outcome of his disciplinary matter.

92.     David withdrew his lawsuit, without prejudice, after reaching an agreement with Brown that allowed him to remain on campus and continue his studies pending the outcome of the formal disciplinary process.

93.     David Smith returned to campus for the Spring Semester and Brown began the formal investigation phase to resolve Jane Roe's Formal Complaint. David and Jane have had no further direct contact since his return to campus. However, the damage was done as David's suspension and disciplinary case became widely known on campus and within the Ivy League athletic conference, and his reputation became permanently marred.

---

[11] *David Stiles v. Brown University*, Civil No. 1:21-cv-00497-MSM-LDA

G.     **Brown's Erroneous Policy Application**

94.     At the inception of the disciplinary process, Brown made clear that it intended to adjudicate the Formal Complaint against David Smith under Brown's *Non*-Title IX Policy. These policies and procedures do not comply with the requirements and strictures of Title IX of the Education Amendments of 1972 and its implementing regulations. For instance, the Non-Title IX Policy and Non-Title IX Procedure do not afford the accused with any right of cross-examination or confrontation of witnesses, including the accuser.

95.     Brown maintains *separate* policies and procedures that *do comply* with Title IX of the Education Amendments of 1972: a "Gender-based Harassment, Sexual Assault, Intimate Partner Violence, and Stalking Policy" (hereafter, the "Title IX Policy") and a "Title IX Grievance Procedure" (hereafter, the "Title IX Procedure"). The Title IX Policy and Procedure are attached hereto as **Exhibits C and D**. These procedures comply with Title IX by, for example, providing for "cross-examination" during which the complainant and respondent may pose questions, through an advisor, "to the other party, investigator, and witnesses to elicit relevant factual information missing from the final investigation report." Title IX Procedure § 2.9.4.4.

96.     Brown refused to apply the Title IX Policy, even though that policy, by its clear and express terms, applied to the Formal Complaint.

97.     Brown's Title IX Policy "applies broadly to the entire Brown University . . . community" any time that "Prohibited Conduct" (including sexual assault) occurs off-campus "in the context of a program, activity, **or location in which Brown exercises substantial control over both the Respondent and the context in which the alleged Prohibited Conduct occurred**." Title IX Policy § 2.0 (emphasis added).

98.     The Title IX Policy applies to the alleged incident at David Smith's residence on October 29–30, 2021, because Brown "exercises substantial control" over both David Smith and

the use of his home for parties and other social gatherings, *i.e.*, the location and the context in which the alleged incident occurred. David Smith is a Brown student, subject to all applicable student handbooks, policies, and procedures of Brown, and he is subject to discipline by Brown. Moreover, the October 29–30, 2021 party was held at a residence that sits on the perimeter of Brown's campus (it is actually surrounded by Brown-owned buildings) and is inhabited exclusively by Brown students, and is within the jurisdiction of the Brown University Police. Brown University Police Officers are "qualified employees" of Brown whose employment Brown has discretion to terminate. 12 R.I. Gen. Laws Ann. § 12-2.1-1.

99.     Indeed, on the night in question, officers from the Brown University Police were dispatched to the party at the residence to investigate a noise complaint from neighbors. Brown University Police Officers arrived within one hour of the time that Jane Roe alleged that she was assaulted (12:30 a.m.), and the officers directed the residents of the house, including David Smith, to either quiet down the event or to break up the party and send their guests home.

100.     Later, Brown decided to discipline most of the residents of David's house for holding the Halloween party—the same party where Jane Roe alleges David sexually assaulted her. Specifically, on December 1, 2021, following individual hearings with a Dean at Brown, David Smith and most of the other residents were found responsible by Brown for "Disruption of the Community" in connection with the noise complaint on October 30, 2021.

101.     Brown exercises jurisdiction through its Code of Student Conduct beyond the boundaries of its campus and into the residences of students in the neighborhood surrounding Campus. Brown reserves the right to discipline students for "Disruption of the Community," which is defined as "[a]ctions that are unreasonably disruptive to the University community and/or its

neighborhoods" and include "disturbances in residential and commercial areas surrounding campus and off-campus programs."

102.    The residents were sanctioned by Brown under this Code of Student Conduct provision, placed on probation, required to write individual letters of apology, and to engage in certain educational activities. On additional occasions, such as Parents' Weekend, Brown also disciplined David Smith and his housemates for having messy trash and excessive noise and disruption at their residence.

103.    The fact that Brown has the authority to send university-employed police officers to David Smith's residence (which residence is surrounded by Brown-owned buildings) to investigate David Smith's and his housemates' conduct during the party at issue in the alleged assault, ask David to remove guests from his home, and then for Brown to discipline David Smith and his co-residents for a noise and trash infractions associated with the same party, demonstrates that the alleged incident occurred at a "location in which Brown exercises substantial control over" David Smith and the context in which the alleged incident occurred.

104.    On December 8, 2021, David Smith emailed Interim Title IX Program Officer Horton challenging Brown's refusal to apply the Title IX Policy to the Formal Complaint.

105.    On December 14, 2021, Interim Title IX Program Officer Horton responded that Brown would not apply its Title IX Policy to the Formal Complaint. She concluded simply that Brown did not exercise substantial control "over the private off-campus residence" or the Halloween party that occurred there, because the residence "is not owned, managed, or leased by the University" and the party "was not sponsored by the University." In other words, despite the clear language of the policy, Brown focused solely on the ownership of the property in deciding whether to apply its Title IX Policy and completely ignored the fact that it controls the students'

conduct within the house through its own private police force, community standards, and its actions in disciplining students for their use/misuse of the property.

106.    Brown unilaterally decided to maintain two sets of sexual misconduct policies and procedures (Title IX and Non-Title IX) in order to minimize protections for students, like David Smith, who are accused of sexual misconduct.

107.    Brown's decision to apply the wrong policy did not just remove critical rights from David and hamper his ability to defend himself at a hearing, but it also amplified the importance of conducting a fair and impartial investigation. That is because under Brown's Non-Title IX policy, there is no "hearing" in the traditional sense. The entire evidentiary record is established by the investigator, who is permitted to make factual and credibility determinations.

108.    The hearing is simply a process by which three hearing officers meet to deliberate on "the facts" the investigator has already determined and to determine whether those facts establish a policy violation. Unlike Brown's Title IX Policy, the Non-Title IX Policy specifically instructs the Hearing Panel that there is a "*presumption* . . . that the investigator has identified and interviewed all relevant witnesses and supplied the information necessary for the Hearing Panel to render its decision and determine sanctions." Non-Title IX Procedure § 2.9.4. There is no witness testimony at the "hearing" and the parties are not permitted to even suggest questions for the panel members to ask the opposing party or investigator.

109.    Brown only allots one hour for Non-Title IX "hearings" and David's lasted only 37 minutes – with only 17 minutes devoted to questions from the panel. In comparison, the Title IX hearing process contemplates that the parties may question one another for 45 minutes each, they may question witnesses for 15 minutes each, and they may also directly question the investigator

for an additional 15 minutes each. Title IX Procedure § 2.9.4.4. Had Brown followed it's Title IX Procedures, David's hearing would have extended well beyond 2.5 hours.

110.    As set forth below, the outside investigator retained by Brown conducted a shoddy, biased and blatantly dishonest investigation that purposefully reported demonstrably false facts to the hearing panel and that refused to present—even generally—David Smith's defense to the allegations against him.

**H.    Brown's Investigator Conducts a Dishonest and Fundamentally Flawed Investigation**

111.    Brown reached out over 1,000 miles to retain the services of Donna Davis and her Texas-based firm, Davis Consulting Group, LLC, to conduct the investigation.

112.    Ms. Davis formed her Texas-based consulting group in September of 2021, just a few months before she was retained by Brown in December of 2021, and upon information and belief she has limited experience investigating campus sexual misconduct cases.

113.    Before forming the Davis Consulting Group, Ms. Davis used the name Donna Davis-Reddix. Under that name, she was identified in a Title IX lawsuit brought against Case Western Reserve University in which she was accused of fabricating testimony of the accused male student in eerily similar ways to what David experienced here.  The lawsuit also alleged that Ms. Davis destroyed recordings that would have accurately reflected the student's testimony, and did so after the student's attorney challenged the accuracy of her report.   Nimer v. Case Western Reserve Univ., Civ. No. 1:18-cv-02269-PAB (N. D. Ohio), Doc. 1.

114.    Ms. Davis was also the subject of an article published on Medium.com that was extremely critical of her handling of a Title VII investigation at the University of Texas at Austin where she served as an investigator. The article highlighted gross inaccuracies in her investigation report which she refused to correct. *See*

https://medium.com/@elizabethgutierrezmata/why-i-reported-my-professor-and-how-my-university-failed-me-4085a4ca2091

115.    Ms. Davis has regularly spoken at events held by a women's rights organization on topics such as "challenges in the equal promotion of women", "microaggressions", "salary equity" and "implicit bias."

116.    Ms. Davis scheduled a virtual interview with David Smith for December 23, 2021. David Smith and his advisor appeared virtually from his advisor's office Washington D.C. Fortuitously, on the advice of his advisor, David Smith audio recorded the entire interview to protect himself in the event the investigator was biased or incompetent in how she summarized the information he provided.[12]   His intuition proved correct. Donna Davis reported almost nothing he said during the interview accurately, and she completely disregarded all the written statements he provided before and after his interview when she composed her investigation report.

117.    Before the interview began, David Smith's advisor asked whether Ms. Davis had read David's answer to the formal complaint, which provided a detailed description of the sexual intercourse that David Smith and Jane Roe engaged in. The advisor asked for confirmation of this fact to determine how much detail David Smith needed to provide given the sensitivity of the topic and the discomfort David experienced when discussing the intimate details of his sexual interaction with Jane Roe.

118.    Ms. Davis confirmed that the interview was a supplement to his written submissions and that he would not have to re-state his written statements.: "Absolutely, yes. I've gone through all of the information, and I appreciate that. And so this is almost supplementary to whatever I've

---

[12] Both Rhode Island and Washington D.C. are jurisdictions that require the consent of only one participant in order to record a communication.

already read." She then repeated several times that she wanted David Smith to provide a "summary" of what happened to begin the interview.

119.    Based on Donna Davis' representation that she was already familiar with the details of his response to the complaint, David Smith provided a summary of his interactions with Jane Roe on October 29-30 and the events that followed over the next two weeks. He first acknowledged to the investigator that the subject matter was difficult for him to discuss. He spoke for approximately 20 minutes.

120.    He explained that he did not and never would sexually assault Jane Roe. After explaining their initial interactions downstairs during the party, he described how events unfolded in his bedroom and the clear indications of consent that Jane Roe provided to him throughout their interactions. He described the three times they had sex. He explained that they began kissing and that Jane Roe removed her own clothes and that she was moaning as they kissed for a long period of time. He explained his embarrassment as he fumbled to put a condom on before they began having sex. He explained that as they began to have sex the first time he recalled "distinctly more moaning and kissing" and that Jane Roe began to use "dirty talk" like "fuck me" and "fuck me you fuck." He explained that she repeated those words frequently and throughout the time they had sex, that her arms and legs were wrapped around him and that "if someone had been in the room with me, there would have been no doubt that she wanted to be there, that we were there together, that it was a mutual engagement."

121.    When describing the second time he and Jane Roe had sex, he stated that Jane was "much more vocal; much more dirty talk on her end. I was-- honestly did not say a whole lot during this encounter. Her leg – her legs were wrapped around me; her arms were wrapped around me." He explained at one point "she gave me the strongest reaction of the entire time. And she still said

the same thing. It was still -- like, fuck me, you fuck is what she said, but it was the loudest, most evident, most clear, and I have that stapled in my mind. The reason -- and the reason it's so stapled is because I was shocked at how much she liked it; and, honestly, I was feeling pretty good because I thought I was doing a good job." He said their intercourse was "pretty long intercourse; sweaty; long; intense; both touching each other everywhere."

122.    During Ms. Davis' follow up questions she asked him to explain again how David understood from Jane Roe's conduct that the sexual intercourse was consensual. David Smith responded: "I can't -- a lot -- like, a lot of it is taking cues from the partner. And I'm not going – I'm not going to describe it well. But from the bottom of my heart, there is absolutely no way that she did not want to be there. There's -- the way she was looking at me, the way she was kissing at me – kissing me, the way she was engaging, the way she was touching me, wrapped around me, the way that she was moaning, it was just somebody who wanted to be there. I don't-- I don't know how else to just, like -- she just wanted to be there and -- yeah. […] this is about everything that she was doing was -- from the first moment that I kissed her, when I asked her if I could kiss her downstairs until -- and when she took off her clothes, the whole process, it was all just a yes, yes, yes, yes, yes, yes, at every step. It was an enthusiastic -- everything she did was enthusiastic, and it was just a series of yes, yes, yes, yes, demonstrations of I want to be there."

123.    At the conclusion of the interview, Ms. Davis asked David Smith if there were any witnesses he believed she should speak to. David Smith advised Ms. Davis that he had not spoken to anyone about the case and that he had been instructed that it would be wrong for him to do so. Ms. Davis confirmed that his understanding was correct and emphasized that David was not permitted to reach out to any potential witnesses.

124.    David Smith specifically asked "Am I allowed to contact witnesses?"  Ms. Davis

responded "No" and then proceeded to explain that:

> the way this works – and it's to protect the integrity of the process,
> right, to ensure that there's no bias. And so I ask you if there are
> additional individuals and what context you are suggesting that I
> speak to them, and then I'll make a determination whether I reach
> out to them or not. But you don't need to reach out to them. You
> shouldn't reach out to them or give them a prompt that they may be
> contacted by an investigator. And I can also share with you that,
> when I do contact witnesses, I do explain to them the confidentiality
> of the process. And so that's another reason why you don't widely
> just share with everyone what's going on. It's on an as-needed basis.
> And so if there are individuals that you're suggesting I speak with,
> then I can reach out to them directly. […] And I will admonish, as I
> mentioned, including [Jane Roe], the importance of maintaining
> confidentiality, the same that I'm sharing with you … I'll ensure that
> everyone is admonished to understand the confidentiality in the
> process.

125.    Also in the interview on December 23, Ms. Davis said her process should conclude

by the end of January. The Brown policies state that the entire process should take around 70

business days unless Brown specifically gives adjustments in writing to the timing of the process.

Therefore, with the engagement of Ms. Davis in mid-December, the entire process should have

concluded approximately five months ago in March. Ms. Davis and the Title IX Office ignored all

these timeframes and failed to notify David in writing of a delay or any reasons for a delay as the

policy requires, further violating David's rights under Brown's policies.

126.    On December 31, 2021, David Smith sent a four-page supplemental statement to

Donna Davis together with ten pages of exhibits in response to several requests Ms. Davis made

during the interview, including phone call records and texts messages he had exchanged with

James Doe. He also submitted additional social media activity posted by Jane Roe demonstrating

her active social life to refute the notion that she was someone in trauma. He also pointed out the

notable timing of some of her posts, which occurred within less than two hours of her allegedly reporting a sexual assault.

127.    In his December 31, 2021 submission, David Smith responded to Donna Davis' request that he identify witnesses, stating: "you asked me about witnesses. I am continuing to think about this, but unfortunately, because the process doesn't allow me to speak with anyone, I cannot possibly know what anyone might have seen outside the room before or after [Jane Roe] and I were upstairs…."

128.    In his December 31, 2021, submission, David Smith pointed out several illogical aspects of Jane Roe's complaint, which he asked Ms. Davis to consider as part of his defense.

129.    In January 2022, David Smith obtained records from the Providence Police, including Jane Roe's November 9, 2021, initial police report, captured in a Detective Field Case Report, as well as Jane Roe's more detailed November 12, 2021, Detective Interview Summary.

130.    On January 25, 2022, David Smith submitted a seven-page supplemental statement attaching the recently-obtained Providence Police records. In his submission, David exhaustively detailed all the conflicts and internal inconsistencies between Jane Roe's two separate statements to the police and her formal complaint to Brown. His submission quoted directly from each document, highlighting eight examples of how Jane Roe's descriptions had significantly changed.

131.    On February 18, 2022, Donna Davis sent an email to David Smith seeking additional information. Several of her requests demonstrated significant lack of attention to detail and/or poor note-taking, for example, asking for David to provide email communications that David had clearly explained occurred over text, and for records of phone calls of conversations that David had clearly explained were in-person or text conversations.

132.    David Smith responded to Donna Davis' requests on February 25, 2022, providing an additional 14 pages of information and exhibits. His submission again outlined several illogical claims in Jane Roe's complaint, including her allegations of being dragged into a corner of the party and kissed and pulled upstairs to David's bedroom, all against her will. He submitted a video of the room where the party took place, the stairs clearly visible to the party room, and his own bedroom, all demonstrating the sheer impossibility that he could have dragged Jane Roe anywhere that was not visible to the entire party, including to Jane Roe's friends.

133.    In his February 25, 2022, statement, David Smith again objected to the fact that Brown was investigating and adjudicating his case pursuant to Brown's Non-Title IX Policy, explaining that Brown did have substantial control over himself and the house where the alleged prohibited conduct occurred. He also objected to the instruction he received that he was not permitted to speak about the case with anyone and advised Ms. Davis that he was aware Jane Roe had been openly discussing the case with her friends and others on campus. He pointed out the unfairness of not being able to seek out people with information particularly since Brown's Non-Title IX policy did not provide for an evidentiary hearing with witnesses and relied entirely on the investigation to gather relevant facts.

134.    Between his initial answer to Jane's formal complaint, and his three supplemental submissions following his interview, David Smith provided forty-nine pages of information and exhibits that he expected to be incorporated into the investigation report.

I.      **Donna Davis Issues a Wildly Inaccurate Draft Investigation Report, Refuses to Make any of the Corrections David Smith had Requested, and Rejects Two Medical Expert Reports David Smith Obtained to Counter Jane Roe's Allegations of Injury**

135.   Donna Davis issued her Draft Investigation Report on March 22, 2022, and the Title IX Office provided a copy to David on March 29, 2022, a full 60 days past the timeframes provided in Brown's policies and without the required notice and explanation for the delay.

136.   Pursuant to Brown's policy, the parties were given ten business days, which was later extended, to review and respond to the Draft Investigation Report and to submit new information.

137.   On April 26, 2022, David Smith timely submitted a 49-page response to the Draft Investigation Report that included: (1) objections to the manner in which the investigation was conducted including the restriction on David Smith's ability to speak with potential witnesses, noting that Brown had not enforced similar restrictions against Jane Roe; (2) objections to the erroneous selection of the Non-Title IX Policy; and (3) a detailed review of demonstrably incorrect/incomplete statements in the report with specific changes that David Smith requested. At the same time he submitted his response, he also advised Brown's Title IX Coordinator via email that there were significant issues with the report that required her attention given her obligation under Brown's policies to "ensure that the investigator is complying with their role as outlined in these procedures" and to review the investigation report "for thoroughness and accuracy."

138.   When responding to the draft report, David also submitted a redlined version of the Draft Investigation Report reflecting all the changes he requested, together with two medical expert reports from highly-credentialed forensic pathologists, as described in more detail below. David also asked for his various submissions to be grouped together in the exhibit packet, clearly labeled, and presented chronologically, as his written submissions were the only documents that explained his defense (the report itself did not). Even this minor suggestion was rejected and

David's written submissions were left mislabeled and strewn about the packet in no particular order.

139.   It is clear that Ms. Davis went out of her way to place David Smith in the worst possible light in drafting her report—even in the section of her report intended to objectively recount David Smith's position. Where David explained active, participatory and enthusiastic conduct by Jane Roe to demonstrate consent, Ms. Davis chose to state that, *according to David Smith*, he "inferred consent" from the fact that "she never reflected an unwillingness to participate." Wherever possible, Donna Davis transposed David Smith's position from, "Jane said yes" to "Jane did not say no." All statements of mutuality were made unilateral—if David said "Jane and I continued to kiss each other", Donna Davis converted this to "David continued to kiss Jane." The cumulative impact of these types of insidious changes is palpable throughout the report.

140.   But the most egregious aspect of the draft investigation report was its attribution of damning admissions to David Smith. The following statements are attributed to him in the report and are demonstrably false:

a.   "**According to Respondent**, Complainant stated twice 'fuck me, fuck', but otherwise didn't speak."

b.   "**Respondent acknowledged** Complainant gazed upward at him while lying on his bed, which prompted Respondent's assumption that Complainant desired continued sexual intercourse with him."

c.   "**At no point did Respondent reflect** Complainant spoke or otherwise motioned for a continued sexual encounter with him."

d.   "**Respondent acknowledged**…that he never checked during the first or second sexual encounter to determine if the continued sexual activity was mutually agreed upon."

e.   "**Respondent offered** the sexual intercourse was intense…but only provided Complainant shouted 'fuck me, fuck' a couple of times and otherwise affirmed Complainant never spoke audibly other than moaning."

f.   "**Respondent claimed** Complainant gazed up at him from a lying position more than once, as if she wanted to continue having sexual intercourse, but he didn't offer that she affirmatively provided indications through an outward demonstration of her wishes."

g.   "**Respondent claimed** [Jane Roe] wanted to have sexual intercourse with him, which was evidenced by her looking at him, and actively participating in kissing."

141.   When responding to the Draft Investigation Report, David Smith pointed out that these purported admissions were false and blatantly conflicted with his written answer to Jane Roe's formal complaint (which Donna Davis had assured him she had read before interviewing him) as well as his interview testimony, and he quoted from his answer to make this point clear:

> throughout our encounter, Complainant was literally shouting encouragement (I apologize for the nature of the words in this letter): "fuck me! "fuck me harder!" "oh fuck me you fuck!" […] she indicated her pleasure to me in words and actions that were excessive." […] But during all this activity she was saying things like "you fucking fuck, fuck me" again further urging me on.
> […]
> [Jane Roe was] exuberant in our activity to an extent I have never experienced – I vividly recall striving to keep up with her own intensity during our activity as she continued to encourage my physicality in the clearest terms possible."
> […]
> she indicated her pleasure in words and actions that were excessive … I cannot conceive of someone giving clearer indications of consent and pleasure than what occurred.

142.   David Smith further explained that he testified similarly during his interview and objected to the inclusion of these purported admissions that had no support in the record and were blatantly untrue.

143.   The Draft Investigation Report falsely represented that David Smith admitted he did not use a condom the second or third times that he had sex with Jane Roe. Again, this was not accurate. During his interview, he clearly stated that he could not recall whether he wore a condom. Based on questions from Ms. Davis, he speculated why he may have been comfortable not using

a condom—because his first condom broke and because Jane Roe had told him she had an IUD. But Ms. Davis was fully aware that David ended that discussion by stating he was unsure—he did not conclusively state he did not wear a condom on each occasion, as the following question and answer during the interview make clear:

> Q. And so there was only condom that was utilized during this sexual encounter? That was the first time?
>
> A. I specifically know that the first was -- yes, for the first. I don't know about the other two.

144.    Notably, Jane Roe reported that she had a specific recollection that David Smith wore a condom each time they had sex. So as between the two students, one recalled that they used condoms every time, and one could not remember. But Donna Davis purposefully created this discrepancy between their accounts, likely to create a question as to whether Jane Roe had consented to unprotected sex.

145.    Donna Davis created an additional issue for the Hearing Panel to consider, again invented from whole cloth. Donna Davis suggested in her report that the panel needed to consider a "secondary issue involve[ing] [Jane Roe's] temporary intoxication and whether her description of being drunk can be viewed as incapacitation prohibiting Complainant's ability to provide consent to a sexual act." Ms. Davis suggested that this was something the panel needed to consider despite the fact that Jane Roe reported she was "tipsy" but "aware of her surroundings," and that she had only two drinks before arriving at the party. Moreover, Ms. Davis did not interview a single witness, nor is there a description anywhere in the report, concerning Jane Roe's level of intoxication during the Halloween party other than Jane's own observation that she was "tipsy." There was no evidence whatsoever that Jane was drunk, let alone incapacitated. Moreover, Ms. Davis never once mentioned the inherent conflict between accepting both Jane's detailed account

of the evening and the prospect that Jane could have been incapacitated. Yet Ms. Davis invited the panel to consider an alternative basis for finding David Smith responsible for sexual assault due to incapacitation.

146.    Notably, this instruction was counter to the training material that Brown was supposed to ensure Donna Davis was familiar with before allowing her to conduct the investigation. Brown's own training material specifically points out that "tipsy" (using that specific word) is not sufficient to find incapacitation.

147.    David Smith never received notice that he was being investigated for a claim of incapacitation by Jane Roe. Under Brown's policies, "incapacitation" means an "inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring. … Where alcohol or other drugs are involved, incapacitation is a state beyond impairment or intoxication."

148.    Jane Roe's Formal Complaint makes clear that she was not claiming incapacitation by pointing out that from the time she arrived at the party and "for the rest of the night…I would like to note that I was drunk but aware of my surroundings."  During the investigation, Jane Roe clarified that she was only "tipsy" during the Halloween party, and that she used the words "drunk" and "tipsy" interchangeably. Had David Smith received notice that he was being investigated for having sex with an incapacitated person, he could have suggested witnesses for the investigator to speak to about Jane Roe's level of intoxication. He also would have had opportunities earlier in the process to ensure that the investigator actually investigated Jane Roe's level of intoxication, which she did not.

149.    As noted above, David Smith submitted a lengthy critique of the Draft Investigation Report, pointing out errors on almost every page of the report such as those highlighted above.

Donna Davis refused to make any of the changes that David Smith requested. However, Ms. Davis did make at least 19 changes that Jane Roe requested, all of which, strengthened Jane's story, again demonstrating Donna Davis' favoritism and bias toward the female accuser. For example, the draft report originally noted that Jane Roe took off her own clothes at David's request   In the final version of the report, Ms. Davis added that David made the request in "a commanding tone." Recall that David's comments were rejected in their entirety because they were simply "preferences to verbiage" and "didn't constitute material substantive facts." Donna Davis also edited Jane Roe's statements to increase the level of force Jane claimed that she needed to use to make David stop (which David fully denies).

150.    Through his review of the Draft Investigation Report David Smith was also shocked to learn that in her more than six-month investigation the investigator interviewed only three witnesses in addition to Jane Roe and himself. Donna Davis interviewed two of Jane Roe's best friends (referred to in the report as "Witness 1" and "Witness 2") who were among the group of friends Jane was with before and after the Halloween party. She also interviewed James Doe (referred to in the report as "Witness 3"), the only witness David Smith had been able to identify as a result of Brown's "gag rule."  Despite having a guest list from the party and acknowledging that she knew the identities of several other friends who interacted with Jane Roe after the alleged assault, Ms. Davis chose not to interview anyone else.

151.    Ms. Davis's decision not to interview other witnesses was particularly troubling given that the report emphasized the descriptions Witnesses 1 and 2 both provided of Jane Roe after Jane Roe left David Smith's bedroom when they met her in a downstairs bathroom at the party.

152.    The report provides that Witnesses 1 and 2 stated that when Jane Roe left David Smith's bedroom, she "was distraught" and had "bruises visibly on her body"; "Complainant appeared confused, upset and withdrawn"; "she was leaned over the mirror and appeared traumatized"; she was "frantically rubbing her face"; she was "hysterical"; she "seemed helpless and struggled to talk about the incident without breaking down"; she "described elements of a sexual assault"; she was "clearly traumatized"; she was "clearly not okay"; "I have honestly never seen her in a state like this."

153.    These descriptions were disturbing but also puzzling because both Witnesses 1 and 2 also admitted that they left the party without Jane Roe to go out to eat at "East Side Pockets" (a popular late-night sandwich shop) and that they figured Jane Roe would join them later. They reported that Jane Roe desired to remain at the party to dance (and for some reason they felt comfortable leaving Jane in the house of her alleged attacker because they were hungry). The investigator did not probe this obvious illogical inconsistency, nor did she reflect upon this fact in any way in forming her conclusions. Nor did the investigator reflect on the fact that these two conflicting stories told by by Witnesses 1 and 2 were completely different from the three original stories told by Jane (to Brown and the Police in her initial complaints) and the additional story Jane told during her interview with the investigator.

154.    The investigation report references, but does not identify, a number of students whom Jane Roe socialized and danced with for approximately 30 minutes after Witnesses 1 and 2 left (despite their alleged concern for her well-being). David Smith learned after the publication of the investigation report that one of these people was his teammate for his varsity sport. David Smith had never discussed the case with this person (and still has not) because of Brown's "gag rule" and therefore David Smith never learned that this individual interacted with Jane Roe and

never had a reason to suggest that the investigator interview him. Regardless, given that the investigator knew that others interacted with Jane Roe at the party for at least a half hour after her best friends left her to get food, she should have sought to corroborate whether Jane Roe really did appear to be in the condition Witnesses 1 and 2 described. This is particularly true given that Ms. Davis also knew that Jane lied in her original Brown complaint. claiming that she left the party with Witnesses 1 and 2 to go home and shower. David also later learned that Witnesses 1 and 2 left the party with another student who is also involved in David's sports team, and walked to East Side Pockets with him. This was another individual Ms. Davis could have interviewed to see if Witnesses 1 and 2 had made any statements at the time that might call into question their later accounts of grave concern for Jane Roe (despite leaving her to grab some food). Ms. Davis interviewed neither of these witnesses presumably because she was afraid they might undercut Complainant's witnesses.

155.    Ms. Davis' decision not to interview anyone else at the party that may have interacted with Jane was even more problematic because by the time of the hearing, many of the seniors who attended the party had already graduated. Thus, even if David had the opportunity to call and question witnesses at a proper hearing, he lost critical opportunities to preserve potentially exculpatory testimony of witnesses who may now be scattered across the country.

156.    The report also made clear that Jane and Witness 1 and 2 collaborated in putting their stories together as they admitted to writing out statements for Jane Roe to submit to the police before Jane Roe reported her alleged assault to Brown. During the investigation, David Smith repeatedly notified Brown that Jane had been discussing the case with her witnesses and with others, but Brown did nothing in response.

157.     Only after David Smith advised Brown's Title IX Coordinator in May of 2022 that he wished to pursue a formal investigation against Jane Roe for violating confidentiality was he advised that Brown had determined that it could not prevent Jane Roe from "telling her story" to her friends. Of course, Brown prohibited David from "telling his story" when it advised him that he was not permitted to speak *to anyone* about the case. And with this "clarification" coming only after the investigation had concluded (and six months after the incident), any opportunity David Smith may have had to speak with friends who were at the party to "share his story" and see if they knew anything helpful, had been lost.

158.     With respect to the only other witness Ms. Davis did interview, James Doe, the draft investigation report went out of its way to discredit him. The investigator's summary of her interview with James Doe begins with a lengthy discussion of the fact James Doe had retained a lawyer who was difficult to work with and who limited James Doe's responses to certain questions —which has absolutely no relevance to the dispute. In responding to the draft report, David Smith pointed out that by the time the investigator interviewed James Doe:  (1) David Smith had already been suspended by Brown based solely on Jane Roe's complaint; (2) Jane Roe and James Doe were no longer speaking; and (3) James Doe was likely justifiably concerned about participating in the investigation given his past sexual experiences with Jane Roe and Brown's demonstrated policy of suspend-first-ask-questions-never when men are accused of sexual misconduct. David Smith's objections to Ms. Davis' treatment of James Doe in the report were ignored.

159.     David Smith also first learned from reading the Draft Investigation Report that Jane Roe and at least one of her friends had been secretly recording their interactions with him. In his review of one of the recordings, taken by a student identified in the report as "Undergraduate E," it was clear that Jane Roe had not submitted the complete recording. The recording was produced

in four separate files with obvious gaps in the conversation. The audio clips (which together totaled only 1 minute and 15 seconds) also appeared to be out of sequence with the actual conversation—something that should have been an obvious red flag to Donna Davis.

160.    David Smith reached out to Donna Davis and the Title IX Coordinator to request that Brown immediately obtain a copy of the complete recording and to inquire why Ms. Davis had not already required Jane Roe to submit a complete recording. Ms. Davis became defensive and explained that Jane Roe had split up the recording because it was too large to email. However, this was not true.

161.    After David Smith continued to insist that Brown obtain the full recording, Jane Roe easily emailed a single file containing the complete recording, which was only 6 minutes and 10 seconds. It was obviously more work for Jane Roe to break up the recording than to provide the entire file, and her reason for doing so was equally obvious. From the complete recording it is clear that Jane Roe had cherry-picked the portions of the conversation she liked and withheld the portions that supported David Smith's consistent account of their time together.

162.    David Smith attempted to submit a transcript of the recording so that he could mark the sections of the conversation that Jane Roe had excised to make it clear for the hearing panel without having to listen to five separate audio files (the 4 original snippets and the 1 complete file). But Brown's Title IX Coordinator refused to let David Smith submit a transcript. In responding to the Draft Investigation Report David Smith asked Donna Davis to at least note that Jane Roe had opted to submit only portions of the complete recording made by Undergraduate E. Ms. Davis again refused and, even worse, in the final investigation report she described the entire event in such a way as to suggest that Jane Roe had submitted the complete recording and had simply broken it up into 4 parts. Thus the report is presented purposefully to obfuscate that the original 4

snippets were less than 20% of the full recording and purposefully edited to mislead. And as part of her report Donna Davis hid the procedural history of David's demands for the full recording, suggesting she was the one who asked for it. Finally, Donna Davis's report quotes from the recordings to summarize their contents—but of course, only quoting from the cherry-picked clips Jane Roe had originally submitted. Donna Davis denied David Smith's request to include other quotes of the helpful and contextual things he stated in the conversation.

163.    Among the things David said on the full recording (again before he was aware Jane had filed a complaint):

- "I have no idea what she's even talking about. She seemed super into it the entire time, and we did [it] like three or four times;"

- Explaining that after the condom broke, "she's like, keep going, it's fine, I have an IUD. I don't know if that's true, like how the fuck would I know that if she has an IUD if that's not true?  She said keep going;"

- "So, what she's doing is she's running around telling people that I raped her and I can't do work, I can't do anything, but I don't understand at all what she's talking about, where she's coming from."

- "And she took like 10 minutes to get ready [after] in my bathroom. And I was just sitting there waiting. It's not like she ran out. And then she said I'll see you later. I said, no, you won't, I'm going to bed."

- "Why'd she come to [my house] then [on Nov 12]. Why would you come to my house where you know I'm going to be. She makes no sense…she talked to [Witness 3 – James] about it the whole night."

164.    In his review of the Draft Investigation Report, David Smith also learned for the first time that Jane Roe had submitted photographs purporting to depict bruising on her body, which she claimed were a result of being choked by David.

165.    David Smith retained two highly credentialed, nationally recognized forensic pathologists to independently review the photographs. Both concluded that the markings were "hickeys," "suck marks" or skin irritation from kissing and facial hair abrasion. Both experts independently concluded that the marks were not consistent with injuries from trauma or from choking.

166.    His first expert explained: "I have reviewed the six photographs and two brief video clips of Claimant that you sent to me. They do not show any evidence of neck compression or of blunt force trauma. They do show fading superficial abrasions that may be suck marks – hickeys – on her neck and upper chest and cheeks that commonly occur during sexual activity……It is my opinion to a reasonable degree of medical certainty, on the basis of my education, training and experience, that the abrasions in these photographs is a hickey."

167.    His second expert consistently found: "Based upon my education, training skill, experience and the photographic exhibits, it is my opinion to a reasonable degree of medical certainty that the photographs do not demonstrate any serious injuries but rather redness of the skin in an area with raised skin lesions without any abrasion or contusion injuries. The photographs of the neck are not suggestive of manual strangulation or "choking" as claimed by the complainant. The force necessary to compromise the airway would be expected to result in some bruising of the neck in the pattern of fingertips. This does not exist. Instead, the redness overlying the pre-existing raised pimples is consistent with skin irritation from friction such as vigorous kissing, licking and facial hair such as whiskers."

168.    David Smith submitted both reports together with the résumés of each expert in response to the Draft Investigation Report. Though he received no notification that the reports would not be accepted, and no explanation as to why, the Final Investigation Report included no reference whatsoever to these medical experts.

169.    The Draft Investigation Report was written purposefully to obscure David Smith's defense. It included no discussion at all of the multiple inconsistencies in Jane Roe's various accounts of what happened, which David Smith had detailed in several of his written submissions. Rather, it noted in a few sentences that David Smith had noted "perceived inconsistencies" during the investigation, without explaining what those were. And though the report included some (but not all) of David Smith's submissions as exhibits, it mislabeled them, ordered them out of sequence, and buried them at the back of the exhibit packet which was over 100 pages long.

170.    For example, David submitted a letter attaching two separate police reports from the Providence Police Department, in which he exhaustively detailed the inconsistencies between Jane Roe's two police reports and Jane Roe's Formal Complaint to Brown. Donna Davis attached this submission as Exhibit 21 to the report and described in the report simply as "Respondent's 1/25 Statement and screenshots of Complainant's Social Media Posts."  The report then attached separately as Exhibit 22 what Ms. Davis labeled "Final Providence Police Department Report"— despite the fact there were two police records from November 9 and November 12, 2021 containing separate and inconsistent statements from Jane Roe.

171.    Because Jane Roe and David Smith are the only two people who were in the room when they had sex, the adjudication was necessarily entirely about which student was more credible in their recounting of the details of the evening. Thus, David Smith's defense hinged on pointing out the numerous ways Jane Roe had changed her story as the investigation unfolded and

more information came out that challenged earlier statements she had made. For example, Jane Roe originally claimed she had been dragged upstairs to David Smith's bedroom against her will. But after David Smith produced a video of the party room and the fully visible multiple flights of winding stairs leading to his bedroom, and after Jane Roe's friends testified that she had been excited to kiss David Smith and agreed to go upstairs with him, Jane Roe changed her story to explain that she willingly went upstairs but did not understand they were going to David Smith's bedroom – despite the fact she had previously had sex with James Doe, who lived on the same floor as David. Then, in the hearing, having recognized that her claim to not know where they were going was not credible, Jane changed this story again such that she knew where she was going but didn't know why David was leading her up to his room, despite having been excited about hooking up with him downstairs and even though her friends stated that Jane went upstairs with David willingly. In other words, when confronted with the truth, Jane Roe changed her account often to new stories that also defy logic and common sense. The investigator chose to ignore each and every point David Smith made in this regard and did not describe any of the inconsistencies David had pointed out throughout the investigation. In this way, the report obscures the main thrust of David Smith's defense, a problem which was amplified by Brown's decision to proceed under the Non-Title IX Procedure where David Smith was given only 7 minutes of "air time" at his hearing to try to explain everything Donna Davis chose to ignore or misrepresent in her report.

172.    Donna Davis, and in turn the panel, completely ignored Jane's behavior in the days, weeks and months after the alleged incident, including as demonstrated by Jane's active social media. For example, immediately after claiming to be sexually assaulted, Jane was posting pictures of herself on multiple social media sites from all three nights in very revealing costumes including

her costume from the night she claimed to be assaulted. She also maintained an active Tinder profile with the tagline "flexible" (which in the context of Tinder is understood to be suggestive sexual language) demonstrating that she was actively seeking partners at a time when she and her friends had described her as withdrawn and traumatized.

173.    Donna Davis's failure to reflect upon the inconsistencies in Jane Roe's statements was exacerbated by the fact that some of her inconsistencies were only discoverable to David from his review of the Draft Investigation Report itself. For example, when David read the summary of Jane Roe's interview for the first time in the Draft Investigation Report, he learned that Jane Roe told the investigator that she called Brown's Sexual Assault Hotline the very next morning after the assault and spoke to an advocate named "Elliott" who allegedly instructed her to take a shower. Of course, no trained sexual assault advocate would instruct someone claiming to have been assaulted to shower before advising them to obtain a rape kit or SANE examination—something Ms. Davis ignored in her report. But David Smith also noted in responding to the Draft Investigation Report that the November 12, 2021 Detective Interview Summary contained a statement by Jane that "by the time she spoke with any of the advocates about what happened it had been more than 5 days."  David Smith pointed out this inconsistency in his response to the Draft Investigation Report and asked that it be noted. It was not. And because Ms. Davis did not include David Smith's response to the Draft Investigation Report as an exhibit (as he requested), there was nothing in the record submitted to the Hearing Panel to explain this inconsistency, and many others, which only David had uncovered and would not be apparent to anyone reading the report.

174.    In her final investigation report, the only indication that there may have been any issues with the consistency of Jane Roe's statements came in the following few sentences:

the investigation noted Respondent's perceived inconsistencies in Complainant's formal complaint, interview statement, and police report [sic].[13] […] The investigator reviewed the perceived inaccuracies in connection with the allegations of prohibited conduct under Brown's [Non-Title IX Policy]. Respondent's perceived innacuracies of Complainant's recollection of events are viewed by Respondent as false allegations. Complainant offered the minor inconsistencies occurred and were impacted by her trauma, shock, and inability to fully reconcile what occurred with the Respondent.

175. With no description or analysis of the way Complainant's stories had changed, even where Jane Roe apparently admitted "minor inconsistencies" occurred, the investigator essentially invited the Hearing Panel to ignore whatever David might say at the hearing about Jane's credibility.

### J.    **Brown Forces David to Defend Himself Against the Manipulated and Inaccurate Record Created by Donna Davis in a Perfunctory Thirty-Seven Minute Hearing**

176. Brown scheduled David's hearing for Thursday, July 21, 2022 and allotted one-hour for the entire proceeding. The hearing was held virtually over Zoom. Unless it was their turn to speak, the parties were taken off camera and muted by the Hearing Panel Chair. After the Hearing Panel Chair spent several minutes reading from Brown's policies and introducing the panel members, the actual "hearing" portion of the proceeding lasted only thirty-seven minutes.

177. Had Brown applied its Title IX Policy/Procedure, David would at least have had an opportunity, at his hearing, to question both the Investigator and Jane Roe and present the factual information that was missing or misstated from the Investigation Report. In contrast, though the

---

[13] The investigation report consistently reported that Jane Roe made only one statement to police, as opposed to two statements on two separate dates. David pointed this out to the investigator and the Title IX Coordinator but was ignored.

Non-Title IX Procedure provides for something it *labels* a hearing, there is no meaningful hearing at all, as David learned on July 21st.

178.    Under the Non-Title IX Procedure, the investigation report serves as the evidentiary record for the so-called "Hearing Panel." The report determines the "facts," and the role of the "Hearing Panel" is to decide whether "the facts" as reported by the Investigator constitute a policy violation. Brown's Non-Title IX Procedure explicitly states that while the Panel "*may* pose questions to the parties, investigator, and witnesses (if applicable) to elicit relevant factual information missing from the final investigation report…[t]he *presumption* is that the investigator has identified and interviewed all relevant witnesses and supplied the information necessary for the Hearing Panel to render its decision and determine sanctions."

179.    David was not allowed to present evidence, call witnesses to testify, question the complainant or Investigator, or even challenge the "relevance" determinations purportedly made by the Investigator or the Chair. The process was limited to the panel asking a handful of questions of the investigator and the parties – with zero follow-up on any responses. With regard to the investigator, whose report the panel relied on to form the entire factual underpinning of their decision, the panel had only two questions that took no more than 90 seconds of the "hearing." David was similarly asked only five questions in just over six minutes.

180.    To further signal to the panel the significant role of the investigator, Ms. Davis was called as the first witness, and the only non-party witness at the hearing. She was asked two questions and was unable to provide a response to either.  In responding to the panel's first question about how much alcohol Jane consumed, Ms. Davis unwittingly revealed both her bias and her ineptitude. In her report, Ms. Davis introduced the possibility of an incapacitation finding, trying to create another hurdle for David to overcome. The panel did indeed try to pursue this accusation,

and asked Ms. Davis and Jane about alcohol consumption. However, despite her 6-month investigation, Ms. Davis could not answer how much Jane drank during the party, because she never asked. This was information Jane readily recalled when asked by the panel, revealing she only had one drink at the party and that incapacitation was a non-issue. This incident alone should have raised grave concerns for the panel about Ms. Davis' competence and utter lack of objectivity.

181.    After the perfunctory 17 minute Q&A concluded, All David *was* allowed to do was make a seven-minute verbal statement "regarding the facts." During his seven minutes, David could not just present his defense; he attempted to convince his panel that *both* Jane and the Investigator had lied, that there was critical evidence the panel had not seen, and that his entire defense, including his explanation for Jane's motivation to lie and his exhaustive list of Jane's inconsistent statements, had been excluded from the record before them. David prefaced his statement with a warning that what he was about to say would be shocking. When David completed his statement, the hearing Chair abruptly ended the proceeding—not one panel member saw fit to ask any follow-up questions of David or of Donna Davis despite being advised that she had misrepresented David's testimony and suppressed relevant evidence.

182.    The Hearing Panel rendered its decision finding David responsible on August 4, 2022 – fifteen days after the hearing, and five business days beyond the timeframe set forth in Brown's policies for the issuance of a decision.

183.    Brown delayed its decision beyond the required five-day deadline to render a decision from the hearing. This was consistent with Brown's dilatory handling of the entire case. Brown missed every deadline set forth in its policies extending a contemplated 75-day process into a nine-month slog, which is remarkable given how little investigation was done.

184.     To add one final insult to this entire ordeal, David was required to pay a large deposit for the fall semester during the additional time it took Brown to render a decision. Under Brown's policies, David's deposit is non-refundable because of his suspension from the University. David reached out to Brown's attorney before paying the deposit to point out the unfairness of the delay and asked for the ability to withhold his deposit until Brown issued its decision (knowing full well that the responsibility finding was inevitable). David was re-directed to Brown's Title IX Officer who simply forwarded to him a link to Brown's policies, which provide that tuition is non-refundable if students leave the university as a result of a disciplinary decision.

### K.     The Hearing Panel Issues A Flawed Responsibility Finding Relying on the Investigator's Manicured Factual Record

185.     On Thursday, August 4, 2022 the Hearing Panel issued a decision finding David responsible for sexual assault and imposing a two-year suspension. The panel's rationale was limited to two short paragraphs, and it was replete with inaccuracies.

186.     In two paragraphs the written decision attempts to explain why the Hearing Panel believed Complainant's version was more credible. The panel's rationale was both flawed and irredeemably infected by the flawed investigation report they relied on. For example, the panel noted that Jane was more credible because she provided "a detailed account of the events" without acknowledging that her account changed multiple times through the course of this proceeding.

187.     A massive component of what should be part of any credibility analysis—witness consistency—was missing from the panel's determination because the Investigation Report ignored all of Jane's inconsistencies. In the few minutes David was allowed to speak during the hearing, he had no way to meaningfully catalogue and explain all of the inconsistent and illogical aspects of the accounts told by Jane and her two best friends, Witnesses 1 and 2. As a result, the

Hearing Panel was led by the investigator to believe there was one consistent account and that it was corroborated by Complainant's two best friends, Witnesses 1 and 2.

188.    The hearing panel determined that "Complainant's actions after leaving the Respondent's room were consistent with her claim of having been assaulted."  And they based this assertion on the fact that Jane's two best friends, Witnesses 1 and 2, met Jane in the bathroom where complainant "showed them bruises consistent with the complaint" and where "both witnesses confirmed that [Jane] was distraught and disoriented at the time, and that she expressed she was in pain."  In making these assertions, the Hearing Panel either ignored or was unaware that Witnesses 1 and 2's accounts made no sense given that they left Jane Roe in the house of her alleged attacker despite claiming she was distraught, visibly injured and in pain, simply to go get food and that Jane stayed for at least 30 minutes to dance and party.

189.    Additionally, the panel noted that Witnesses 1 and 2 confirmed that Complainant's costume was ripped and that she had bruises. But, according to Jane, Jane took off her own costume before having sex with David, and no one bothered to ask her how her costume became torn. Regarding the alleged bruises, David had submitted expert medical opinions regarding the alleged bruising that were hidden from the panel, which demonstrated that the marks were "hickeys" and "suck marks" and not a result of any trauma.

190.    The panel also relied on the fact that Jane filed police reports after the fact to bolster her credibility, without reflecting on the fact that her police reports contained material and significant differences from the accounting she told Brown. Again,  those details were not included in the investigation report and Brown's Non-Title IX Policy specifically instructs hearing panel members to presume the investigation report is accurate and contains all the information needed to render a decision. In fact, that Jane filed police reports should not be read to support her

credibility when the substance of what she told the police was so markedly different than what she told Brown.

191.    The Hearing Panel's rationale for why David was determined not to be credible was also irrational and hopelessly reliant upon the false record created by the investigator. The decision faulted David for "not provid[ing] details about examples of the Complainant's verbal encouragement to engage in specific forms of sexual contact, including physical roughness, <u>beyond the phrases</u> 'fuck me!' 'fuck me harder!' 'oh fuck me you fuck!'?" While these words are obviously specific and quite instructive, the Hearing Panel was led by the investigator to believe that David admitted Jane only spoke these words once or twice and was otherwise silent.

192.    In fact, David had repeatedly told the investigator that Jane loudly stated those phrases constantly and throughout their sexual encounter. And in almost 100 pages of written submissions David provided many more detailed descriptions of Jane Roe's verbal and non-verbal conduct that demonstrated consent. <u>In short, David's purported lack of detail was the only reason the hearing panel provided for finding him not to be credible</u>, and that was entirely a result of the investigator falsifying and misstating his testimony.

### L.    <u>Brown's Appeal Process Rubber-Stamped the Responsibility Finding</u>

193.    On August 11, 2022 David submitted an appeal, pursuant to Brown's procedures, which exhaustively catalogued all the above flaws in both the investigation and the hearing process.

194.    Brown's Policies provide an approximate timeline of each stage of a disciplinary proceeding and allots five days for consideration of an appeal of a disciplinary decision. Non-Title IX Procedure § 2.9.5. The policies state that "[t]he Complainant and Respondent will be notified of any delays or extensions of these timeframes and will be provided with a revised timeline to resolve the complaint." *Id.*

195.     Brown never advised David that it would require more than five days to review his appeal. This is consistent with Brown's management of this entire process which by its own policy was outlined as a 75-day process unless Brown notified the parties of any delays. Brown made no such notifications prior to the hearing, yet the process has taken 10 months.

196.     Consistent with its disregard for its own policies, Brown was silent after David filed his appeal. After hearing nothing for nearly three weeks, on August 29, 2022, David wrote to the Title IX coordinator to inquire into the status of the appeal, advising that he needed to make preparations to return to campus for the fall semester, which begins on September 7, 2022.

197.     The Title IX Coordinator responded that she could not provide a timeline for when the appeal would be decided.

198.     David paid his 2nd fall tuition deposit on September 6, 2022, which under Brown's policies is non-refundable if a student withdraws from the university as a result of a suspension. On information and belief, Brown's delay in confirming David's suspension until after he paid tuition was purposeful, given that this was the second time Brown rendered an adverse decision the day after charging non-refundable tuition.

199.     David returned to Providence, RI on the evening of September 6, 2022, waiting until the last possible moment to return to campus because Brown refused to provide any guidance on when his appeal decision would issue. David went to Providence only after Brown charged tuition on September 6th. David did not want to return to campus only to be humiliated in front of his peers and emotionally crushed by having to immediately turn around and return home. But that is exactly what happened when Brown affirmed the responsibility finding the next morning.

200.    As David was walking to class on the morning of September 7 after already having attended 2 prior classes that day, he received Brown's appeal decision, which affirmed the finding against him and required him to leave campus immediately.

201.    While the appeal decision confirmed the responsibility finding, it did reduce David's suspension from two years to one semester, with the imposition of a permanent ban on representing the University in athletics or any leadership roles, and on participating in any extra-curricular clubs or activities. The decision states that once he returns from suspension, David will remain on probation until graduation, which makes him ineligible to hold any office with any university program or group, and further precludes his participation in any university-sponsored travel or study abroad.

202.    The appeal panel's rationale for the reduced sanction was a perplexing acknowledgment that the sanction was "overly harsh given the decision's foundation primarily on credibility."  In other words, the appeal panel was not convinced by any objective evidence that David committed the violent sexual assault he was accused of and also clearly felt that he was not a threat to anyone on campus.

203.    In overturning the discipline, the appeal panel acknowledged that the case turned entirely on credibility, which was the exact point David made in his appeal and in other written and oral submissions. But while acknowledging the centrality of assessing the parties' credibility to the finding, the panel disregarded everything that should have informed a reasonable credibility assessment. The appeal panel should have at a minimum recognized the deleterious impact the investigator's dozens of lies regarding David's accounting of events clearly had on the hearing panel's decision. Moreover, the appeal panel, just like the investigator and the hearing panel, disregarded as "not material" the numerous substantive inconsistencies in the accounts told by

Jane and her friends and did not bother to address the litany of their ever-evolving and conflicting stories.

204.    The appeal panel rejected each of the grounds David raised in his 14-page appeal in a five-page opinion that was replete with flawed logic and factually incorrect assertions, and that was wholly infected by undue deference to the investigator despite her dozens of lies and selectively hidden evidence.

205.    With respect to David's challenge to Brown's decision to adjudicate his case under the Non-Title IX Policy, the University doubled down on its misapplication of its own policy, reasoning that the social gathering held at David's house where Jane Roe alleged the assault occurred was not a university sponsored program or activity and therefore was not covered by the Title IX Policy. This plainly flawed rationale again ignores the express language of Brown's policy that provides that the Title IX Policy applies to off-campus locations "in which Brown exercises substantial control"—as it clearly did that evening. In a case about credibility, the decision to intentionally thwart David's ability to cross-examine Jane, her witnesses and the investigator was damning– their lies and inconsistencies could never be challenged in a meaningful hearing process.

206.    David also challenged as a procedural error the repeated instructions he received from both the Interim Title IX Coordinator and the investigator that he was not permitted to speak with witnesses. Brown's appeal panel rejected this by blaming David for misunderstanding the policy. The appeal decision notes "[w]hile the Procedure does not limit the parties from contacting witnesses for the purpose of identifying their relevance to the complaint, we acknowledge [David] may have interpreted the provisions as limiting."  Given that David repeatedly objected throughout the 6 month investigation, specifically informing the Title IX Coordinator that he had been instructed by the investigator not to contact witnesses *despite the lack of any such restriction in*

*Brown's policies*, it is outrageous for Brown to claim only after the investigation is over that David misunderstood that Brown's policies, in fact, never did prevent David from speaking with witnesses. There was absolutely no misunderstanding. David knew from the start that these instructions were incorrect, and objected on that basis repeatedly and in writing, noting that Jane was not acting consistent with the instructions he received. Brown never responded to David's objections during the investigation other than to confirm his confidentiality obligations while at the same time advising David that the university could not stop Jane from telling her story to others. To now claim that David misunderstood the policy is a weak attempt to shift blame for its objectively unfair treatment of David.

207.    After obliquely acknowledging the erroneous instructions David received, the decision nonetheless goes on to blame David for not specifically asking the investigator to interview his party guests, even though there were dozens of people at the party, and he was never able to speak to any them to learn if they had relevant information. The appeal decision also incorrectly stated that the investigator was in possession of the full guest list for the party — in fact, the investigator had only asked David to submit James Doe's personal guest list, because it included Jane Roe. The investigator never made any effort to ascertain who else might have had relevant information, despite making assurances to David during his recorded interview that she would do so. Moreover, despite identifying witnesses that clearly had relevant information, the investigator chose not to interview them for no explicable reason. Again, this was despite telling David in his interview that she would identify and interview relevant witnesses. In fact, David did suggest one other potential witness during his interview, but since he was not allowed to speak with that person, David could not articulate what the potential witness might know and so the investigator did not interview him.

208.    In short, David was told by both the investigator and the Title IX coordinator that he couldn't speak to anyone to gather information and identify people with relevant knowledge. And yet the appeal panel determined David had no basis to appeal the investigator's failure to interview other witnesses because David did not ask her to interview others. Obviously, without the ability to learn what knowledge people had, David was not in a position to randomly suggest individuals for the investigator to interview.  His only default would have been to suggest to the investigator that she "interview every single person at the party" which would not have been taken seriously.

209.    In addition, the appeal panel determined that the investigator's failure to interview other witnesses was essentially harmless error, reasoning that "the potential that other witnesses may exist does not materially affect the outcome of the case as it was decided by the Hearing Panel with the evidence available."  Of course, deciding that unknown information could not have materially affected an outcome is non-sensical. To determine the impact of missing testimony on the outcome, the appeal panel obviously would first need to know the content of the missing testimony.

210.    The appeal panel also rejected David's challenge to the improper exclusion of the reports from his two medical experts who addressed Jane Roe's claims of bruising and injury. The appeal panel reasoned that it did not qualify as "new evidence not reasonably available at the time of the hearing" (one of Brown's limited permissible grounds for appeal) because it was evidence known by the investigator at the time of the hearing – even though she chose to exclude it from the record. Without any further explanation, the appeal panel declared that upon review of the reports prepared by two nationally renowned medical experts, the contents "do not meaningfully undermine the Complainant's credibility" and do not constitute "material evidence."  The appeal

panel reached this determination despite the fact that Jane Roe claimed a violent forcible rape, submitted pictures of purported bruising to corroborate her claims, and confirmed during the hearing that she believed the markings on her neck were a result of being choked. The expert medical reports David submitted contradicted all of those allegations. In a case where both the hearing panel and the appeal panel acknowledge that the case was about credibility, the refusal to consider this evidence was inexcusable.

211.    David also appealed on the basis that the investigator: (a) misrepresented his testimony, (b) failed to analyze the substantial inconsistencies in the accounts of Jane Roe and her witnesses, (c) altered testimony to favor Jane Roe, (d) purposefully declined to interview witnesses that may have contradicted the accounts presented by Jane Roe and her two friends, and (e) made none of the changes to the draft investigation report that David requested, but made 19 changes that Jane requested to bolster her story. In a series of conclusory statements, the appeal panel rejected all of David's suggestions and arguments, reasoning that there was no evidence the investigator did anything wrong, and no evidence that the hearing panel failed to consider everything it needed to in order to reach a decision. The appeal panel further concluded that the changes David had requested to the draft investigation report were "not materially different from the information provided by the investigator in the investigation report." This conclusion is irreconcilable with reality given that David documented dozens of material misrepresentations in the draft report that the investigator refused to correct.

212.    Finally, David challenged the result of his hearing based on the bias exhibited by Brown and its outside investigator, demonstrated through their: (a) mishandling of the entire proceeding, which began with his immediate suspension based solely on a complaint; (b) the disparate instructions given to David and Jane regarding their ability to speak with witnesses; (c)

the investigator's failure to follow up on obvious inconsistencies in Jane's allegations; (d) the investigator's efforts to assist Jane Roe cover up her submission of tampered audio recordings; and (e) the blatantly false admissions the investigator attributed to David in her report. Again, in a series of conclusory statements, the appeal panel determined that the record evidence did not support David's arguments on appeal.

213.    In responding specifically to David's assertion that he was improperly suspended at the beginning of the disciplinary process based solely Jane's complaint, the panel asserted that Brown had correctly adhered to its procedures in issuing an emergency order removing David from campus. The appeal panel made this conclusion despite the fact that the Federal District Court for the District of Rhode Island, just months before, held in a related case that Brown's decision to immediately suspend accused students violated its own policies which promise a presumption of innocence to accused students.

**M.**    **Brown Ignores David Smith's Complaints that Jane Roe is Violating Confidentiality, Violating the No-Contact Order, and Engaging in Retaliatory Conduct**

214.    From the beginning of the process, in an order dated November 16, 2021, Brown imposed restrictions on David Smith's and Jane Roe's ability to interact with one another in the form of a "No-Contact" order. It prohibited the parties from making direct contact with one another, or from enlisting the help of others to indirectly contact one another.

215.    Jane Roe was advised when she filed her complaint that a No-Contact Order would soon be issued and according to Brown's policies that the process is confidential. While highlighting the absurdity of Jane's allegations given that Jane would return to his house the night she filed the Complaint, David Smith also complained that Jane Roe rushed to get ahead of the No-Contact Order and to contact him on each of November 12, 13, and 14 in her efforts to secretly record him. Because the No-Contact Order was purportedly for Jane Roe's protection, and because

she had later requested that David be restricted from certain areas of campus to maintain safe spaces for her, David Smith questioned whether her conduct was a violation of the spirit, if not the letter, of the No-Contact Order she initiated. He was ignored.

216.    On May 2 and 3, 2022, David Smith advised Brown's Title IX Coordinator of a direct violation of the No-Contact Order by Jane. Many of Jane Roe's friends came to a party at his house and one of them advised him that Jane Roe and Witness 1 and 2 had decided they would like to resume coming to parties at David Smith's house. David was instructed by Jane Roe's friend that she and/or another of Jane's friends would text him beforehand when Jane Roe and her two best friends planned to enter David's house so that he could hide himself in his bedroom for as long as Jane Roe cared to stay. David Smith was told that he "better fucking check his text messages," which he perceived as a threat.

217.    Brown took no immediate action to prevent further incidents between David Smith and Jane Roe's friends and did nothing to instruct Jane Roe that she had no right to demand entrance in David Smith's home.

218.    On June 12, 2022, David submitted a request for a formal investigation of the above-described event under both the No-Contact Order and as an act of prohibited retaliation under Brown's policies.

219.    Brown dismissed David's Complaint on July 22, 2022 based on what it described as a "Preliminary Inquiry" even though there is no such procedure under Brown's policies. Brown's Title IX and Non-Title IX Procedures provide only for an "Initial Assessment" in which the university may only assess whether the allegations, if substantiated, would constitute a policy violation. If so, Brown is required to proceed to a full formal investigation and disciplinary proceeding. In other words, Brown invented a new procedure specifically to adjudicate David's

No-Contact Order Violation and Retaliation claims and to minimize any burden on Jane Roe or her friends in having to answer for their conduct.

220.     As part of its "Preliminary Inquiry" an investigator interviewed Jane Roe and her friends. However, the investigator did not bother to interview David. Brown apparently learned enough information from Jane and her friends to conclude that David's complaint had no merit and summarily dismissed his complaint. In a letter that assured David "Brown University takes all allegations seriously" it advised David that "the evidence *suggested*…that neither [Jane Roe] nor [her friends] violated the No-Contact Order." Stated differently, a suggestion of evidence— without bothering to interview the male complainant—was enough to absolve Jane and her friends of any policy violation.

221.     David submitted an appeal of this decision on July 25, 2022, which pointed out the above procedural flaws. Brown rejected David's appeal on September 2, 2022 in a letter providing virtually no explanation for the decision.

222.     As part of his June 12, 2022 submission David Smith submitted several other formal requests for investigation, including under Brown's Honor Code concerning Jane Roe's decision to submit spliced and incomplete audio recordings of secretly taped conversations. The Honor Code specifically prohibits "[l]ying or materially misrepresenting information to an official University body or officer…"

223.     Brown's investigation of David's Honor Code complaint remains ongoing.

**N.**     **Brown Ignored David's Complaints of Campus Hostility Directed Toward Him**

224.     Likely as a result of Jane Roe's violations of the confidentiality requirements that Brown seemingly only imposed on David, during the course of the investigation David began to experience open hostility from complete strangers on campus.

225.     David reported to Brown that students he did not know "flipped him off" and called him a rapist. David also reported to Brown that opposing players in his varsity sport had harassed him on the field calling him a rapist.

226.     David reported to Brown that friends had distanced themselves from him, that he felt isolated and alone on campus, and that it was affecting his mental health.

227.     Brown did not respond in any way to David's reports of this treatment. It did not offer him support or resources to help him manage the situation, despite the presumption of innocence he was entitled to throughout the investigation.

228.     Upon information and belief, Brown provides ample support to female students involved in sexual misconduct proceedings who report similar campus harassment and retaliation.

O.     **Brown's Unreasonable and Biased Treatment of David is a Direct Response to Extreme Pressure to Protect Female Students from Sexual Assault**

229.     Brown's unreasonable position of imposing immediate suspensions against any male, like David, accused of sexual assault, its decision to deny David Smith basic rights guaranteed under Title IX, and its actions in railroading David Smith through a process designed to find him responsible is a tacit response to the fact that it is facing extreme pressure and scrutiny regarding its handling of sexual assault accusations within the university community, including by media articles, vocal campus organizations, social media groups, and in litigation including class action litigation. To be clear, David has never been accused of any misconduct in his life, much less sexual assault. Whether Brown has handled Title IX cases appropriately in the past is no justification for how Brown treated David in this case.

230.    For example, in April 2021, student activists launched a week-long series of campus protests, which included hanging thousands of posters on campus criticizing the University for its purported failure to address sexual violence on campus.[14]

231.    Students and alumni have formed a task force to continually put pressure on campus administrators to clamp down on what they believe to be systemic failures to address a purported culture of sexual violence on campus.[15]

232.    At Brown, there is a history of protests and litigation when male students are found not responsible for sexual misconduct allegations, as occurred in 2014 when a male who was accused of spiking a female student's drink at a party was found not responsible.[16]

233.    Similarly, in 2016 when a male accused student had the audacity to challenge Brown's disciplinary procedures in court, student activists organized a letter writing campaign directed to the judge presiding over the case to try to influence the result.[17]

234.    Students and alumni have formed multiple groups on social media networks, with thousands of members, to place constant and continuous pressure on Brown to take a hard stance against sexual violence on campus. For example, the Instagram group "Voices of Brown," with more than 3,600 followers and more than 180 posts, is a community organization that asks for anonymous posts by Brown students to share their stories of sexual assault. Nearly all of the posts

---

[14]   *See*    https://www.browndailyherald.com/article/2021/04/end-sexual-violence-at-brown-launches-week-of-protest-with-poster-campaign.

[15]   *See*    https://www.browndailyherald.com/article/2014/04/u-mishandled-sexual-assault-case-victim-says/;   https://www.browndailyherald.com/article/2021/04/it-happens-in-the-places-where-we-live-and-sleep-students-fight-for-sexual-assault-resources-on-campus.

[16]   *See* https://www.cbsnews.com/news/ex-student-brown-university-protected-trustees-son-in-frat-party-drugging-case/; https://www.huffpost.com/entry/brown-sexual-assault-protest_n_6859486;

[17]   *See* *https://thetab.com/us/brown/2016/09/01/why-we-need-to-stop-the-student-convicted-of-sexual-assault-coming-back-to-brown-3077*; *also* https://www.wsj.com/articles/brown-university-student-found-responsible-of-sexual-misconduct-by-school-panel-allowed-back-on-campus-for-fall-1472831359.

describe purported acts of sexual violence by men. Similarly, the Instagram Group "End Sexual Violence @ Brown" is "coalition of students and student-run organizations" boasting more than 2,300 followers, which takes particular aim at male fraternities as a source of sexual violence on campus.

235.    Brown recently hired a new Title IX Coordinator, and during its search to fill the position, Brown faced pressure from student activists to appoint someone who will make "fundamental structural changes" because "the University is not treating this issue [sexual assault] with the scale that it needs to be treated."[18]

236.    The Title IX Coordinator Brown ultimately hired, and who presided over David's case, has publicly come out against allowing cross-examination in Title IX proceedings.[19]

237.    The wave of campus activism reached a crescendo in August of 2021—three months before the incident that Jane Roe alleges—when current and former female Brown students filed a class action lawsuit alleging that they were victims of sexual assault caused in part by Brown's systemic failures to address sexual violence on campus.[20] This action remains pending as of the filing of this Complaint.

238.    Brown has responded to this pressure by instituting a policy of immediately suspending any male student accused of sexual assault. Brown also took other steps to minimize due process protections for accused students when it recently updated its sexual misconduct policies.

---

[18]   https://www.browndailyherald.com/article/2021/11/search-for-new-university-title-ix-coordinator-underway.

[19] https://apnews.com/article/0ebd98f4d38643c2912e7159afcb35cb

[20]   *Soenen, et al., v. Brown University*, Case No. 1:21-cv-00325-JJM-PAS (D.R.I.).

239.    For example, after the Department of Education formally amended its Title IX regulations in 2020 to ensure colleges and universities were ensuring procedural fairness, Brown enacted a separate sexual misconduct policy (the Non-Title IX Policy) that was specifically designed to skirt federal regulatory requirements whenever the University can justify avoiding compliance with Title IX. In this way Brown currently maintains two separate but unequal procedures for handling student sexual misconduct cases. The Non-Title IX Policy is Brown's procedure of choice because it dramatically diminishes the rights of accused students to a fair process. Brown's new Title IX Coordinator recently advised David that Brown has not adjudicated a single case under its Title IX Policy since she took over the position.

240.    As set forth above, Brown opted, over David's objection, to adjudicate his sexual misconduct decidedly biased and unfair (against the accused party) Non-Title IX Policy.

**P.    Plaintiff's Entire Future is Severely Damaged by Brown's Actions**

241.    As a result of Brown's actions, David's entire academic career has been halted. Without a college education, his economic and employment future is completely compromised.

242.    David's education is at a standstill. David is unable to continue his education at Brown, or any other comparable institution, due to Brown's wrongful finding against him and the stigma that he has suffered by being labeled a sexual predator.

243.    Brown's actions have also placed his career prospects in jeopardy. David has been offered full time employment upon graduation by a prestigious firm following a highly competitive summer internship that David completed in August of 2022. His offer of employment is contingent upon completion of his Brown degree by the Spring of 2023, when he would otherwise be expected to graduate.

244.     David's academic and disciplinary record is irrevocably and irreversibly tarnished and will not allow him to transfer to any other educational institution to complete his undergraduate degree, let along pursue post-graduate studies.

245.     As a result of Brown's actions, David's parents' financial resources used to provide him with a good education have been squandered.

246.     Without appropriate redress, the unjustified outcome of the hearing will continue to cause irreversible damage to David, with no end in sight. David seeks redress from this Court to undo the wrongs occasioned by Brown on his education and future

## V.    CAUSES OF ACTION

**COUNT I**
**BREACH OF CONTRACT**
**Against Brown University**

247.     David Smith repeats and re-avers each and every paragraph above as if fully set forth herein.

248.     A contract exists between Brown and David. Brown offered David enrollment in the winter of 2018, and David accepted that offer by paying tuition and enrolling in the Class of 2023. As part of his enrollment, Brown required David to comply with its student handbook and all student policies and procedures, including its Title IX Policy and Title IX Procedure (collectively, the "Policies and Procedures").

249.     In order to assure compliance with legal standards and to ensure students' acceptable behavior, Brown maintains a variety of school policies and procedures, including the Title IX Policy, Title IX Procedure, Non-Title IX Policy, and Non-Title IX Procedure.

250.     Pursuant to Rhode Island law, these policies and procedures form the basis of a contractual relationship between Brown and David Smith.

251.    Brown promised to provide the full protections of the procedures outlined in its Title IX Policy whenever adjudicating allegations of sexual misconduct alleged to have occurred at a "location in which Brown exercises substantial control over both the Respondent and the context in which the alleged Prohibited Conduct occurred." Title IX Policy § 2.0.

252.    Brown breached its promise to David Smith by, *inter alia*, refusing to adjudicate the Formal Complaint filed against him by Jane Roe under its Title IX Policy because it concerned conduct that occurred at a location where Brown exercised substantial control over both David Smith and the use of his home for a party, which was the context in which the alleged assault occurred. As noted above, Brown deployed university-employed police officers to David Smith's home to break up the party, investigated David Smith and his housemates for noise violations associated with the party, and disciplined David Smith and his housemates for holding the party. As such, Brown clearly exercised substantial control over David Smith and his home, bringing the alleged conduct within the ambit of Brown's Title IX Policy.

253.    Brown additionally breached its contract with David Smith under both the Title IX and Non-Title IX Procedures, which both promise a "prompt, impartial, and unbiased response to Formal Complaint" and further promise that "[t]his procedure is grounded in fairness and support for all parties, and includes procedural protections that ensure nondiscrimination, adequate notice and meaningful opportunities to participate."  (Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0).

254.    Brown breached its promise to provide a "meaningful opportunity to participate" by: (1) precluding David from being able to question his accuser at a hearing; (2) limiting his defense to a seven minute statement at a non-evidentiary hearing; (3) allowing its investigator to submit an investigation report which Brown knew or should have known contained false,

misleading and incomplete information as outlined more fully above; and (4) instructing David Smith that he could not speak with potential witnesses during the investigation, which precluded him from determining whether people who attended the party and observed Jane Roe may have had relevant information to share.

255.    Brown breached its promise to provide an impartial and unbiased process, grounded in fairness, by engaging an investigator who was blatantly biased and who purposefully misrepresented facts, and by refusing to acknowledge or correct the investigator's mistakes and permitting the Hearing Panel to make a determination based on a false, misleading and incomplete investigation report.

256.    Moreover, Brown breached its promises under both the Title IX and Non-Title Policies to:[21]

    a.    Afford David Smith a "presume[ption] that [he] is not responsible for the alleged Prohibited conduct until a determination is made at the conclusion of this procedure," Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0;

    b.    Not impose any "Interim Action" against a student accused of sexual misconduct unless such measures are "both restorative (designed to address a Complainant's safety and well-being and continued access to educational opportunities) and remedial (involving action against a Respondent without unreasonably burdening a Respondent.)," Title IX Policy § 4.0; Non-Title IX Policy § 4.0;

    c.    Not impose any "Emergency Removal" unless Brown's Threat Assessment Team first identifies "reasonable cause to believe that the Prohibited Conduct is likely to continue and/or the Respondent poses a significant threat of harm to the health, safety, and welfare of others or the University community," Title IX Policy § 4.0; Non-Title IX Policy § 4.0.

    d.    "In all stages of the process, . . . appl[y] the preponderance of the evidence standard (more likely than not) when determining whether the Policy has been violated." Title IX Procedure § 2.3; Non-Title IX Procedure § 2.3.

---

[21]   The provisions of the policies and procedures discussed in this paragraph do not differ between the Title IX and Non-Title IX versions of the policies and procedures. Therefore, regardless of which version of the policies and procedures apply, Brown's contractual obligations are identical.

e.     Ensure that all participants in the disciplinary process are free of conflicts of interest: "The Title IX Program Officer, investigator, hearing panel and other decision makers will be free from conflicts and receive training on identifying and mitigating explicit and implicit bias. The Title IX Office checks for conflict of interest with the parties, investigator, hearing officer, and decision makers. Individuals can disclose potential or actual conflicts as they arise to Title IX Program Officer." Title IX Procedure § 2.7; Non-Title IX Procedure § 2.7.

f.     Ensure a thorough, fair and accurate investigation and a thorough, fair and accurate report. Under Title IX Procedure § 2.9.2 and Non-Title IX Procedure § 2.9.2:

     i.     "The role of the investigator will be to gather, assess, and synthesize the relevant evidence in a report that sets forth the facts determined to have occurred."

     ii.     "The investigator has the discretion to determine the relevance of any witness or other evidence and may exclude information in preparing the investigation report if the information is irrelevant, immaterial, or more prejudicial than informative."

     iii.     "The investigator will prepare an initial (draft) investigation report. A redacted version of the draft investigation report and a redacted copy of all of the physical evidence submitted or obtained is shared electronically with both parties who will have ten (10) business days from the date of delivery of the draft report to review and comment before the investigation report is finalized. The investigator does not make a final determination to whether a policy violation has occurred."

     iv.     "The investigator's report may include credibility assessments, where appropriate, based on their interviews with the Complainant, Respondent, witnesses, and review of the material evidence, as well as the basis of those assessments. The credibility assessment may include direct observations and reasonable inferences drawn from the facts and any consistencies or inconsistencies between the various sources of information."

     v.     "To ensure that the investigator is complying with their role as outlined in these procedures, the Title IX Program Officer will review the investigation report in advance of the parties for thoroughness and accuracy and may return the investigation report to the investigator in instances where the investigator does not comply with their role, the Title IX Program Officer questions an initial decision of relevance of evidence, clarification is needed, or

the potential policy violation is not addressed in a manner consistent with the Policy definition."

257.   Brown failed to afford David Smith each of these contractual rights.

258.   Brown failed to afford David Smith his contractual right to be presumed "not responsible" for the conduct alleged by Jane Roe, because Brown removed David Smith from campus and suspended him before performing an investigation of Jane Roe's allegations.

259.   As a direct and foreseeable consequence of these breaches, David Smith has sustained damages.

260.   In addition, Brown's conduct in this matter was deeply unfair, oppressive and counter to public policy. All of the forgoing breaches were committed maliciously and in bad faith and constitute egregious circumstances sufficient to warrant punitive damages.

**COUNT II**
**DISCRIMINATION IN VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681 *ET SEQ.***
**Against Brown University**

261.   David Smith repeats and re-avers each and every paragraph above as if fully set forth herein.

A.   **Federal statutes and regulations forbidding gender discrimination and retaliation and requiring prompt and equitable disciplinary proceedings**

262.   Title IX provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.

263.   Defendant Brown is a recipient of federal funds and is therefore bound by Title IX and its regulations.

264.     As interpreted by federal courts, Title IX protects students attending federally-funded educational institutions from sexual harassment and assault, discrimination based on gender, and retaliation for having exercised rights protected by Title IX.

265.     A federally-funded educational institution violates Title IX if it subjects a male student to adverse treatment because of his gender.

266.     A federally-funded educational institution violates Title IX if it retaliates against a student by taking adverse action against the student in response to the student's exercise of a protected right under Title IX, including but not limited to the student's right to file a report of sexual assault or a report of gender discrimination or defend himself against accusations of sexual misconduct.

267.     Complementing Title IX, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act is a federal statute requiring federally-funded educational institutions to maintain and disclose campus crime statistics and security information. 20 U.S.C. § 1092(f).

268.     Under the Clery Act, as amended in 2013, school disciplinary procedures for alleged sexual misconduct must "provide a prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa).

269.     The United States Department of Education's regulations implementing Title IX, as issued in 1975, require federally-funded educational institutions to "adopt and publish grievance procedures providing for prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited" by Title IX and implementing federal regulations. 34 C.F.R. § 106.8(b).

270.     Regulations implementing the Clery Act require that campus Title IX proceedings:

a.      "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result";

b.      be conducted by trained officials;

c.      be conducted in a way that is "consistent with the institution's policies and transparent to the accuser and accused";

d.      give "timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings";

e.      be "[c]onducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused"; and

f.      include in "any initial, interim, and final decision by any official or entity authorized to resolve disciplinary matters" "the rationale for the result and the sanctions." 34 F.R. § 668.46(k).

271.    The regulations also prohibit retaliation: "An institution, or an officer, employee, or agent of an institution, may not retaliate, intimidate, threaten, coerce, or otherwise discriminate against any individual for exercising their rights or responsibilities under any provision in this section." 34 CFR § 668.46(m).

**B.      OCR's 2001 Guidance affirming the requirement that disciplinary proceedings be prompt and impartial**

272.    In 2001, after a public notice and comment period, the U.S. Department of Education's Office for Civil Rights ("OCR") issued a document entitled "Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance") (https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf).

273.    OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable." *Id.* at 20. These elements apply to private and public colleges and universities and include "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence," and

"[d]esignated and reasonably prompt timeframes for the major stages of the complaint process."
Id.

274.    OCR's 2001 Guidance further stated that "[a]ccording due process to both parties
involved, will lead to sound and supportable decisions." *Id.* at 22 (emphasis added).  Title IX's
"due process" requirement applies to both public and private colleges and universities. *Id.* at 2, 22.

**C.**    **Starting in 2011, the federal government pressured educational institutions to**
       **provide more protection to students alleging sexual assault, focusing on**
       **protection of women.**

275.    In the years leading up to the incident in question, colleges in the United States,
including Brown, have been subjected to pressure from the federal government, the public, and
members of college communities to take campus sexual misconduct more seriously, provide more
protection to purported victims, and crack down on purported offenders.

276.    On April 4, 2011, the OCR issued a "significant guidance document" commonly
referred to as the 2011 "Dear Colleague Letter." *Letter from Russlynn Ali, Assistant Sec'y for Civil
Rights, U.S. Dep't of Educ., Office for Civil Rights* (Apr. 4, 2011) at n.1, available at
http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf   (hereinafter "2011 Dear
Colleague Letter").

277.    Although the letter marked a substantial change in OCR's position on how schools
should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and
comment process required for proposed regulations. *See* Administrative Procedure Act, 5 U.S.C.
§ 553.

278.    The press release announcing the letter stated that it was "the first specifically
advising schools, colleges and universities that their responsibilities under Title IX include
protecting students from sexual violence," and that it included "new steps to help our nation's
schools, universities and colleges end the cycle of sexual violence on campus." The press release

made clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women"; it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college"; and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages." *Vice President Biden Announces New Administration Effort to Help Nation's Schools Address Sexual Violence* (Apr. 4, 2011), https://www.ed.gov/news/press-releases/vice-president-biden-announces-new-administration-effort-help-nations-schools-ad.[22]

279.    The 2011 Dear Colleague Letter itself explicitly focused on protection of women, repeating the claim that "about 1 in 5 women are victims of completed or attempted sexual assault while in college" and stating that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol." *2011 Dear Colleague Letter* at 2 & n.3.

---

[22] The "one in five" "statistic," regularly cited by government officials and many others as the basis for government policy decisions, disciplinary processes, training materials, and advocacy efforts, has been thoroughly discredited. *E.g.* https://www.washingtonpost.com/news/fact-checker/wp/2014/12/17/one-in-five-women-in-college-sexually-assaulted-an-update/?utm_term=.7f211e30541e; https://www.washingtonexaminer.com/no-1-in-5-women-have-not-been-raped-on-college-campuses; http://www.slate.com/articles/double_x/doublex/2015/09/aau_campus_sexual_assault_survey_why_such_surveys_don_t_paint_an_accurate.html. The Bureau of Justice Statistics' National Crime Victimization Survey reports a much lower rate of sexual assault: 6.1 per 1000 female students from 1995 to 2013, with the rate trending downwards. https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf. Similarly, advocates for reported victims often suggest false accusations of sexual assault are rare. These claims too have been disputed, have been undermined by some high profile cases, and do not appear to take into account the wide spectrum of situations in which complaints can be made. But regardless of the accuracy of these claims, the decision in any particular case should be based on the facts of that case, objectively and fairly assessed. One sexual assault is too many; one false accusation is too many.

280.     The letter contained provisions which expanded the nature and scope of schools'
responsibility to address sexual misconduct, essentially compelling them to choose between
fundamental fairness for students and continued federal funding. These provisions are not required
by Title IX and are not consistent with legal precedent.

281.     Among other things, the 2011 Dear Colleague Letter directed schools to ensure
"steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily
delay the Title IX protections for the complainant" (*id.* at 12); directed schools to take interim
steps to protect complainants and "minimize the burden on the complainant" (*id.* at 15-16);
"strongly discourage[d]" schools from allowing cross-examination of parties (*id.* at 12); and urged
schools to focus on victim advocacy (*id.* at 19 n.46).

282.     The 2011 Dear Colleague Letter also stated that schools "must use a preponderance
of the evidence standard (i.e., it is more likely than not that sexual harassment or violence
occurred)," and must not use the "clear and convincing standard (i.e., it is highly probable or
reasonably certain that the sexual harassment or violence occurred)." *Id.*

283.     Even though the 2011 Dear Colleague Letter purports to be a "guidance" document
and did not go through rulemaking procedures, OCR framed many of its directives, including the
directive to use the preponderance of the evidence standard, as mandatory.

284.     Moreover, the 2011 Dear Colleague Letter contained an explicit threat to colleges
and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate
proceedings to withdraw Federal funding by the Department or refer the case to the U.S.
Department of Justice for litigation." *Id.* at 16.

285.     The overriding purpose of the 2011 Dear Colleague Letter was "to make it easier
for victims of sexual assault to make and prove their claims and for the schools to adopt punitive

measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the *Brandeis* court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished." *Id.*

286.    The 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual misconduct proceedings as OCR wanted. *See How Sexual Assaults Came to Command New Attention*, NPR (Aug. 13, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention.

287.    After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual misconduct, to adopt procedures that do not safeguard the rights of the accused, and to train officials to start with the presumption that an accused student is responsible, all with a focus on protection of women.

288.    In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."  In addition, OCR advised schools to give employees and students "trauma-informed" training and said "hearings should be conducted in a manner that does not inflict additional trauma on the complainant." Questions and Answers on Title IX and Sexual Violence, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

289.    The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued

the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence." *Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault*, at 2, https://www.justice.gov/ovw/page/file/905942/download.

290.    The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding. *Id*. at 2, 17.

291.    Among other things, the Task Force supported the use of a single investigator model, which generally involves one school official serving as investigator, prosecutor, and decisionmaker and severely limits the respondent's ability to challenge the complainant's account. *Id*. at 3, 14.

292.    The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." *Id*. at 3.

293.    The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs. *Id*.

294.    Ultimately, the Department of Justice funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." *End Violence Against Women International, Effective Report Writing: Using the Language of Non-Consensual*

*Sex*, at 6, http://evaw.threegate.com/Library/DocumentLibraryHandler.ashx?id=43; *see also Campus Action Kit, Start by Believing*, https://www.startbybelieving.org/wp-content/uploads/2019/08/Campus-Action-Kit.pdf.

295.    Among other things, "Start by Believing" training directs investigators to:

a.    "recreate the entire reality of the sexual assault from the perspective of the victim";

b.    focus on evidence and statements that "corroborate the victim's account";

c.    include details not just about what happened, but about "what the victim was thinking and feeling," in order to create a "word picture" that "better support[s] prosecution";

d.    "replace neutral words such as 'said,' 'told,' or 'asked'" with more "descriptive" words – e.g., say the "victim" "begged" or "pleaded," and the "suspect" was "ordering," "insisting," or "demanding";

e.    "describ[e] all of the elements that contributed to the victim's experience of force, threat, or fear";

f.    "always use the language of non-consensual sex"; i.e., instead of "terms that convey positive, mutual interactions such as 'sexual intercourse' [or] 'oral sex,'" "it is sometimes appropriate to use terminology from the penal code, such as 'rape' or 'sexual assault,'" or, alternatively "simply describe the parts of the body and the things the victim was forced to do with those parts of the body";

g.    "highlight implausible, absurd, and/or changing explanations provided by the suspect regarding what happened";

h.    "try to anticipate potential defense strategies and include the evidence and information necessary to counter these strategies"; and

i.    "ensure that . . . reports include all of the evidence required to prove the elements of the offense and refute the likely defense, which in most sexual assault cases is going to be consent."

*Effective Report Writing: Using the Language of Non-Consensual Sex*, at 5, 7, 8, 10, 11, 12, 14, 23, 30 (emphasis original).

296.    In sum, "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can

greatly increase the likelihood that charges will be filed in the case and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'" Effective Report Writing: Using the Language of Non-Consensual Sex, at 37.

**D.** **In response to government and public pressure, colleges and universities across the nation adopted Title IX policies and procedures that are "victim"-centered and fundamentally unfair to accused students.**

297.     The threats and pressure from OCR forced colleges and universities to change their policies, since virtually all colleges and universities in the country receive federal funding.

298.     In response to the federal government's directives and enforcement activities, schools across the nation adopted special policies for disciplinary proceedings involving alleged sexual misconduct. In many instances, the policies and processes offered accused students significantly less protections than students receive in other campus disciplinary matters, including matters involving allegations of serious non-sexual misconduct.

299.     In their policies for adjudicating Title IX complaints, many schools went even further than OCR's specific directives in adopting procedures favoring alleged victims (the great majority of whom are female) and essentially eliminating fair process protections for respondents (the great majority of whom are male).

300.     Following the model of the federally-funded "Start by Believing" campaign, schools routinely trained their officials to apply trauma-informed and "#BelieveWomen" approaches in ways that lead them to presume that an alleged assault occurred, that a complainant's account of an incident must be true, and that a complainant's subjective impressions determine whether conduct is sexual harassment or assault. Students are suspended or expelled without meaningful notice or opportunity to be heard and are left with records that permanently brand them

as sexual offenders, devastate them personally, and severely impact their educational and career opportunities.

301.    "Because the changes to the process were impelled in large part by the federal government, the issues presented [in any particular case] are not entirely unique, and not confined to a single campus." *Brandeis*, 177 F. Supp. 3d at 572.

302.    In the words of a judge considering college disciplinary procedures that "appear[] to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process:" "it is not enough simply to say that such changes are appropriate because victims of sexual assault have not always achieved justice in the past. Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision. Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion." *Brandeis*, 177 F. Supp. 3d at 573.

E.    **Starting in 2017, the Department of Education modified its approach to Title IX enforcement, focusing on fairness to all parties.**

303.    On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

304.    DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." *Id.*

305.    Acknowledging the massive pressure placed on universities and educational programs, by the 2011 Dear Colleague Letter, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington." *Id.*

306.    With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." *Id.* She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." *Id.*

307.    In guidance documents issued on September 22, 2017, the Department of Education expressed concern that many schools have established procedures for resolving allegations that "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'" Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, provided guidance on procedural protections necessary for a fair, reliable process. 2017 Q&A, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

308.    On November 29, 2018, the Department published new proposed regulations for public review and comment. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance:

https://www.federalregister.gov/documents/2018/11/29/2018-25314/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal.

309.   The proposed regulations represented the Department's effort to align Title IX regulatory requirements with basic principles of justice and court rulings requiring that people accused of serious misconduct receive notice, a fair hearing before unbiased decision makers, and a presumption of innocence. *Id.*

310.   The proposed regulations set forth specific procedural protections including:

a.   Provisions requiring schools to provide adequate notice of allegations and their applicable procedures, conduct full and fair investigations, collect and objectively evaluate both exculpatory and inculpatory evidence, create investigative reports that fairly summarize relevant evidence, provide fair hearings in front of unbiased decisionmakers (who cannot be the same people as the investigator(s)), and give respondents a presumption of non-responsibility.

b.   Provisions requiring schools to allow both parties to review all the evidence related to the allegations (not just evidence the school considers relevant or intends to rely on), so that the parties can meaningfully respond to the evidence before the investigation concludes.

c.   Provisions requiring schools to train officials to conduct impartial proceedings, not to rely on sex stereotypes, and not to base credibility decisions on a party's status as complainant or respondent.

d.   Provisions requiring colleges and universities to provide a live hearing and allow advisors to the parties to cross-examine the other party and witnesses.

311.   The proposed regulations confirmed that "[a school's] treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX" and that "[a school's] treatment of the respondent may also constitute discrimination on the basis of sex under title IX." Proposed 34 C.F.R. § 106.45.

312.   On May 7, 2020, the Department of Education announced the final Title IX regulations. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving

Federal Financial Assistance (to be published in the Federal Register; unofficial text available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf).

313.    Under the final regulations: "A recipient's response must treat complainants and respondents equitably by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." 34 C.F.R. § 106.44(a), as amended.

314.    Section 106.45(b) sets forth the specific requirements for a formal grievance process.

315.    The required procedural protections include provisions the Department proposed in 2018, as summarized above.

316.    The Department repeatedly emphasized that the protections it has mandated are rooted in longstanding principles of due process and fundamental fairness and apply to both private and public institutions. "[A]s the Department has recognized in guidance for nearly 20 years, Title IX rights must be interpreted consistent with due process guarantees." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Supplementary Information, at 276.

317.    Section 106.45(a) confirms that a school's "treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX."

318.    As the Department explained: "a process lacking principles of due process risks bias that in the context of sexual harassment allegations is likely to involve bias based on stereotypes and generalizations on the basis of sex." Supplementary Information, at 220, 277.

319.    Significantly, the new regulations also reduced the scope of Title IX's reach with respect to when colleges must investigate off-campus conduct. The 2020 regulations provide that colleges are only required to pursue Title IX allegations that occur during an institution's education program or activity over which the institution exercised substantial control over both the respondent and the context in which the alleged sexual harassment occurred.

320.    Despite the fact that the 2020 regulations were intended to restore fairness and due process, Brown seized upon this opportunity to draft and implement a separate set of rules for adjudicating off-campus allegations of sexual misconduct between students. The separate policy Brown developed reverted back to the same victim-centric approach the Department of Education had attempted to correct.

321.    In a tacit admission that Brown does not agree with the due process concerns raised by the Department of Education and remains completely beholden to victim advocacy groups, Brown's new sexual misconduct procedures for off-campus conduct (the Non-Title IX Policy) essentially mirror its Title IX Policy except for critical hearing procedures, where Brown carefully stripped out the new requirements imposed by the 2020 regulations for conducting fair hearings.

322.    Specifically, while both the Title IX and Non-Title IX Procedures provide for something Brown labels a "live hearing," the Title IX Procedure "provides the Complainant and Respondent the opportunity to pose questions to the other party, investigator, and witnesses to elicit relevant factual information missing from the final investigation report." Title IX Procedure § 2.9.4.4. The Non-Title IX Procedure *eliminates* that right. While it provides that "[t]he Hearing Panel *may* pose questions to the parties, investigator, and witnesses (if applicable) to elicit relevant factual information missing from the final investigation report," "[t]he *presumption* is that the investigator has identified and interviewed all relevant witnesses and supplied the information

necessary for the Hearing Panel to render its decision and determine sanctions." *All* the parties are allowed to do is to "make a verbal statement regarding the facts," which "must be no more than seven (7) minutes in length." Non-Title IX Procedure § 2.9.4.

323.    Under the Non-Title IX Policy, the "hearing" has been reduced to a mere formality, where the parties are not allowed to ask questions, not allowed to present witnesses or evidence, and are only permitted to speak once for a maximum of seven minutes. The only evidence to be considered at the hearing is the written record and report assembled by the investigator. The Investigator is the primary witness at the hearing and the investigator is allowed to decide questions of credibility between the complainant and respondent.

324.    As such, the model Brown adopted in its Non-Title IX Policy closely resembles the "single investigator model" (but for the perfunctory show-hearing) that the Department of Education had determined was particularly problematic.

325.    It appears that Brown largely cut-and-paste its Title IX Policy when drafting its Non-Title IX Policy, as there remain notes that refer to cross-examination within the Non-Title IX Policy even though Brown removed the right to cross-examination from the Non-Title IX Policy.

326.    Upon information and belief, Brown has since sought to adjudicate all student sexual misconduct matters under the Non-Title IX Policy to ensure that men accused of sexual assault are found responsible, even where (as in David's case) the Title IX Policy clearly applies.

**F.    Pro-"victim" bias violates Title IX.**

327.    Since cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily result in harsher treatment of men.

328.    Indeed, as noted above, efforts to provide more protections to reported victims of sexual misconduct have consistently focused on protection of women.

329.     As the new Title IX regulations confirm, any approach under which accused people are presumed guilty or deprived of the ability to defend themselves, or individual cases are resolved without full and fair consideration of the facts of each case, is contrary to this nation's fundamental principles and contrary to Title IX and the Clery Act's requirements of a "prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa); see also 34 C.F.R. 106.8(b) and 45 C.F.R. § 86.8(b) (quoted above).

330.     In the words of Justice Ruth Bader Ginsburg, fair process for the accused "must not be ignored and it goes beyond sexual harassment. The person who is accused has a right to defend herself or himself, and we certainly should not lose sight of that. Recognizing that these are complaints that should be heard. There's been criticism of some college codes of conduct for not giving the accused person a fair opportunity to be heard, and that's one of the basic tenets of our system, as you know, everyone deserves a fair hearing." Asked how to "balance the values of due process against the need for increased gender equality," Justice Ginsburg replied: "It's not one or the other. It's both. We have a system of justice where people who are accused get due process, so it's just applying to this field what we have applied generally." Jeffrey Rosen, Ruth Bader Ginsburg Opens Up About #MeToo, Voting Rights, and Millennials, The Atlantic (Feb. 15, 2018), https://www.theatlantic.com/politics/archive/2018/02/ruth-bader-ginsburg-opens-up-about-metoo-voting-rights-and-millenials/553409/.

331.     That measures to protect reported victims are generally equated with protection of women, and measures to ensure a fair process for respondents are generally equated with protection of men, has been starkly confirmed by responses to the Department of Education's 2017 guidance and its proposal in 2018 to amend Title IX regulations to ensure a fair process for both complainants and respondents.

332.     Over 100,000 comments were filed to the proposed regulations, with a common theme being allegations that the Department's efforts to restore fair processes in campus disciplinary proceedings were motivated by bias against women and disproportionately burden women.

### G.     Brown's Conduct Violates Title IX

333.     As set forth in more detail at paragraphs 209-220 Brown was under considerable pressure from a class action alleging that Brown mishandled sexual misconduct complaints brought by female students, and relentless campus activism and political pressure aimed at forcing Brown to protect female students from a perceived threat of rampant sexual assault on campus. In an effort to address those concerns the University's Title IX personnel in David Smith's case failed in crucial ways in each phase of the disciplinary proceeding to adhere to Title IX's requirement of a fair and impartial proceeding free from gender bias.

334.     Brown instituted a policy of immediately suspending men accused of sexual misconduct, before conducting any inquiry into the allegations. Brown immediately suspended David and at least one other male student who had been accused in an unrelated sexual misconduct matter at or around the same time. Brown only relented from this policy when a Court issued an injunction against it. *See David Stiles v. Brown University*, Civil No. 1:21-cv-00497-MSM-LDA at Doc. No. 30.

335.     Brown reached an adverse, erroneous outcome in David's case. David Smith was innocent and wrongly found to have committed a sexual assault, and gender bias was a motivating factor behind the erroneous finding.

336.     As set forth in detail in the foregoing complaint, the investigator engaged in certain intentional acts and omissions with respect to the gathering of evidence that favored Jane Roe to David Smith's detriment and the Hearing Panel's finding was entirely based upon a flawed and

demonstrably false and misleading investigation report which relied on gender stereotypes in making credibility determinations in favor of Jane Roe and against David Smith.

337.    Upon information and belief, Brown's lack of fairness in its handling of the disciplinary proceeding in David's case was intentional and was motivated by institutional gender bias created by a campus climate that supported student "survivors" of sexual assault, who are overwhelmingly female, and who are presumed to be victims based on their accusation before an investigation and adjudication even begins, and under pressure from a class action and it associated negative press in which Brown is alleged to have mishandled and failed to prevent systemic sexual assault of its female student population.

338.    Based on the foregoing intentional acts and omissions, David was subjected to a gender biased, prejudicial, and explicitly unfair process in violation of Title IX.

339.    Brown was on notice of, and was deliberately indifferent to, the serious flaws in the investigation of Jane Roe's complaint and the bias demonstrated by the investigators, the Hearing Panel, and the Appeal Panel in favor of Jane and against David. Brown did nothing to address or remedy the harm to David.

340.    The University selectively enforced its Title IX policies by treating David as a male student accused of sexual misconduct less favorably than it would treat a similarly situated female student.

341.    Brown's conduct was so severe, pervasive, and objectively offensive that it denied David equal access to education that Title IX is designed to protect.

342.    This unlawful discrimination in violation of Title IX proximately caused David to sustain substantial injury, damage, and loss, including without limitation, emotional distress,

psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

343.    As a result, David is entitled to injunctive relief, specific performance, and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT III**
**NEGLIGENT HIRING & SUPERVISION**
**Against Brown University**

344.    David Smith repeats and re-avers each and every paragraph above as if fully set forth herein.

345.    Brown owed David Smith a duty to use reasonable care in investigating Davis' background to ensure she was qualified and unbiased before retaining her to perform investigations of sexual misconduct cases.

346.    Brown owed David Smith a duty to ensure that Davis was adequately trained on Brown's policies and procedures as well as on basic standards and best practices for conducting investigations.

347.    Brown owed David Smith a duty to provide adequate and reasonable supervision of Davis in the conduct of her investigation and preparation of her investigation report.

348.    Brown breached each of these duties as detailed in this Complaint.

349.    Brown failed to uncover, or negligently disregarded, information that should have called into question Davis' competency and personal biases.

350.    Brown was on notice during the investigation that Davis was not adequately investigating the allegations brought by Jane Roe against David Smith and that Davis had drafted an investigation report that misrepresented the evidence gathered during her investigation.

351.    As a result of the above-described conduct, David Smith has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**<u>COUNT IV</u>**
**VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION ACT**
***Against Brown University***

352.    David Smith repeats and re-avers each and every paragraph above as if fully set forth herein.

353.    Rhode Island's Unfair Trade Practice and Consumer Protection Act ("UTPCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 6 R.I. Gen. Laws Ann. § 6-13.1-1.2.

354.    As used in Section § 6-13.1-1.2 of the UTPCPA, "trade" and "commerce" mean "the advertising, offering for sale, sale, distribution of any service and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value...." 6 R.I. Gen. Laws Ann. § 6-13.1-1.

355.    As used above, "unfair methods of competition and unfair or deceptive acts or practices" is defined in Section 6-13.1-1 of the UTPCPA to include:

      a.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have....";

-103-

b. "Representing that goods or services are of a particular standard, quality, or grade...."

c. "Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding";

d. "Engaging in any act or practice that is unfair or deceptive to the consumer"; and

e. "Using any other methods, acts, or practices that mislead or deceive members of the public in a material respect."

356.    The UTPCPA permits a private right of action in which the plaintiff may "recover actual damages or five hundred dollars ($500), whichever is greater." *See* 6 R.I. Gen. Laws Ann. § 6-13.1-5.2.

357.    Under the UTPCPA, the court may award damages "equal to three (3) times the amount of actual damages and, in its discretion, provide other equitable relief that it deems necessary or proper." *See id.*

358.    In addition to the relief above, the UTPCPA permits a court to award reasonable attorneys' fees and costs. *See id.*

359.    David Smith has paid substantial tuition to receive an education from Brown.

360.    As detailed in this Complaint, Brown made numerous representations about the features of its sexual misconduct procedures that turned out to be false. These include:

f. Representing that Brown would provide the full protections of the procedures outlined in its Title IX Policy whenever adjudicating allegations of sexual misconduct alleged to have occurred at a "location in which Brown exercises substantial control over both the Respondent and the context in which the alleged Prohibited Conduct occurred." Title IX Policy § 2.0.

g.   Representing that Brown would provide a "prompt, impartial, and unbiased response to Formal Complaints." Non-Title IX Procedure § 1.0; Title IX Procedure § 1.0.

h.   Representing that Brown's procedure is "grounded in fairness and support for all parties, and includes procedural protections that ensure nondiscrimination, adequate notice and meaningful opportunities to participate." Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0.

i.   Representing that respondents are afforded a "presum[ption] that [they] are not responsible for the alleged Prohibited conduct until a determination is made at the conclusion of this procedure." Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0.

j.   Representing that Brown will not impose any "Interim Action" against a student accused of sexual misconduct unless such measures are "both restorative (designed to address a Complainant's safety and well-being and continued access to educational opportunities) and remedial (involving action against a Respondent without unreasonably burdening a Respondent.)," Title IX Policy § 4.0; Non-Title IX Policy § 4.0.

k.   Representing that Brown will not impose any "Emergency Removal" unless Brown's Threat Assessment Team first identifies "reasonable cause to believe that the Prohibited Conduct is likely to continue and/or the Respondent poses a significant threat of harm to the health, safety, and welfare of others or the University community." Title IX Policy § 4.0; Non-Title IX Policy § 4.0.

l.   Representing that Brown will "[i]n all stages of the process, . . . appl[y] the preponderance of the evidence standard (more likely than not) when determining whether the Policy has been violated." Title IX Procedure § 2.3; Non-Title IX Procedure § 2.3.

m.   Representing that all participants in the disciplinary process are free of conflicts of interest. *See* Title IX Procedure § 2.7; Non-Title IX Procedure § 2.7.

n.   Representing that Brown's Title IX Program Officer will review the investigation report for thoroughness and accuracy and return the report to the investigator when he or she does not comply with their role. *See* Title IX Procedure § 2.9.2; Non-Title IX Procedure § 2.9.2.

o.   Representing that the investigator will gather, assess, and synthesize the relevant evidence. *See* Title IX Procedure § 2.9.2; Non-Title IX Procedure § 2.9.2.

361.   Further, Davis' numerous and blatant falsifications of the record, as detailed above, are practices that "unfair or deceptive to the consumer" and that "mislead or deceive members of the public in a material respect" under Section 6-13.1-1 of the UTPCPA.

362.   As a result of the above-described conduct, David Smith has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT V
## NEGLIGENCE
**Against Brown University, Donna Davis and Davis Consulting Group, LLC**

363.    David Smith repeats and re-avers each and every paragraph above as if fully set forth herein.

364.    Donna Davis and Davis Consulting, LLC (collectively, "Davis") accepted the role of outside investigator for Brown University with the understanding that she would be conducting investigations of serious matters with potentially grave and life-altering consequences for the students involved.

365.    Davis owed David Smith a duty of reasonable care to be thorough, objective, truthful, accurate, and diligent in gathering all relevant evidence, including any and all exculpatory evidence for the accused, and to accurately and objectively report the results of this investigation to the University's hearing panel.

366.    Brown owed David Smith the same duty of reasonable care to be thorough, objective, truthful, accurate, and diligent in gathering all relevant evidence, including any and all exculpatory evidence for the accused, and to accurately and objectively report the results of this investigation to the University's hearing panel. *Cf. Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 251 (6th Cir. July 19, 2005); *Collick v. William Paterson Univ.*, No. 16-471, 2016 WL 6824374, at *26 (D.N.J. Nov. 17, 2016); *Doe v. Univ. of S.*, No. 09-62, 2011 WL 1258104, at *21 (E.D. Tenn. Mar. 31, 2011); *Doe v. Univ. of Denver*, 2022 COA 57, ¶¶ 3, 60-61, 2022 WL 1670545, *1, 10 (Colo. App. 2022).

367.    As detailed in this Complaint, Davis breached the above-referenced duties by falsifying facts to incriminate David Smith in the investigation report, willfully ignoring and suppressing exonerating evidence during her investigation, failing to interview critical witnesses

that were known to her, restraining David Smith from speaking with witnesses despite no such prohibition within Brown's policies, and in willfully failing to conduct a reasonable or adequate investigation.

368.    Brown is liable for Davis' breaches of duty because Brown trained Davis, appointed Davis, promised to oversee Davis, and otherwise exercised substantial control over Davis.

369.    As a result of the above-described conduct, David Smith has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT VI
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Against Brown University, Donna Davis and Davis Consulting Group, LLC**

370.    David Smith repeats and re-avers each and every paragraph above as if fully set forth herein.

371.    As detailed in this Complaint, Davis' conduct in falsifying facts to incriminate David Smith in the investigation report, willfully ignoring and suppressing exonerating evidence during her investigation, failing to interview critical witnesses that were known to Davis, restraining David Smith from speaking with witnesses despite no such prohibition within Brown's policies, and in willfully failing to conduct a reasonable or adequate investigation was extreme and outrageous.

372.    Davis intended her conduct to inflict severe emotional distress, or knew there was at least a high probability that her conduct would cause severe emotional distress to David Smith.

373.    As detailed in this Complaint, David Smith informed Brown of Davis' numerous falsifications, but Brown refused to remedy them. Brown intended this conduct to inflict severe emotional distress, or knew there was at least a high probability that this conduct would cause severe emotional distress to David Smith.

374.    Brown is liable for Davis' misconduct as described above because Brown trained Davis, appointed Davis, promised to oversee Davis, and otherwise exercised substantial control over Davis.

375.    David Smith, like other students, stood "in a particularly vulnerable relationship vis-à-vis the university." *See Doe v. Brown Univ.*, No. 20-2023, 2022 WL 3095288, at *10 (1st Cir. Aug. 4, 2022). The nature of this relationship, in which Brown had actual authority over David Smith, makes the conduct described above particularly extreme and outrageous.

376.    As a result of the above-described conduct, David Smith has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT VII
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
*Against Donna Davis and Davis Consulting Group, LLC*

377.     David Smith repeats and re-avers each and every paragraph above as if fully set forth herein.

378.     A contract exists between Brown and David Smith. Brown offered David Smith enrollment in the winter of 2018, and David Smith accepted that offer by paying tuition and enrolling in the Class of 2023. As part of his enrollment, Brown required David Smith to comply with the Policies and Procedures.

379.     Pursuant to Rhode Island law, the Policies and Procedures form the basis of a contractual relationship between Brown and David Smith.

380.     Under the Policies and Procedures, Brown was required to provide to David Smith a "prompt, impartial, and unbiased response to Formal Complaint" and a "procedure [that] is grounded in fairness and support for all parties, and includes…meaningful opportunities to participate." (Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0).

381.     Further, under the Policies and Procedures, the investigator's role is to "gather, assess, and synthesize the relevant evidence in a report that sets forth the facts determined to have occurred." (Title IX Procedure § 2.9.2; Non-Title IX Procedure § 2.9.2).

382.     Davis knew of Brown's Policies and Procedures. In fact, Davis received training from Brown on how to conduct investigations. (Title IX Policy § 3.5; Non-Title IX Policy § 3.5).

383.     Further, as Donna Davis had legal training, she had reason to know that these Policies and Procedures formed a contract between Brown and David Smith.

384.     Davis intentionally interfered with the contract between Brown and David Smith by: (1) submitting an investigation report containing false, misleading, and incomplete information as outlined more fully above, which was delivered to and relied upon by the hearing panel; and (2) instructing David Smith that he could not speak to anybody about the case, including witnesses.

385.    By interfering in the manner described above, Davis prevented Brown from providing an "impartial[] and unbiased response to Formal Complaint" and a "procedure [that] is grounded in fairness and support for all parties, and includes...meaningful opportunities to participate." (Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0).

386.    Davis' interference with the contract between Brown and David Smith was improper, unprivileged, and lacked any legal justification. Davis intended to deprive David Smith of the impartial, unbiased, and fair treatment that Brown's Policies and Procedures afforded him. Davis also intended to deprive David Smith of a meaningful opportunity to participate in his disciplinary investigation.

387.    As a result of the above-described conduct, David Smith has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

<strong>PRAYER FOR RELIEF</strong>

**WHEREFORE**, for the foregoing reasons, David Smith demands the following relief from Defendants Brown University, Donna Davis and Davis Consulting, LLC:

    a.    An award of compensatory damages in an amount exceeding $75,000 to be determined at trial;

    b.    An award of punitive damages in an amount to be determined by the Court and that is sufficient to deter Defendants' willful and malicious conduct committed in bad faith;

c.  The issuance of a permanent injunction ordering Brown to reverse the suspension and allow David Smith to resume university activities, including attending classes and athletic training and events, under the existing No-Contact Order or other appropriately-tailored measures to ensure separation between David Smith and Jane Roe;

d.  The issuance of a permanent injunction prohibiting Brown from conducting a new investigation and/or disciplinary proceeding against David in connection with Jane Roe's underlying complaint given Brown's demonstrated history of animus toward affording David a fair process as well as the inability of David to now obtain relevant witness testimony needed for his defense as a result of the passage of time during which Brown prohibited David from speaking with witnesses at the same time its investigator declined to interview relevant witnesses;

e.  An award of the costs and expenses of suit;

f.  Attorneys' fees; and

g.  Such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff David Smith demands a trial by jury on all issues so triable.

Dated:  September 9, 2022

By: */s/ Maria F. Deaton*
    Patrick C. Lynch, Esq. (#4867)
    Maria F. Deaton, Esq. (#7286)
    Lynch & Pine, Attorneys at Law
    One Park Row, Fifth Floor
    Providence, RI 02903
    (401) 274-3306
    plynch@lynchpine.com
    mdeaton@lynchpine.com

By: */s/ Patricia M. Hamill*
    Patricia M. Hamill, Esq. (*pro hac pending*)
    Andrew S. Gallinaro, Esq. (*pro hac pending*)
    Conrad O'Brien, PC
    1500 Market Street, Suite 3900
    Centre Square, West Tower
    Philadelphia, PA 19102
    (215) 864-9600
    phamill@conradobrien.com
    agallinaro@conradobrien.com

By: */s/ Douglas F. Gansler*
    Douglas F. Gansler, esq. (*pro hac pending*)
    Cadwalader, Wickersham & Taft LLP
    700 Sixth Street, N.W.
    Washington, DC 20001
    (202) 862-2300
    douglas.gansler@cwt.com

**VERIFICATION**

The undersigned hereby swears under pains and penalties of perjury that the facts stated

in the foregoing Verified Complaint are true and accurate to the best of his knowledge.

*David Smith*
_____
David Smith