# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DAVID SMITH, | ) |
|       Plaintiff, | ) |
| | ) |
|    vs. | ) |
| | ) |
| BROWN UNIVERSITY, | ) |
| | ) |
| DAVIS CONSULTING GROUP, LLC, and | ) |
| | ) |
| DONNA DAVIS, Individually | ) |
|       Defendants. | ) |

Case No.: 1:22-cv-00329

**JURY TRIAL DEMANDED**

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF DAVID SMITH'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF

This action stems from a grievously mishandled and biased student disciplinary proceeding conducted by Defendant Brown University. Plaintiff David Smith[1] was falsely accused of sexual assault by a female Brown student (referred to as Jane Roe), then erroneously found responsible and suspended by Brown. At every turn, from the inception of the disciplinary process through the so-called "investigation," "hearing," and "appeal", Brown and its privately retained Investigator did everything in their power to strip the process of any semblance of fairness and deprive David of access to his education. David's Complaint brings multiple causes of action against Brown and its privately retained investigator. But for purposes of this Motion, David directs his request for injunctive relief solely at Brown and solely based on his breach of contract claims.

---

[1] Plaintiff also has filed a motion to proceed under pseudonym for himself, Complainant "Jane Roe", and other students involved in the underlying disciplinary proceeding. Defendant knows the identity of the students and does not oppose the motion. This Court previously granted David's motion to proceed under pseudonym in a related action. *David Smith v. Brown University*, Civ No. 1:22-cv-24-JJM-PAS (Text Order entered 01/18/2022).

David is an outstanding student, athlete and co-head of a club on campus. He is an impactful, engaged member of the Brown community and has never been accused of wrongdoing in his life. From the outset, David has maintained his innocence, insisting that the entire encounter with Jane was unequivocally consensual. His accounting of what happened has never waivered, including on multiple occasions when David was covertly recorded by Jane and her friend before he was aware of any complaint. As explained below, David's consistency stood in stark contrast with an ever-evolving series of inconsistent accusations from Jane—accusations which in many respects were self-evidently implausible. The improper process that Brown used to investigate and adjudicate this matter, and the malicious investigator that Brown employed, allowed Jane's wild and ever-changing allegations to go untested at the same time that David's statements were deliberately misrepresented to ensure he would be found responsible.

Throughout its disciplinary process, Brown breached many of the promises it made to David under its applicable policies. But none more so than its promise to provide him with an "impartial" process "grounded in fairness" and a "meaningful opportunity to participate." As set forth below, Brown employed an Investigator who falsified testimony and suppressed exonerating medical evidence to secure David's conviction. Brown's Investigator fabricated damning admissions supposedly made by David—he has a recording to prove it—and drafted an investigation report that entirely omitted David's defense.

Both in lengthy written submissions, and during his interview with the investigator (which David recorded), David consistently described his sexual encounter with Jane as unmistakably consensual, using terms that are impossible to misunderstand or misinterpret. He said for example: "throughout our encounter [Jane was] literally shouting encouragement (I apologize for the nature of the words in this letter): 'fuck me!' 'fuck me harder!' 'oh fuck me you fuck!'" […] "she

indicated her pleasure to me in words and actions that were excessive […] I cannot conceive of someone giving clearer indications of consent and pleasure than what occurred." […] "her legs were wrapped around me; her arms were wrapped around me." […] "from the first moment that I kissed her, when I asked her if I could kiss her downstairs until-- and when she took off her clothes, the whole process, it was all just a yes, yes, yes, yes, yes, yes, at every step. It was an enthusiastic -- everything she did was enthusiastic."

Despite the clarity of David's consistent position on Jane's conduct, the investigator attributed the following admissions to him in her report:

- "At no point did [David Smith] reflect [Jane Roe] spoke or otherwise motioned for a continued sexual encounter with him."

- "[David Smith] acknowledged…that he never checked during the first or second sexual encounter to determine if the continued sexual activity was mutually agreed upon."

- "[David Smith] claimed [Jane Roe] gazed up at him from a lying position more than once, as if she wanted to continue having sexual intercourse, but he didn't offer that she affirmatively provided indications through an outward demonstration of her wishes."

- "[David Smith] claimed [Jane Roe] wanted to have sexual intercourse with him, which was evidenced by her looking at him, and actively participating in kissing."

- "According to [David Smith], [Jane Roe] stated twice, 'Fuck me, fuck', but otherwise didn't speak."

- "[David Smith]…only provided [Jane Roe] shouted, 'Fuck me, Fuck' a couple of times and otherwise he affirmed [Jane Roe] never spoke audibly other than moaning."

Nowhere in David's written submissions, or in his recorded interview, did he make any statements that would justify the investigator summarizing his testimony in this way. There is no other way to understand what happened—these were malicious lies intended to incriminate David.

In addition to fabricating these damning admissions, the investigator also suppressed medical evidence David submitted to counter Jane's outlandish claims that he had violently accosted and choked her to the point of nearly passing out while they had sex. Jane submitted

photographs to the investigator purporting to demonstrate bruising on her neck and cheeks to support these allegations. To counter these baseless accusations, David retained two nationally renowned forensic pathologists to review the photographs. Neither expert was aware of the other, and both independently concluded the photos did not depict bruising and did not support Jane's claims of having been choked. Rather, the purported bruises were actually hickeys, suck marks and abrasions from vigorous kissing. The investigator, in consultation with Brown's Title IX coordinator, excluded the medical reports from the record without any explanation to David and without advising the hearing panel of their existence. Notably, the hearing panel that found David responsible was keenly interested in the photos during the hearing, and had Jane, an untrained undergraduate student and the Complainant, confirm that she believed the marks were a result of her being choked by David.

Brown's unfair investigation and hearing process was compounded by another blatant breach:  Brown insisted on adjudicating David's case under an inapplicable policy and procedure Brown employs whenever the University believes it is not jurisdictionally obligated to comply with Title IX of the Education Amendments Act of 1972.[2] In 2020, the Department of Education adopted regulations requiring enhanced procedural protections for students in Title IX disciplinary proceedings. To comply with the regulations, Brown was forced to replace its then-current policy and procedures for Title IX matters with a new set. At the same time, however, it designed a separate, watered-down "Sexual and Gender-based Misconduct Policy" and "Complaint Procedure," by cutting and pasting its Title IX Policy/Procedure, then deleting basic due process protections meant to ensure parties a meaningful opportunity to present their evidence to the

---

[2] 20 U.S.C. §§1681 – 1688.

hearing panel before a decision is made.[3] Brown's Title IX Policy/Procedure, on its face, applies to the allegations against David, but Brown insisted on adjudicating David's case under its Non-Title IX Policy/Procedure instead.

Brown then proceeded to violate even the provisions the Title IX and Non-Title IX Policy/Procedure have in common.[4] Under those provisions, David was entitled, among other things, to:

- A "prompt, impartial, and unbiased response," a procedure "grounded in fairness and support for all parties," and "procedural protections that ensure nondiscrimination, adequate notice and meaningful opportunities to participate."

- A "presum[ption] that [he] is not responsible for the alleged Prohibited conduct until a determination is made at the conclusion of this procedure."

- A "Title IX Program Officer, investigator, hearing panel and other decision makers . . . [who are] free from conflicts and receive training on identifying and mitigating explicit and implicit bias."

- The right to provide names of potential witnesses and other evidence to the investigator.

---

[3] As noted in the Verified Complaint, the two separate sets of policies and procedures consist of (A) the "Gender-based Harassment, Sexual Assault, Intimate Partner Violence, and Stalking Policy" (hereafter, "Title IX Policy") and "Title IX Grievance Procedure" ("Title IX Procedure"); and (B) the "Sexual and Gender-Based Misconduct Policy" ("Non-Title IX Policy") and "Sexual and Gender-Based Misconduct Complaint Procedure" ("Non-Title IX Procedure"). *Id.* at ¶¶ 69, 121, Exs. A, B, C & D. Brown was so hasty and careless in its creation of the Non-Title IX Procedure that it left reference to cross-examination in the Non-Title IX document (section 2.9.4 Hearing lead-in), despite having purposefully deleted the right to cross-examination in the main body of section 2.9.4.

[4] When this memorandum addresses the terms found in both the Title IX and Non-Title IX Policy/Procedure, it refers to "Policies/Procedures." Citations for the provisions quoted in this introduction are included in Section I.D.1 below.

- An investigator who "gather[s], assess[es], and synthesize[s] the relevant *evidence* in a report that sets forth the *facts* determined to have occurred" (emphasis added), but who "does not make a final determination to whether a policy violation has occurred."

- Safeguards to ensure that the investigation report is thorough and accurate, including an opportunity for the parties to "review and comment before the investigation report is finalized . . . to assure the thoroughness and sufficiency of the investigation," review of the report by the Title IX Program Officer "for thoroughness and accuracy," and a hearing panel chair responsible for "procedural matters and decisions leading up to the hearing."

- An appeal to ensure correction of "material procedural errors," "a decision and/or Discipline that is clearly contrary to the weight of the evidence," and/or "conflict of interest or bias on the part of the Title IX Program Officer, investigator, or Hearing Panelist that affected the outcome."

Brown breached all these promises to David. Instead of honoring its contractual obligations, Brown brought in an outside investigator with a checkered past[5] who did virtually nothing to independently investigate the matter (in more than six months the Investigator spoke to only three witnesses, two of whom were Jane's best friends). Brown and its Investigator forbade David from talking to potential witnesses, thereby hamstringing his ability to defend himself, yet allowed Jane to openly coordinate with witnesses and discuss her case at will throughout campus. The Investigator wrote an investigation report that was replete with mistakes, omissions, and demonstrably false statements. She went out of her way to discredit the one witness David was

---

[5] This lawsuit is at least the second time that Defendant Donna Davis, the investigator in the underlying disciplinary matter, has been accused of fabricating testimony during an investigation. She was previously accused of similarly shocking conduct in a Title IX lawsuit brought by another male student against Case Western Reserve University at a time when she identified by a different name – Donna Davis-Reddix.

able to identify, while completely disregarding inconsistencies in Jane's and Jane's witnesses' accounts.

Because the investigator never subjected Jane's allegations to any real scrutiny, the hearing panel had no way to discern that Jane significantly altered her story every time she told it. She first reported the alleged assault to the Providence Police. She then amended her story in an interview with a Providence Police detective three days later. And that same day she told a different story still when she submitted her formal written complaint to Brown. Her story continued to evolve when she was interviewed by the investigator (with different stories in the initial and the final report), and even then, her story did not match up with much of what her own two witnesses said about the evening. Finally, her story at the hearing presented yet another version of the events. None of this would have been apparent to the hearing panel because anyone reading the investigator's report would never know for example that:

- Jane initially claimed that when David asked her to kiss him during the party, she said no and he spit in her face. She later said that she agreed to kiss him because it would have been awkward to say no. In contrast, her friends reported that she was obviously happy and excited when she told them she had kissed David. Jane also claimed in one of her different versions of the night that David spat in her face during the party while they were engaged in conversation, but that she "didn't think anything of it."

- Jane initially claimed David dragged her from the party and up multiple flights of winding stairs to his bedroom, but later contradicted this allegation when it did not match up with her friends' accounts who reported that she went willingly to David's bedroom, and after David submitted a video of the party room and stairs depicting the impossibility of what

she alleged.

- Jane initially claimed that David forced her to perform oral sex on him. Later she claimed he only attempted to force her while they were lying in bed together. Later still she claimed that David made this attempt as she was trying to leave his room, standing by his door.

- Jane initially told police that she went straight home after leaving David's bedroom and immediately showered. She later told Police that she left the party with Witnesses 1 and 2 to get food before going home and showered the next day. She changed her story again when she reported in her written complaint to Brown (on the same day she met with Police) that she left the party with Witnesses 1 and 2 and went straight home. She later conceded at her interview that Witnesses 1 and 2 left the party without her, and that she remained at the party for at least thirty more minutes to dance (after allegedly being violently assaulted for over an hour, and allegedly in a bruised, bleeding and traumatized condition), before walking with a different friend to meet up with Witnesses 1 and 2 at a popular and crowded late night eatery on campus.

- Jane's friends purportedly corroborated that she was injured and in a frantic and traumatized state immediately after leaving David's bedroom, but were never questioned as to why they had been comfortable leaving her in that condition, in the home of her alleged attacker who still remained in the house. Both witnesses admitted that minutes after Jane told them she was sexually assaulted, they left Jane (their best friend) behind to go out to eat because Jane wanted to remain at the party and dance. After allegedly being violently assaulted *for over an hour* Jane decided to stick around in David's house to dance and socialize. And none of the many people she interacted with during that time were asked

to corroborate Witnesses 1 and 2's alarming descriptions of Jane's condition.

- Jane told the investigator during her interview that she called a sexual assault hotline the morning after the alleged assault, but Jane had previously told the police she did not call any advocates until at least five days after the alleged assault. Jane told the hearing panel again that she called Brown's sexual assault hotline the day after the alleged assault and referred to phone records that the investigator withheld from the investigation report. Those phone records confirmed that Jane did not call Brown's sexual assault hotline until 5 days after the alleged assault.

- In the hours and days immediately after claiming to be sexually assaulted, Jane posted pictures of herself on multiple social media sites from all three nights of that weekend. In each case, Jane wore revealing costumes including her costume from the night she claimed to have been assaulted. She also was actively posting on her Tinder profile in the period following the alleged assault with a tagline of "flexible," which is understood on Tinder to be suggestive sexual language. The panel found Jane's behavior following the assault to be consistent with trauma, yet Jane was actively seeking matches on Tinder, a site designed specifically to facilitate one-time hook-ups among strangers.

The investigator also did not present another significant aspect of David's defense in her investigation report, and it concerned Jane Roe's motivation to have lied about their sexual experience. Unbeknownst to David, Jane Roe had an ongoing sexual relationship with his good friend and teammate. Jane Roe's friends had warned her during the party not to hook up with David because of the conflict it would create. They were right. The next morning David's friend learned that David and Jane had hooked up, became enraged and angrily texted Jane Roe demanding an

explanation. Several hours after receiving that text, after she got together with Witnesses 1 and 2, Jane responded with her excuse – "I didn't fucking want it."

With an investigative record built on made-up admissions, suppressed medical evidence, and after the investigator carefully avoided interviewing any witnesses that might have contradicted the litany of dubious claims made by Jane and her two best friends, Brown then thrust David into a hearing process so truncated and superficial (at just 37 minutes in length) as to render his participation and the hearing itself meaningless. Brown's hearing process relied on the evidentiary record established by the Investigator and imposed a hard-and-fast seven-minute cap on David's ability to speak and present a defense. The omissions and misrepresentations in the report doomed David's defense.

Under Brown's Non-Title IX Procedure, the investigation report determines the "facts," and the role of the "Hearing Panel" is to decide whether "the facts" as reported by the Investigator constitute a policy violation. Unlike its Title IX Procedure (which contemplates a more robust evidentiary proceeding), Brown's Non-Title IX Procedure specifically instructs the Hearing Panel that "[t]he *presumption* is that the investigator has identified and interviewed all relevant witnesses and supplied the information necessary for the Hearing Panel to render its decision and determine sanctions." (Non-Title IX Procedure § 2.9.4). Here, because Brown used the wrong procedure (a contractual breach that by itself warrants relief), its promise to perform a fair, thorough and accurate investigation was even more critical because under the Non-Title IX hearing process nearly all the evidence for the panel to consider is the investigation report itself. David's inability to overcome the false record constructed by the investigator became patently apparent during his "hearing" before three university employees who knew only what they were told by the investigator.

-10-

After some prefatory introductions David's "hearing" lasted only thirty-seven minutes. He was not allowed to present evidence, call witnesses, question the Complainant or Investigator, or even challenge the "relevance" determinations made by the Investigator or the Chair. The process was limited to the panel asking a handful of questions of the investigator and the parties – with zero follow-up on any responses.

To further signal to the panel the significant role of the investigator, Ms. Davis was called as the first witness, and the only non-party witness at the hearing. In responding to the panel's first question about how much alcohol Jane consumed, Ms. Davis unwittingly revealed both her bias and her ineptitude. In her report, Ms. Davis introduced the possibility of an incapacitation finding, trying to create another hurdle for David to overcome. The panel did indeed try to pursue this accusation, and asked Ms. Davis and Jane about alcohol consumption. However, despite her 6-month investigation, Ms. Davis could not answer how much Jane drank during the party, because she never asked. This was information Jane readily recalled when asked by the panel, revealing she only had one drink at the party and that incapacitation was a non-issue. This incident alone should have raised grave concerns for the panel about Ms. Davis' competence and utter lack of objectivity.

After the perfunctory Q&A concluded, all David *was* allowed to do was make a seven-minute verbal statement "regarding the facts." With only seven minutes to defend himself, he faced an impossible task; he attempted to convince the panel that *both* Jane and the Investigator had lied, that there was critical evidence the panel had not seen, and that his entire defense, including his explanation for Jane's motivation to lie and his exhaustive list of Jane's inconsistent statements, had been excluded from the record before them. But the "Hearing Board," having been led by the investigator to believe (falsely) that David had all but admitted a lack of clear affirmative consent,

and having given David no meaningful opportunity to present his defense, inevitably found David responsible and suspended him for two years. And, despite the plain errors, bias, and lack of evidence for the Panel's decision, Brown denied David's appeal on September 7, 2022. To add insult to injury, Brown delayed the issuance of its appeal decision for almost a month, waiting until after David paid his tuition deposit on September 6th (which is non-refundable) and David was literally minutes from walking into his third class of the day.

Through this Kafkaesque process Brown saw fit to destroy the academic and athletic career of a promising student, irreparably ruin his reputation, and shatter the emotional well-being of David and his family. As set forth in more detail below, David meets all the prerequisites for injunctive relief. He will likely succeed on his breach of contract claim. First, his case was adjudicated under an inapplicable Non-Title IX Policy, and he was denied critical due process protections as a result. Second, regardless of which policy was applied, it was breached: David did not receive a fair process or meaningful opportunities to participate; his right to a presumption of non-responsibility and a decision based on the preponderance of the evidence was defeated by the investigator's misrepresentations and distortions and Brown's refusal to correct them; Brown did not acknowledge or mitigate the bias against him; his ability to provide names of potential witnesses and other evidence to the investigator was stymied by the "gag order" imposed on him (with no such order on Jane); the investigator did not "gather, assess, and synthesize the relevant evidence;" the investigation report did not set forth "facts," but instead misrepresented and omitted facts in a way calculated to ensure David was found responsible; and Brown's Title IX Coordinator did nothing to ensure that the report—or the decision based on the report—was thorough and accurate.

David asks this Court to enter a temporary restraining order and preliminary injunction, to

compel Brown to preserve the status quo by staying his suspension and allowing him to remain a student-athlete in good standing while this case is resolved on the merits. Brown's fall semester classes began on September 7, 2022. David will suffer immediate irreparable harm to his educational prospects, future career, and reputation if injunctive relief is withheld. Moreover, David and Jane co-existed this entire past semester under the existing No-Contact Order without incident and will be able to do so until the claims are finally adjudicated. The concrete hardship to David of an interrupted education during his senior year, and the stigma of a finding of sexual misconduct far outweighs any theoretical hardship for Brown in allowing him to remain a student. And finally, an injunction serves the public interest in fair and reliable disciplinary processes.

## I.   FACTUAL BACKGROUND

### A.   The Underlying and Alleged Conduct

David is a rising senior and has been an upstanding member of the Brown community, excelling in academics, varsity athletics, and campus engagement. Verified Compl. ¶ 2. On November 12, 2021, Jane Roe, a female student at Brown, filed a "Formal Complaint" against David with Brown's Title IX Office. *Id.* at ¶ 74. On the exact day she filed that complaint, she came to a party at David's house and she was bragging to David's friends in his house (particularly James Doe) that she intended to file a complaint for the express purpose of getting him "kicked out" of Brown. *Id.* at ¶ 77. The basis of Jane's Formal Complaint was a sexual encounter with David during the evening of October 29–30, 2021, which is fully described in the Verified Complaint. *Id.* at ¶¶ 57-61.

In brief summary, David and Jane met for the first time and had sex during a Halloween party at David's shared residence. *Id.* at ¶ 52. Neither student was drunk and Jane would later confirm that she had the equivalent of three shots of alcohol spread out over the course of the entire evening and that she was only tipsy but fully aware of her surroundings. *Id.* at ¶ 49. After some

conversation, Jane and David began kissing in the main room of the party. Unbeknownst to David, Jane Roe was romantically involved with one of his friends and teammates, referred to in the Complaint as "James Doe." *Id.* at ¶ 54. Jane Roe told her two best friends that Jane and David kissing. They had a side conversation with Jane during and possibly even before the party to warn her not to hook up with David because of the conflict it might create with James Doe. *Id.* at ¶ 54. Jane ignored her friends' advice and continued to make out with David while downstairs at the party. Jane's best friends both noted that she was excited about hooking up with David, contradicting Jane's false claim that David was aggressive and forceful with Jane downstairs at the party. *Id.* at ¶ 54.

As the party progressed, David Smith and Jane Roe decided to leave the party and to go upstairs to David's bedroom. Jane Roe followed David Smith up multiple flights of winding stairs, in the middle of the house, to his third-floor bedroom. *Id.* at ¶ 55. David Smith and Jane Roe had consensual sexual intercourse three times over the course of approximately an hour during the evening of October 29–30, 2021. Jane Roe was an extremely active, enthusiastic, and exuberant participant in each sexual act that she engaged in with David Smith. She actively encouraged David Smith to have sex with her by, for example, challenging him with active and intense "dirty talk" such as, "fuck me," "fuck me harder," and "fuck me you fucking fuck." *Id.* at ¶¶ 57, 59. Jane Roe gave clear and unmistakable verbal and physical signs of encouragement for each sexual act that she engaged in with David Smith.

During the third instance of intercourse, Jane Roe suggested that they go downstairs to return to the party. This was the first verbal or nonverbal signal that Jane Roe no longer wanted to continue their sexual activity. *Id.* at ¶ 61. David immediately ceased having intercourse with Jane the moment she made this request to go downstairs. *Id.* at ¶ 61. Jane Roe then dressed and went to

-14-

the bathroom that is *inside* David's room. Jane Roe then asked David to return with her to the party. David Smith was exhausted from the sexual activities that had occurred up to that point, and he declined Jane Roe's request to return to the party together and instead stayed behind in his room. Jane Roe then went back downstairs to the party. *Id.* at ¶ 61. After some time, David did return to the party where he saw Jane standing with a group of friends, however, he did not interact with her. Jane remained at the party dancing and socializing for approximately 30 minutes before leaving to meet up with friends for food at a popular late-night sandwich shop. *Id.* at ¶¶ 79, 154, 188.

Jane had a strong motivation to create a false narrative of sexual assault to avoid the repercussions of her actions when she learned the next morning that James Doe found out that she had hooked up with David and that James was extremely upset. At 9:16 a.m. on October 30, 2021, the morning after the party, David called James and told him that he (David) had been with Jane and that he wanted Jane's phone number. *Id.* at ¶ 62. James became very angry upon learning that David and Jane had been together, and he refused to give David her phone number. *Id.* at ¶ 63. James texted Jane, at 9:22 a.m., asking, "Why did you get with my teammate?" *Id.* at ¶ 64. At 12:25 p.m., on October 30, 2021, after going to meet with her two best friends, Jane responded, "you don't know anything," "i didn't fucking want it." *Id.*[6] Two weeks later, on November 12, Jane filed a complaint with Brown's Title IX Office alleging sexual assault.

---

[6] Shortly after that 12:25 p.m. text, Jane Roe posted on two different social media sites several smiling pictures of herself from the night in question, suggesting nothing but a fun and social celebration of Halloween had occurred. She continued to post pictures of herself and friends happy and in costume from other parties throughout the rest of the weekend. Despite all that, Jane and her two best friends claimed that Jane was devastated, and that she was not functioning as a person during this exact timeframe. *Id.* at ¶¶ 28, 71, 172.

### B.    Brown's Emergency Removal Procedures and Unsupportable Threat Assessment

On November 18, 2021, Brown kicked David out of the entire university community without giving David so much as a chance to respond to the complaint. *Id.* at ¶ 87. Brown's purported basis for the suspension—the only permissible basis under its policies—was that David was likely to engage in further misconduct or posed a "significant threat of harm to the health, safety, and welfare of others or the University community." *Id.* at ¶¶ 133, 236. However, Brown based its decision *solely* on Jane's complaint, in violation of its own procedures for "Emergency Removal" and its promise to accord accused students a presumption of innocence. Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0. As the decision flew in the face of David's upstanding citizenship at Brown and was entirely unsupported by evidence, David submitted several appeals to have the interim suspension lifted, including photographs showing Jane had none of the injuries alleged in her complaint and evidence that she had twice sought him out after the alleged assault. *Id.* at ¶ 89.

Though Brown afforded him temporary relief to complete the fall semester remotely, it remained entrenched in its decision to suspend David as of January 7, 2022, and did not even consider the information he supplied. *Id.* at ¶¶ 88, 90. The suspension barred him from participating in any Brown academic or athletic events, including starting Spring 2022 courses when they resumed on January 26, 2022. *Id.* at ¶ 90.

On January 14, 2022, David filed a lawsuit against Brown in this Court, challenging the interim suspension. *David Smith v. Brown University*, Civ No. 1:22-cv-24-JJM-PAS. Brown had already been sued in this Court a month before, by another male student who had received an

interim suspension, again based solely on a female student's complaint.[7]  The Court in that case granted a preliminary injunction in favor of the plaintiff and ordered Brown to lift the suspension and allow the student to resume his studies as a student in good standing pending the outcome of his disciplinary matter. After that order, Brown agreed to allow David to remain on campus and continue his studies pending the outcome of the formal disciplinary process. David withdrew his lawsuit, without prejudice. *Id.* at ¶¶ 91, 92  David Smith then returned to campus for the Spring Semester and Brown began the formal investigation phase to resolve Jane Roe's Formal Complaint.[8]

### C.    Brown Applies an Inapplicable Policy, With the Intent and Result of Denying David a Fair Process

Brown insisted on adjudicating David's case under an inapplicable policy and procedure Brown designed specifically to skirt federal regulatory requirements under Title IX. Brown maintains two sets of policies for adjudicating sexual misconduct cases—one that is designed to be Title IX compliant, and another watered-down policy that is not. *Id.* at ¶ 4. Brown designed its separate "Non-Title IX Policy" by cutting and pasting its Title IX Policy, then deleting basic due process protections designed to ensure a respondent a meaningful opportunity to present a defense. *Id.* at ¶ 4 Specifically, while both the Title IX and Non-Title IX Procedures provide for something Brown labels a "live hearing," only the Title IX Procedure "provides the Complainant and Respondent the opportunity to pose questions to the other party, investigator, and witnesses to elicit relevant factual information missing from the final investigation report." Title IX Procedure § 2.9.4.4. The Non-Title IX Procedure *eliminates* that right. While it provides that "[t]he Hearing

---

[7] *David Stiles v. Brown University*, Civil No. 1:21-cv-00497-MSM-LDA

[8] David reserves the right to pursue a breach of contract claim and damages against Brown for the unwarranted interim suspension, but is not relying on that breach to support this motion.

Panel *may* pose questions to the parties, investigator, and witnesses (if applicable) to elicit relevant factual information missing from the final investigation report," the Non-Title IX Policy specifically instructs the hearing panel that "[t]he *presumption* is that the investigator has identified and interviewed all relevant witnesses and supplied the information necessary for the Hearing Panel to render its decision and determine sanctions." *All* the parties are allowed to do at a Non-Title IX "hearing" is to "make a verbal statement regarding the facts," which "must be no more than seven (7) minutes in length." Non-Title IX Procedure § 2.9.4.

Brown had no basis for refusing to adjudicate David's case under its Title IX Policy and Procedure. By its express terms, the Title IX Policy/Procedure "applies broadly to the entire Brown University . . . community including applicants, employees, invitees, students, and contractors, and to off-campus "acts of Prohibited Conduct" that occur at a location "in the United States, in the context of a program, activity, or location in which Brown exercises substantial control over both the Respondent and the context in which the alleged Prohibited Conduct occurred." Title IX Policy § 2; *see also* Procedure § 2. The alleged assault occurred at David's house – literally across the street from Brown's campus, and surrounded by other Brown campus buildings – during a Halloween party Brown campus police (not local law enforcement) threatened to break up if the party was not quieted down. *Id.* at ¶ 5. If that were not proof enough of Brown's substantial control of the location, Brown later formally investigated and disciplined David and nearly all his housemates for noise and trash violations associated with the same Halloween party—in other words, Brown has assumed control to tell David what he can and cannot do in his home, and punish him for non-compliance. *Id.* at ¶ 5. David raised these issues in his repeated objections to proceeding under Brown's non-Title IX policy. But Brown, determined to deny David a fair process, irrationally insisted it does not substantially control his house or the Halloween party. *Id.*

at ¶ 5.

**D.     Brown Fails to Follow the Common Provisions of its Title IX and Non-Title IX Policies/Procedures**

**1.     Relevant Provisions of the Policies/Procedures**

As relevant here, except for the hearing provisions highlighted above, Brown's Non-Title IX Policy/Procedure is a cut-and-paste from its Title IX Policy/Procedure. The stated "purpose" of both is:

> to provide a prompt, impartial, and unbiased response to Formal Complaints . . . . This procedure is grounded in fairness and support for all parties, and includes procedural protections that ensure nondiscrimination, adequate notice, and meaningful opportunities to participate. The University makes the presumption that reports and formal complaints are made in good faith and presumes that the Respondent is not responsible for the alleged Prohibited conduct until a determination is made at the conclusion of this procedure.

Title IX Procedure § 1.0; Non-Title IX Procedure § 1.0.

Brown further promised, in both Procedures:

1. That it would not impose any "Interim Action" against a student accused of sexual misconduct unless such measures are "both restorative (designed to address a Complainant's safety and well-being and continued access to educational opportunities) and remedial (involving action against a Respondent without unreasonably burdening a Respondent.)" Title IX Procedure § 4.0; Non-Title IX Procedure § 4.0.

2. That it would not impose any "Emergency Removal" unless Brown's Threat Assessment Team first identifies "reasonable cause to believe that the Prohibited Conduct is likely to continue and/or the Respondent poses a significant threat of harm to the health, safety, and welfare of others or the University community." Title IX Procedure § 4.0; Non-Title IX Procedure § 4.0.[9]

3. That it would, "[i]n all stages of the process, . . . appl[y] the preponderance of the evidence standard (more likely than not) when determining whether the Policy has been

---

[9] Brown's breaches associated with its interim suspension of David are not the basis for his request for preliminary injunctive relief. Those breaches are relevant for understanding David's overall treatment by Brown throughout the disciplinary process, for which David seeks redress in multiple causes of action asserted in his Complaint.

violated." Title IX Procedure § 2.3; Non-Title IX Procedure § 2.3; *see also* § 2.9.4 (decision to be based on preponderance of evidence).

4. That it would ensure all participants in the disciplinary process are free of conflicts of interest: "The Title IX Program Officer, investigator, hearing panel and other decision makers will be free from conflicts and receive training on identifying and mitigating explicit and implicit bias. The Title IX Office checks for conflict of interest with the parties, investigator, hearing officer, and decision makers. Individuals can disclose potential or actual conflicts as they arise to Title IX Program Officer." Title IX Procedure § 2.7; Non-Title IX Procedure § 2.7.

5. That it would ensure a thorough, fair and accurate investigation and a thorough, fair and accurate report. Per Sections 2.9.2 and 2.93 in both Procedures:

- "The role of the investigator will be to gather, assess, and synthesize the relevant evidence in a report that sets forth the facts determined to have occurred."

- "The Complainant, Respondent, and witnesses are permitted to provide names of potential witnesses . . . and evidence to the investigator."

- "The investigator will prepare an initial (draft) investigation report. A redacted version of the draft investigation report and a redacted copy of all of the physical evidence submitted or obtained is shared electronically with both parties who will have ten (10) business days from the date of delivery of the draft report to review and comment before the investigation report is finalized. The investigator does not make a final determination to [sic] whether a policy violation has occurred."

- "The investigator's report may include credibility assessments, where appropriate, based on their interviews with the Complainant, Respondent, witnesses, and review of the material evidence, as well as the basis of those assessments. The credibility assessment may include direct observations and reasonable inferences drawn from the facts and any consistencies or inconsistencies between the various sources of information."

- "To ensure that the investigator is complying with their role as outlined in these procedures, the Title IX Program Officer will review the investigation report in advance of the parties for thoroughness and accuracy and may return the investigation report to the investigator in instances where the investigator does not comply with their role, the Title IX Program Officer questions an initial decision of relevance of evidence, clarification is needed, or the potential policy violation is not addressed in a manner consistent with the Policy definition."

- The Chair of the Title IX Council "is responsible for the administration of the hearing process and conduct of the deliberations process, including procedural matters and decisions leading up to the hearing. The Chair is also responsible for the overall decorum and conduct of the parties, panelist, investigator, and advisors during the hearing."

6. That it would provide a meaningful review on appeal: "The Complainant and Respondent both have the right to appeal a determination of responsibility on the limited grounds of (i.) material procedural error that materially affected the outcome; (ii.) material, new evidence not reasonably available at the time of the hearing; (iii.) a decision and/or Discipline that is clearly contrary to the weight of the evidence; and/or (iv.) conflict of interest or bias on the part of the Title IX Program Officer, investigator, or Hearing Panelist that affected the outcome. . . . If the appeal officer/appeal panel finds that the grounds for appeal are met, the appeal will be granted." Title IX Procedure § 2.9.4; Non-Title IX Procedure § 2.9.4.

**2.    Brown Retained an Outside Investigator who Prevented David From Identifying Witness, Refused to Interview Relevant Eye-Witnesses, and Conducted a Woefully Deficient Investigation**

Brown brought in an outside investigator who had a newly-formed consulting firm and who had been publicly criticized for her investigative failures in the past.[10] Ms. Davis was also identified in a Title IX lawsuit brought against Case Western Reserve University in which she was accused of fabricating testimony of the accused male student in eerily similar ways to what David experienced here. The lawsuit further alleged that Ms. Davis destroyed recordings that would have accurately reflected the student's testimony, and did so after the student's attorney challenged the accuracy of her report. See Nimer v. Case Western Reserve Univ., Civ. No. 1:18-cv-02269-PAB (N. D. Ohio), Doc. 1. The investigator did virtually nothing to independently investigate David's case—in more than six months the investigator spoke to only three witnesses, two of whom were Jane's best friends. Id. at ¶ 6. David was told from the outset by Brown's Title IX Program Officer and by its investigator that the investigation was strictly confidential, and that he was not allowed to speak with anyone about the case. He was specifically instructed by the investigator not to speak to potential witnesses and was assured by the investigator that she would interview all relevant

_____

[10] The investigator, Donna Davis, was identified in an Op Ed. (using a different name – Donna Davis Reddix) written by a complaining student in a Title VI investigation, that Davis conducted on behalf of another university, and specifically criticized for remarkably similar investigative failures and for creating an investigation report full if inaccuracies and misstatements.

witnesses. *Id.* at ¶ 7. There is nothing in Brown's written policies to justify these instructions.

David repeatedly objected to this "gag rule," which prevented him from identifying potential witnesses that may have information relevant to his defense. *Id.* at ¶ 8. As such, David was only able to identify one witness, whom the investigator went out of her way to discredit in her report. Unlike the summary for the two witnesses who are Jane's best friends, the investigator's summary of the information obtained from David's only witness was prefaced by a lengthy discussion of the fact the witness obtained counsel who limited the witness' responses to certain questions. In reality, this witness, who also had an ongoing sexual history with Jane, presumably relied upon his own lawyers to protect him against the Complainant and Brown given the university's demonstrated pattern of immediately suspending male students if they are accused of sexual assault. *Id.* at ¶ 9.

David later learned that Jane Roe was given an entirely different set of confidentiality instructions and that Brown allowed her to openly coordinate with witnesses and discuss her case at will throughout campus. *Id.* at ¶ 12. Because of David's inability to speak even with students who were present on the night in question, he could not identify individuals with relevant knowledge for the investigator to interview. And because the investigator chose to interview only the witnesses the parties specifically asked her to, critical witnesses who observed Jane Roe before and after the alleged assault were not interviewed. Worse, the investigator identified and then ignored multiple witnesses in her report, including a teammate of David's, whom the investigator acknowledged were with Jane immediately after the alleged assault, yet she failed to interview any of them. *Id.* at ¶¶ 13, 14.

> **3.    The Investigator Ignored Multiple Blatant Inconsistencies Told by Jane Roe and Her Friends**

The investigator's failure to perform basic investigatory functions had a dramatic impact on the factual record she assembled for the Hearing Panel. First, the investigator entirely ignored that Complainant and her two witnesses told multiple conflicting stories of how the night played out. Complainant filed a police report on November 9, 2021, sat for an interview with Providence Police on November 12, 2021 that was summarized in a "detective interview summary," and filed a Formal Complaint with Brown's Title IX office on November 12, 2021. *Id.* at ¶¶ 129, 173. The investigator possessed all three of these documents. The Investigator also interviewed Complainant as well as her two best friends, referred to in the investigation report as Witnesses 1 and 2, and obtained written statements from Witnesses 1 and 2 that each prepared before Jane filed her Formal Complaint. *Id.* at ¶ 12. Each time Complainant and her witnesses described what happened, something material changed.

For example, she initially told police that David asked her to kiss him during the party and that he spat in her face when she refused. She later stated that she said yes to the kiss even though she did not want to kiss David because it "would have been awkward to say no." Witnesses 1 and 2 separately reported that Jane excitedly told them she had kissed David and was clearly happy about it. *Id.* at ¶¶ 10, 28, 54, 171. In her Formal Complaint Jane told Brown that David had dragged her upstairs to his bedroom against her will. *Id.* at ¶¶ 10, 28, 132, 171. Once David produced a video depicting the party room and the multiple winding sets of stairs, demonstrating how close Jane's friends were to the fully visible staircase and how implausible it was that he could pull her up those stairs against her will, Jane Roe altered her story in her interview with the investigator to admit that she willingly went upstairs with David, but claimed she did not know where they were going. *Id.* at ¶¶ 28, 171. The investigator never challenged Jane on this point despite the fact she stated in the report that she had engaged in sexual activity multiple times with David's friend,

James Doe, who lived in the same house, on the same floor as David. *Id.* at ¶ 171. Then, in the hearing, having recognized that her claim to not know where they were going was not credible, Jane changed this story again such that she knew where she was going but didn't know why David was leading her up to his room, despite having been excited about hooking up with him downstairs and even though her friends stated that Jane went upstairs with David willingly. In addition, both David and Jane acknowledge that David told Jane while they were downstairs that they would need to wait in order to continue the sexual activity in contrast with Jane's second of three different claims explaining how she  arrived upstairs.

Jane originally told the Providence Police that David forced her to perform oral sex on him. Three days later to the Police, she claimed David aggressively tried to get her to perform oral sex while blocking his bedroom door, after she was dressed and trying to "escape."  Jane later told Brown *on the very same day* in her formal complaint that David asked in pornographic terms for oral sex while they were both naked, having for some bizarre reason walked naked all the way across the room, and were "face-to-face" by the door." Jane stated that she refused, and then went back to the main part of the room, got dressed, and then used David's bathroom which flies fully in the face of any notion of trying to "escape."  David has repeatedly stated that any element of oral sex is completely fabricated. The reason her description kept changing was because the oral sex encounter was completely fabricated by Jane. Despite all these significant changes, the investigator never questioned or specifically identified these inconsistencies in her report. *Id.* at ¶¶ 174, 175, 187.

The investigator similarly failed to inquire into an obviously illogical, and frankly bizarre, aspect of Jane's story. Jane and Witnesses 1 and 2 all stated that after Jane left David's bedroom, she immediately texted Witnesses 1 and 2 to meet her in the bathroom where she supposedly told

them she had just been assaulted. *Id.* at ¶¶ 151. Witnesses 1 and 2 stated that when they encountered Jane, she was in a frightful and deeply concerning condition. Their words, according to the investigator and their own written submissions to the investigator were that: "[Jane] was distraught" and had "bruises visibly on her body"; "[Jane] appeared confused, upset and withdrawn"; "she was leaned over the mirror and appeared traumatized"; she was "frantically rubbing her face"; she was "hysterical"; she "seemed helpless and struggled to talk about the incident without breaking down"; she "described elements of a sexual assault"; she was "clearly traumatized"; she was "clearly not okay"; they claimed her costume was torn up and that "I have honestly never seen her in a state like this." *Id.* at ¶ 152. The investigator (and later the Hearing Panel) determined this description was corroborated between Jane and her two best friends and was therefore credible. *Id.* at ¶ 153. But the investigator never questioned a particularly inexplicable aspect of Jane's story, which David only discovered by obtaining Jane Roe's police records where she let this information slip.[11] Despite their alleged concern for their injured friend who had just told them she had been sexually assaulted, Witnesses 1 and 2 admitted that they left the party without Jane shortly after meeting Jane in the bathroom—not to go get her medical attention or flag down a police officer—but to go eat at a popular late night sandwich shop. *Id.* at ¶ 153. Witnesses 1 and 2 left their best friend alone in the house where they claim Jane had just told them she was assaulted, where she was supposedly wearing a torn up revealing costume, because they were hungry. They claim that Jane wanted to stay behind and dance. In fact, Jane did remain at the party for another half-hour after her friends left and continued to socialize and dance

---

[11] Even this "slip" to the Police was later proven inaccurate: Jane told the Providence Police she left with her friends to go get food, when in fact it was later found out that her friends left her and she stayed at the party to dance for thirty minutes before leaving with another person to go meet everyone at the restaurant.

with multiple people. *Id.* at ¶ 154. They invited Jane to join them at the diner after she had finished dancing. Indeed, Jane walked with another student to meet up with Witnesses 1 and 2 for late-night snacks at the very public and popular late-night sandwich shop. *Id.* at ¶ 154. All of this happened while Jane was supposedly wearing a torn-up, revealing costume and was bruised, bleeding and traumatized in a state they had never seen her.

During the investigation, the investigator did not seek to confirm whether Complainant appeared to be as distraught and injured as Witness 1 and 2 claimed, which she could have easily done by speaking with any of the people Jane interacted with during the time she remained at the party to dance. *Id.* at ¶¶ 154, 155. The investigator was aware of some of the identities of students who were with Jane during that time, but chose not to interview any of them. And because David couldn't speak with any witnesses to learn what they may have observed, he was unable to identify these individuals himself and ask the investigator to interview them.[12] *Id.* at ¶¶ 54. Some of these individuals were seniors at the time and have since graduated and left the university. *Id.* at ¶ 154.

David also pointed out in his many written responses to the investigator that Witnesses 1 and 2's claims that Jane was not herself and distraught the rest of the weekend was questionable given that Jane had posted social media pictures (on multiple social media sites) showing that she went out partying for Halloween the next two nights in a row after her alleged assault. *Id.* at ¶¶ 69, 70, 71. The investigator did not seek to corroborate with any other students Jane socialized with that weekend regarding her condition. And her alleged condition, as reported by her best friends Witnesses 1 and 2, was later relied on by the Hearing Panel as a significant factor in finding her allegations credible. *Id.* at ¶¶ 186, 187, 188.

---

[12] One of the people Jane was with that the Investigator failed to interview turned out to be David's teammate.

There were a litany of additional inconsistencies in Jane Roe's account of the evening which David attempted to document in his multiple written submissions to the investigator. But the investigator ignored all of them. In her final investigation report, the only indication that there may have been any issues with the consistency of Jane Roe's statements came in the following few sentences:

> the investigation noted Respondent's *perceived* inconsistencies in Complainant's formal complaint, interview statement, and police report [sic].[13] [...] The investigator reviewed the *perceived* inaccuracies in connection with the allegations of prohibited conduct under Brown's [Non-Title IX Policy]. Respondent's *perceived* inaccuracies of Complainant's recollection of events are viewed by Respondent as false allegations.[14] Complainant offered the *minor* inconsistencies occurred and were impacted by her trauma, shock, and inability to fully reconcile what occurred with the Respondent."

*Id.* at ¶ 174. (emphasis added). The Investigator's excessive use of the word "perceived" was unequivocally designed to manipulate the panel. In this way, the investigator not only undermines the significance of the inconsistencies David highlights, but the Investigator is also clearly signaling to the panel that the inconsistencies aren't even real. With no description or analysis of the way Complainant's stories had changed, even where Jane Roe apparently admitted "minor inconsistencies" occurred, the investigator essentially instructed the panel not to bother reading David's exhibits challenging Jane's credibility, and moreover invited the Hearing Panel to ignore whatever David might say at the hearing about Jane's credibility.

---

[13] The investigation report consistently reported that Jane Roe made only one statement to police, as opposed to two statements on two separate dates. David pointed this out to the investigator and the Title IX Coordinator but was ignored.

[14] Notably, the investigator's statement that the inconsistencies were "viewed by Respondent as false allegations" demonstrates a lack of appreciation that David was highlighting the inconsistencies to demonstrate Jane Roe's overall lack of credibility.

4.      **The Investigator Prepared an Investigation Report Designed to Ensure David Was Found Responsible – Brown Refused to Take Action When David Advised the Title IX Coordinator that the Report was Incomplete, Inaccurate and that it Grossly Misrepresented his Testimony Dozens of Times**

Given the blatant demonstrations of bias David experienced in being suspended based solely on an allegation, Brown's refusal to afford him a fair process under its Title IX procedures, and the investigator's checkered history, David and his advisor were naturally distrustful of the process and the investigator and felt it was necessary and prudent to record his interview with the investigator to protect himself.[15] *Id.* at ¶ 14. David's decision proved prescient, because the investigator wrote an investigation report (which served as virtually the entire evidentiary record for David's hearing) that was replete with mistakes, omissions, and demonstrably false statements attributing admissions to David that he never made and that were carefully designed to ensure a hearing panel would find him responsible. *Id.* at ¶ 14.

Brown's procedures allow the parties to respond to an initial draft of the investigation report to suggest factual corrections and to identify areas requiring further investigation. David submitted a 49-page document to Brown's Title IX Coordinator (who is charged in Brown's policies with ensuring the investigation report's thoroughness and accuracy) in which he documented a litany of inaccuracies and outright lies in the report—over 60 in total. *Id.* at ¶ 15. At the time he submitted his response, he also advised Brown's Title IX Coordinator via email that there were significant issues with the report that required her attention given her obligation under Brown's policies to "ensure that the investigator is complying with their role as outlined in these

---

[15] David made this recording at the direction and under the guidance of counsel and from a location where consent from the recorded party was not required by law. Brown's policies did not prohibit him from recording his interview, nor did the investigator state during his interview that recording was not allowed.

procedures" and to review the investigation report "for thoroughness and accuracy." *Id.* at ¶ 137.

In responding to the draft report, David also submitted two expert medical reports from forensic pathologists that David's advisor retained to examine photographs of alleged bruising that Complainant had supplied and that were first made known to David in the draft investigation report. Both experts were independently retained and not advised of the other's engagement, and both concluded that the pictures did not represent bruises or evidence of trauma—rather the photos reflected hickeys and suck marks. *Id.* at ¶¶ 165, 166, 189. The investigator rejected David's medical experts with no explanation—she excluded their opinions and did not even include a notation in the report to alert the hearing panel that they had been submitted and excluded. Similarly, all of David's requests for corrections to the report were rejected based on the Investigator's determination that his corrections were simply "preferences to verbiage" and "didn't constitute material substantive facts."[16] *Id.* at ¶ 15.

The investigator's refusal to make changes for David was indefensible. Far from quibbling over "verbiage," David documented blatant factual misrepresentations throughout the report. While the examples of the report's inaccuracy and tilted presentation of the facts are legion, the worst example of its bias was the manipulative and dishonest manner in which it recounted David's statements to ensure he would be found responsible.

Throughout the investigation, David had consistently described his sexual interactions with Jane Roe as unambiguously affirmatively consensual. For example, in his written response to the

---

[16] To underscore the investigator's bias, while the investigator made none of the changes David suggested, she did make approximately nineteen (19) changes at the request of Jane Roe, all of which strengthened Jane's version of her story from the initial to the final report. *Id.* at ¶ 15. For example, the draft report originally noted that Jane Roe took off her own clothes at David's request. In the final version of the report, the investigator added that David made the request in "a commanding tone," presumably to help explain Jane's voluntary act despite her allegations that the entirety of the sexual encounter was against her will.

complaint he provided:

> throughout our encounter, [Jane Roe] was literally shouting encouragement (I apologize for the nature of the words in this letter): "fuck me! "fuck me harder!" "oh fuck me you fuck!"
>
> But during all this activity she was saying things like "you fucking fuck, fuck me" again further urging me on.
>
> [Jane Roe was] exuberant in our activity to an extent I have never experienced – I vividly recall striving to keep up with her own intensity during our activity as she continued to encourage my physicality in the clearest terms possible.
>
> she indicated her pleasure in words and actions that were excessive… I cannot conceive of someone giving clearer indications of consent and pleasure than what occurred.

*Id.* at ¶ 17.  And in his interview with the investigator, David reiterated over and over again that:

> [Jane Roe was] much more vocal; much more dirty talk on her end. I was-- honestly did not say a whole lot during this encounter. Her leg – her legs were wrapped around me; her arms were wrapped around me. […] she gave me the strongest reaction of the entire time. And she still said the same thing. It was still -- like, "fuck me, you fuck" is what she said, but it was the loudest, most evident, most clear, and I have that stapled in my mind. The reason -- and the reason it's so stapled is because I was shocked at how much she liked it.
>
> From the bottom of my heart, there is absolutely no way that she did not want to be there. There's -- the way she was looking at me, the way she was kissing at me – kissing me, the way she was engaging, the way she was touching me, wrapped around me, the way that she was moaning, it was just somebody who wanted to be there. I don't-- I don't know how else to just, like -- she just wanted to be there
>
> This is about everything that she was doing was -- from the first moment that I kissed her, when I asked her if I could kiss her downstairs until-- and when she took off her clothes, the whole process, it was all just a yes, yes, yes, yes, yes, yes, at every step. It was an enthusiastic -- everything she did was enthusiastic, and it was just a series of yes, yes, yes, yes, demonstrations of I want to be there.

*Id.* at ¶ 17.

Despite the clarity of David's written and oral statements, the investigator presented a report to the hearing panel representing that David had made the following admissions during the investigation:

- "At no point did [David Smith] reflect [Jane Roe] spoke or otherwise motioned for a continued sexual encounter with him."

- "[David Smith] acknowledged…that he never checked during the first or second sexual encounter to determine if the continued sexual activity was mutually agreed upon."

- "[David Smith] claimed [Jane Roe] gazed up at him from a lying position more than once, as if she wanted to continue having sexual intercourse, but he didn't offer that she affirmatively provided indications through an outward demonstration of her wishes."

- "[David Smith] claimed [Jane Roe] wanted to have sexual intercourse with him, which was evidence by her looking at him, and actively participating in kissing."

- "According to [David Smith], [Jane Roe] stated twice, 'Fuck me, fuck', but otherwise didn't speak."

- "[David Smith]…only provided [Jane Roe] shouted, 'Fuck me, Fuck' a couple of times and otherwise he affirmed [Jane Roe] never spoke audibly other than moaning."

*Id.* at ¶ 18.

Beyond these fabricated admissions, the Report was purposefully written to obscure David's defense. As noted above, it failed to describe, let alone analyze, any of the multiple inconsistencies in Jane Roe's various accounts of the alleged assault. Not only that, but the investigator went out of her way to place David in the worst possible light in drafting her report— even in the section of her report intended to objectively recount David Smith's position. Where David explained active, participatory, and enthusiastic conduct by Jane Roe to demonstrate consent, the investigator chose to state that, *according to David Smith*, he "inferred consent" from the fact that "she never reflected an unwillingness to participate." *Id.* at ¶ 139. Wherever possible, the investigator transposed David's account from, "Jane said yes" to "Jane did not say no."  All

statements of mutuality were made unilateral—if David said "Jane and I continued to kiss each other", the investigator converted this to "David continued to kiss Jane." *Id.* at ¶ 139. The cumulative impact of these types of insidious changes is palpable throughout the report, and it was all done to create the impression that even David's own statements demonstrated that he did not obtain affirmative consent.

The investigator also acted unethically in assisting Jane Roe to cover up the fact that she had tampered with evidence during the investigation. Before David received notice of Jane Roe's complaint, Jane had enlisted a friend (referred to in the investigation report as "Undergraduate E") to covertly record a conversation with David in which the witness asked him about the sexual encounter with Jane Roe. *Id.* at ¶¶ 2, 21, 159. Jane Roe chopped up the recording of David's conversation and submitted only four excerpts in four separate audio files, some of which were out of order. It was obvious from the four audio files that the recordings Jane submitted were incomplete and part of a longer conversation. However, the investigator never asked Jane to submit the rest. *Id.* at ¶ 21. David had to submit a request to Brown's Title IX Coordinator to ensure that the complete recording was obtained by the investigator. *Id.* at ¶¶ 21, 22. Ultimately it was, and it was obvious why Jane had excised large portions of the conversation—because they supported David's defense. For example, David can be heard stating on the full recording (again before he was aware Jane had filed a complaint): "I have no idea what she's even talking about. She seemed super into it the entire time, and we did [it] like three or four times." He also explained on the tape that when his condom broke "she's like, keep going, it's fine, I have an IUD. I don't know if that's true, like how the fuck would I know that if she has an IUD if that's not true?  She said keep going." *Id.* at ¶ 163.

However, to smooth over any damage to Jane Roe's credibility and to her own credibility,

the investigator went out of her way to explain away the separate recordings. First, the investigator stated in her report that she asked for the full recording, as opposed to noting that David had to go to the Title IX Coordinator and insist on it. *Id.* at ¶ 162, Second, the investigator explained that Jane had submitted the recording in four files because it was too large to email in a single file. However, the investigator knew this was not true as the recording was only 6 minutes long and Jane was able to send the full file via email when the Title IX Coordinator requested it from her.[17] *Id.* at ¶ 161. Third, the investigator described the original four audio clips in the report as if they were the full recording, simply broken up into four parts. *Id.* at ¶ 162. Finally, despite the lengths David went through to obtain the full recording, the final investigation report selectively quotes only the passages in the recording that Jane Roe originally selected, purposefully excluding any exonerating statements David made in the newly-obtained, complete recording. *Id.* at ¶ 162.

### 5.   A Sham "Hearing" and a Preordained Conclusion

At Brown, and particularly under its Non-Title IX Policy, the investigator is responsible for assembling the entire evidentiary record for the hearing panel. The parties may not present evidence at the hearing, they may not call witnesses to testify, and they may not question each other or the investigator. They are not even permitted to suggest questions for the hearing panel to ask. *Id.* at ¶ 19. Underscoring the importance of the investigation report, the investigator is called as the first and primary witness at the hearing. *Id.* at ¶ 19. The investigator is also the only non-party witness permitted in a Non-Title IX hearing at Brown. Thus, nearly all the facts the hearing panel is likely to know are contained within the investigation report. The Hearing Panel's job is

---

[17] The four originally submitted "snippets" totaled only one minute 15 seconds vs. the full six-minute audio.

simply to determine whether "the facts" reported by the investigator constitute a policy violation.

As a result of the investigator's misrepresentations, the Hearing Panel that adjudicated David Smith's case was led to believe he all but admitted the facts necessary to find him responsible—as far as the Hearing Panel was aware, David Smith admitted that he did not have affirmative consent:  he relied on the fact that Jane Roe never said no to infer consent; Jane Roe was mostly silent during their sexual activity; and he primarily inferred consent from the way she looked at him. These purported admissions were outrageously false statements by the investigator.

Brown allowed the hearing to move ahead based on the false and incomplete record its investigator put forward. This made it impossible for David to defend himself. Brown sets aside only one hour for hearings (and David's took less than that), underscoring Brown's expectation that the hearing is not intended to be a robust or searching proceeding. *Id.* at ¶¶ 23, 109. The parties are only allowed to give one short seven-minute statement. With a report falsely representing as a fact that David Smith admitted Jane Roe never demonstrated consent, his fate was sealed.

David's "hearing" was little more than a formality—it was a thirty-seven-minute event in which David was asked five questions by a panel whose knowledge of the case was exclusively limited to the investigator's report. *Id.* at ¶¶ 24, 109, 179. Not surprisingly, one of the questions David was asked highlighted how badly the panel had been misled by the investigator: David was asked why he inferred consent from Jane given how little they communicated. *Id.* at ¶ 24. David responded that the panel had been misinformed on that point and that he had always maintained that Jane verbally and physically encouraged him throughout their encounter. *Id.* at ¶ 24. The panel did not ask a single follow-up question in response to David's statement.

The impact of the investigator's decision to exclude David's medical opinions also became markedly apparent at the hearing because the panel asked Jane if she believed the marks on her

neck were from being choked by David. *Id.* at ¶ 20. Jane stated that she believed that was the case. David was not permitted to counter this claim with the medical expert testimony he had submitted and that was withheld from the record. *Id.* at ¶ 20. Thus, all that was before the panel were photos of hickeys which the panel was misled to believe were bruises, together with the incredible—but completely unchallenged—testimony of Jane and her two best friends that Jane was bruised and traumatized after her encounter with David even though the two best friends left her there to go get food.

After the perfunctory Q&A concluded, David used his seven-minutes of permitted speaking time attempting in vain to convince his panel that both Jane and the investigator had lied, that there was critical evidence they had not seen, that the multitude of inconsistent statements by Jane that he had exhaustively detailed for the investigator were left out of the report, and that his entire defense including his explanation for Jane's motivation to lie, had been excluded from the record before them. *Id.* at ¶¶ 24, 181.

Jane similarly relied on the false statements contained in the investigation report as part of her 7-minute statement, explaining to the panel that David had to be found responsible based on his own admissions, including that he inferred consent from a "gaze." *Id.* at ¶¶ 25, 26.

### 6. The Hearing Panel Issues A Flawed Responsibility Finding Relying on the Investigator's Manicured Factual Record

On Thursday, August 4, 2022, the Hearing Panel issued a decision finding David responsible for sexual assault and imposing a two-year suspension. *Id.* at ¶ 26. The panel's rationale was limited to two short paragraphs, and it was replete with inaccuracies. In two short paragraphs the written decision attempts to explain why the Hearing Panel believed Complainant's version was more credible. The panel's rationale is both flawed and irredeemably infected by the flawed investigation report they relied on. For example, the panel noted that Jane was more

credible because she provided "a detailed account of the events" without acknowledging that her account substantively changed multiple times through the course of this proceeding. *Id.* at ¶¶ 26, 186. A significant component of what should be part of any credibility analysis—witness consistency—was missing from the panel's determination because the Investigation Report ignored all of Jane's inconsistencies and David had no opportunity to explain them in the few minutes he was allowed to speak during the hearing. *Id.* at ¶ 187.

Instead the Panel was led to believe there was one consistent account and that it was corroborated by Complainant's two best friends, Witnesses 1 and 2. For example, the hearing panel determined that "Complainant's actions after leaving the Respondent's room were consistent with her claim of having been assaulted." *Id.* at ¶ 188. And they based this assertion on the fact that Witnesses 1 and 2 met Jane in the bathroom where Complainant "showed them bruises consistent with the complaint" and where "both witnesses confirmed that [Jane] was distraught and disoriented at the time, and that she expressed she was in pain." *Id.* at  ¶ 188. In making these assertions, the Hearing Panel either ignored or was unaware that Witnesses 1 and 2's accounts made no sense given that they left Jane Roe in the house of her alleged attacker despite claiming she was distraught, visibly injured and in pain and moreover, that she stayed to dance for 30 minutes. Additionally, the panel noted that Witnesses 1 and 2 confirmed that Jane's costume was ripped and that she had bruises. First, <u>according to Jane</u>, she took off her own costume before having sex with David, and no one bothered to ask her how her costume became torn. And again, David had submitted expert medical opinions regarding the alleged bruising that were purposefully hidden from the panel. *Id.* at ¶ 189.

The panel also relied on the fact that Jane filed police reports after the fact, without reflecting on the fact that her police reports contained material and significant differences from the

accounting she told Brown on the same day[18]. *Id.* at ¶ 190. The panel was not equipped to wrestle with Jane Roe's inconsistencies because those details were not included in the investigation report—a report Brown instructs panel members to presume is accurate and contains all the information necessary to render a decision. The fact that Jane filed police reports should not be read to support her credibility when the substance of what she told the police was so markedly different than what she told Brown.

The Hearing Panel's rationale for why David was determined not to be credible was also irrational and hopelessly reliant upon the false record created by the investigator. The decision faulted David for "not provid[ing] details about examples of the Complainant's verbal encouragement to engage in specific forms of sexual contact, including physical roughness, beyond the phrases 'fuck me!' 'fuck me harder!' 'oh fuck me you fuck!'?" *Id.* at ¶ 191. While these words are obviously specific and quite instructive, the Hearing Panel was led by the investigator to believe that David admitted Jane only spoke these words once or twice and was otherwise silent. *Id.* at ¶ 191. In fact, David had repeatedly told the investigator that Jane loudly stated those phrases constantly and throughout their sexual encounter. And in his voluminous written submissions David provided many detailed descriptions of Jane Roe's verbal and non-verbal conduct that demonstrated consent. *Id.* at ¶ 192. During his interview, the investigator assured David that she had read all of his written submissions—but there is no evidence of this *at all* in her investigation report. In short, David's purported lack of detail was the only reason the hearing panel provided for finding him not to be credible, and that was entirely a result of the investigator falsifying and misstating his testimony.

---

[18] One Providence Police report occurred on November 9th, the other on November 12th, the same day as the initial Brown Complaint.

### 7.   A Meaningless Appeal Process

On August 11, 2022 David submitted an appeal, pursuant to Brown's procedures, which exhaustively catalogued all the above flaws in both the investigation and the hearing process. *Id* at ¶193. Brown's Policies provide an approximate timeline of each stage of a disciplinary proceeding and allots five days for consideration of an appeal of a disciplinary decision. Non-Title IX Procedure § 2.9.5. The policies state that "[t]he Complainant and Respondent will be notified of any delays or extensions of these timeframes and will be provided with a revised timeline to resolve the complaint." *Id.* Brown never advised David that it would require more than five days to review his appeal. This is consistent with Brown's management of this entire process which by its own policy was outlined as a 75-day process unless Brown notified the parties of any delays. Brown made no such notifications prior to the hearing, yet the process has taken 10 months.

Consistent with its disregard for its own policies, Brown was silent after David filed his appeal. After hearing nothing for nearly three weeks, on August 29, 2022, David wrote to the Title IX coordinator to inquire into the status of the appeal, advising that he needed to make preparations to return to campus for the fall semester, which began on September 7, 2022. The Title IX Coordinator responded that she could not provide a timeline for when the appeal would be decided. Compl. at ¶¶ 195-197.

David paid his 2nd fall tuition deposit on September 6, 2022, which under Brown's policies is non-refundable if a student withdraws from the university as a result of a suspension. Brown's delay in confirming David's suspension until after he paid tuition was purposeful, given that this was the second time Brown rendered an adverse decision the day after charging non-refundable tuition. ¶ 198.

David returned to Providence, RI on the evening of September 6, 2022, waiting until the last possible moment to return to campus because Brown refused to provide any guidance on when

his appeal decision would issue. David did not want to return to campus only to be humiliated in front of his peers and emotionally crushed by having to immediately turn around and return home. But that is exactly what happened when Brown affirmed the responsibility finding the next morning. As David was walking to class on the morning of September 7 after already having attended 2 prior classes that day, he received Brown's appeal decision, which affirmed the finding against him and required him to leave campus immediately. *Id.* at ¶¶ 199-200.

While the appeal decision confirmed the responsibility finding, it did reduce David's suspension from two years to one semester, with the imposition of a permanent ban on representing the University in athletics or any leadership roles, and on participating in any extra-curricular clubs or activities. The decision states that once he returns from suspension, David will remain on probation until graduation, which makes him ineligible to hold any office with any university program or group, and further precludes his participation in any university-sponsored travel or study abroad. The appeal panel's rationale for the reduced sanction was a perplexing acknowledgment that the sanction was "overly harsh given the decision's foundation primarily on credibility." In other words, the appeal panel was not convinced by any objective evidence that David committed the violent sexual assault he was accused of and also clearly felt that he was not a threat to anyone on campus. *Id.* at ¶¶ 201-202.

In overturning the discipline, the appeal panel acknowledged that the case turned entirely on credibility, which was the exact point David made in his appeal and in other written and oral submissions. But while acknowledging the centrality of assessing the parties' credibility to the finding, the panel disregarded everything that should have informed a reasonable credibility assessment.

The appeal panel rejected each of the grounds David raised in his 14-page appeal in a five-page opinion that was replete with flawed logic and factually incorrect assertions, and that was wholly infected by undue deference to the investigator despite her dozens of lies and selectively hidden evidence.

With respect to David's challenge to Brown's decision to adjudicate his case under the Non-Title IX Policy, the University doubled down on its misapplication of its own policy, reasoning that the social gathering held at David's house where Jane Roe alleged the assault occurred was not a university sponsored program or activity and therefore was not covered by the Title IX Policy. This plainly flawed rationale again ignored the express language of Brown's policy that provides that the Title IX Policy applies to off-campus locations "in which Brown exercises substantial control"—as it clearly did that evening. *Id.* at ¶ 205.

David also challenged as a procedural error the repeated instructions he received from both the Interim Title IX Coordinator and the investigator that he was not permitted to speak with witnesses. Brown's appeal panel rejected this by blaming David for misunderstanding the policy. The appeal decision notes "[w]hile the Procedure does not limit the parties from contacting witnesses for the purpose of identifying their relevance to the complaint, we acknowledge [David] may have interpreted the provisions as limiting." *Id.* at ¶ 206. Given that David repeatedly objected throughout the 6 month investigation, specifically informing the Title IX Coordinator that he had been instructed by the investigator not to contact witnesses *despite the lack of any such restriction in Brown's policies*, it is outrageous for Brown to claim only after the investigation is over that David misunderstood that Brown's policies, in fact, never did prevent David from speaking with witnesses. There was absolutely no misunderstanding. David knew from the start that these instructions were incorrect, and objected on that basis repeatedly and in writing. *Id.*

After obliquely acknowledging the erroneous instructions David received, the decision nonetheless goes on to blame David for not specifically asking the investigator to interview his party guests, even though there were dozens of people at the party, and he was never able to speak to any them to learn if they had relevant information. *Id.* at ¶ 207. The appeal decision also incorrectly stated that the investigator was in possession of the full guest list for the party — in fact, the investigator had only asked David to submit James Doe's personal guest list, because it included Jane Roe. The investigator never made any effort to ascertain who else might have had relevant information, despite making assurances to David during his recorded interview that she would identify and interview the relevant witnesses. *Id.*

In short, David was told by both the investigator and the Title IX coordinator that he couldn't speak to anyone to gather information and identify people with relevant knowledge. And yet the appeal panel determined David had no basis to appeal the investigator's failure to interview other witnesses because David did not ask her to interview others—erroneously placing the burden on David to ensure a thorough investigation. Obviously, without the ability to learn what knowledge people had, David was not in a position to randomly suggest individuals for the investigator to interview. His only default would have been to suggest to the investigator that she interview every single person at the party, which would not have been taken seriously. *Id.* at ¶ 208.

In addition, the appeal panel determined that the investigator's failure to interview other witnesses was essentially harmless error, reasoning that "the potential that other witnesses may exist does not materially affect the outcome of the case as it was decided by the Hearing Panel with the evidence available."  *Id.* at ¶ 209. Of course, deciding that unknown information could not have materially affected the outcome is non-sensical. To determine the impact of missing

testimony on the outcome, the appeal panel obviously would first need to know the content of the missing testimony.

The appeal panel also rejected David's challenge to the improper exclusion of the reports from his two medical experts who addressed Jane Roe's claims of bruising and injury. The appeal panel reasoned that it did not qualify as "new evidence not reasonably available at the time of the hearing" (one of Brown's limited permissible grounds for appeal) because it was evidence known by the investigator at the time of the hearing – even though she chose to exclude it from the record. *Id.* at ¶ 210. Without any further explanation, the appeal panel declared that upon review of the reports prepared by two nationally renowned medical experts, the contents "do not meaningfully undermine the Complainant's credibility" and do not constitute "material evidence."  The appeal panel reached this determination despite the fact that Jane Roe claimed a violent forcible rape, submitted pictures of purported bruising to corroborate her claims, and confirmed during the hearing that she believed the markings on her neck were a result of being choked. The expert medical reports David submitted contradicted all of those allegations. In a case where both the hearing panel and the appeal panel acknowledge that the case was about credibility, the refusal to consider this evidence was inexcusable.

David also appealed on the basis that the investigator: (a) misrepresented his testimony, (b) failed to analyze the substantial inconsistencies in the accounts of Jane Roe and her witnesses, (c) altered testimony to favor Jane Roe, (d) purposefully declined to interview witnesses that may have contradicted the accounts presented by Jane Roe and her two friends, and (e) made none of the changes to the draft investigation report that David requested, but made 19 changes that Jane requested to bolster her story. *Id.* at ¶ 211. In a series of conclusory statements, the appeal panel rejected all of David's suggestions and arguments, reasoning that there was no evidence the

investigator did anything wrong, and no evidence that the hearing panel failed to consider everything it needed to in order to reach a decision. The appeal panel further concluded that the changes David had requested to the draft investigation report were "not materially different from the information provided by the investigator in the investigation report." *Id.* This conclusion is irreconcilable with reality given that David documented dozens of material misrepresentations in the draft report that the investigator refused to correct.

Finally, David challenged the result of his hearing based on the bias exhibited by Brown and its outside investigator, demonstrated through their: (a) mishandling of the entire proceeding, which began with his immediate suspension based solely on a complaint; (b) the disparate instructions given to David and Jane regarding their ability to speak with witnesses; (c) the investigator's failure to follow up on obvious inconsistencies in Jane's allegations; (d) the investigator's efforts to assist Jane Roe cover up her submission of tampered audio recordings; and (e) the blatantly false admissions the investigator attributed to David in her report. Again, in a series of dismissive and conclusory statements, the appeal panel determined that the record evidence did not support David's arguments on appeal.

* * *

## II.   ARGUMENT

Federal Rule of Civil Procedure 65 allows a court to grant a temporary restraining order when a plaintiff demonstrates, through specific facts in an affidavit or a verified complaint, that he will suffer "immediate and irreparable injury, loss, or damage." Fed. R. Civ. P. 65(b)(1). Identical standards apply to temporary restraining orders and preliminary injunctions. *Harris v. Wall*, 217 F. Supp. 3d 541, 552 (D.R.I. 2016). "In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld;

(iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Stiles v. Brown University*, No. 1:21-cv-00497-MSM-LDA, Slip Op. at 3 (D.R.I. Jan. 25, 2022) (Exh. A). The First Circuit evaluates these factors on a "sliding scale": "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 19 (1st Cir. 1996). A preliminary injunction is a powerful tool to "preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).

David's case, as supported by the Verified Complaint and exhibits, satisfies all prerequisites for a temporary restraining order and preliminary injunction. David seeks essentially the same injunctive relief, on essentially the same grounds, as Chief Judge Smith granted another Brown student whom Brown suspended for alleged sexual misconduct:

> In order to maintain the status quo, and facilitate its decision on the merits, the Court has determined that extending the terms of the [previously granted] TRO as a preliminary injunction is appropriate. . . . Here, the Court finds that Plaintiff John Doe ("Doe") is likely to succeed (at least partially) on the merits of his breach of contract claim against Brown University ("Brown"), and that he will suffer irreparable harm if his suspension remains in place and he is unable to start the fall semester. The balance of the relevant equities also favors enjoining Plaintiff's suspension. The no-contact orders issued by Brown, however, will remain in place so that Doe may not contact the alleged victim in this case. Given this safeguard, the Court finds that Doe's interest in resuming classes outweighs Brown's interest in keeping him off campus while the outcome of the case is finalized. For the foregoing reasons, Plaintiff's Motion for Injunctive Relief (ECF No. 13) is GRANTED and the Court hereby issues the following PRELIMINARY INJUNCTION:
> • Brown is enjoined and restrained from enforcing its suspension of Doe;
> • This Order shall not affect any existing no-contact orders concerning Doe;
> • Doe retains all of the rights and privileges guaranteed to members of the Brown University Community unless specifically denied in a no-contact order . . . .

*Doe v. Brown Univ*., No. CV 16-017 S, 2016 WL 8786771 (D.R.I. Aug. 23, 2016).

A.      **David Is Likely to Succeed on His Breach-of-Contract Claim**

A party "need not prove its claims at the preliminary injunction stage, only that it is likely to be able to prove its claims later." *Stiles*, Slip Op. at 3 (emphasis added) (internal citation and quotation marks omitted). The court "need not predict the eventual outcome on the merits with absolute assurance; . . . decisions on preliminary injunction are to be understood as statements of probable outcomes only." *Ross–Simons*, 102 F.3d at 16 (internal citation and quotation marks omitted). David Smith satisfies this element and presents a strong showing that Brown breached its contract with him by adjudicating his case under an inapplicable Policy/Procedure, failing to follow even the Policy/Procedure it purported to apply, and by conducting a fundamentally unfair proceeding.

1.      *A contract exists between Brown and David*

The elements of breach of contract are the existence of a contract, breach of that contract, and damages flowing from the breach. *See Petrarca v. Fidelity and Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005). Under Rhode Island law, the relationship between student and university is contractual in nature. *See Gorman v. St. Raphael Academy*, 853 A.2d 28, 34 (R.I. 2004); *Mangla v. Brown University*, 135 F.3d 80, 83 (1st Cir. 1998). "The terms of the contract may include statements provided in student manuals and registration materials." *Id.* The proper standard for interpreting those terms is that of "reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Id.* (internal quotation marks omitted). The processes included in a university's disciplinary code "must be carried out in line with the student's reasonable expectations." *Havlik v. Johnson & Wales Univ*., 509 F.3d 25, 34 (1st Cir. 2007). If the university fails to meet a student's reasonable expectations, it breaches its contract. *Stiles*, Slip Op. at 4 (internal citation and quotation marks omitted). "Any '[a]mbiguities in a contract must be construed against the drafter of the

document,' . . . which in the case of a student handbook is the university." *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 330 (D.R.I. 2016) (internal citation omitted).

In addition, Rhode Island law recognizes that "contracts contain an implied duty of good faith and fair dealing." *Mangla*, 135 F.3d at 84. "The implication of the duty is that the parties will act in a manner consistent with the purposes of the contract." *Havlik v. Johnson & Wales Univ.*, 490 F.Supp.2d 250, 261 (D.R.I. 2007).

A contract exists between Brown and David. Brown offered David enrollment in the winter of 2018, and David accepted that offer by paying tuition and enrolling in the Class of 2023. *Id.* at ¶ 8. As part of his enrollment, Brown required David to comply with its student handbook and all student policies and procedures, including both its Title IX and Non-Title IX Policies/Procedures. *Id.* at ¶¶ 124, 131. Those Policies/Procedures set forth terms of Brown's contractual relationship with David, *Id.* at ¶ 132, and Brown was bound to carry out its Policies/Procedures in line with David's reasonable expectations and in good faith.

### 2. Brown breached its contract with David by failing to apply its Title IX Policy/Procedure

As set forth above, Brown's Title IX Policy/Procedure, by its express terms, applies to alleged off-campus sexual misconduct that occurs at a location "in the United States, in the context of a program, activity, or location in which Brown exercises substantial control over both the Respondent and the context in which the alleged Prohibited Conduct occurred." Title IX Procedure § 2. Brown exercised substantial control over David's house, where the alleged assault occurred: Brown campus police (not local law enforcement) came to the house and threatened to break up the party if they did not quiet down (Brown campus police actually specifically asked David to quiet down the party), and Brown through one of its Deans later formally investigated and disciplined David and his housemates for noise and trash violations associated with the party. In

other words, Brown assumed, and exercised, substantial control by strictly limiting David's ability to use his home for social gatherings and punishing him for non-compliance.

Under the terms of the Title IX Policy/Procedure, and given Brown's exercise of control over David's home and the Halloween party the night in question, David reasonably expected Brown to adjudicate his case under that Policy/Procedure. As discussed both above and below, most of the relevant terms of the two sets of Policy/Procedure are the same, and Brown breached its obligations to David under both sets. But if Brown had applied its Title IX Policy/Procedure, David would have had the right, at the hearing, "to pose questions to the other party, investigator, and witnesses to elicit relevant factual information missing from the final investigation report." Title IX Procedure § 2.9.4.4. The Non-Title IX Procedure eliminates that right, and instead establishes a "*presumption* . . . that the investigator has identified and interviewed all relevant witnesses and supplied the information necessary for the Hearing Panel to render its decision and determine sanctions." Non-Title IX Procedure § 2.9.4. Although David told the Hearing Panel during his seven-minute statement that any such "presumption" would be false—explaining his testimony had been falsified and his defenses ignored in the report, the Panel declined to inquire into his accusations by questioning the investigator and instead accepted the false "presumption." *Id.* at ¶ 181.

A federal court's observations in a case in which another university – like Brown – adopted a Title IX policy to comply with the 2020 regulations, but insisted on adjudicating a sexual misconduct complaint under its non-Title IX policy with reduced rights, apply equally here: "[D]efendant decided that it would be best to maintain two parallel procedures solely to ensure that at least some respondents would not have access to new rules designed to provide due process protections such as the right to cross-examination that have long been considered essential in other

contexts. . . . Such disregard for the inevitable administrative headaches of a multi-procedure approach certainly qualifies as evidence of an irregular adjudicative process. Similarly, the Court finds that a school's conscious and voluntary choice to afford a plaintiff, over his objection, a lesser standard of due process protections when that school has in place a process which affords greater protections, qualifies as an adverse action." *Doe v. Rensselaer Polytechnic Institute*, No. 1:20-CV-1185, 2020 WL 6118492, *7 (N.D.N.Y. Oct. 16, 2020).[19] Brown's decision to apply its Non-Title IX Policy was both a breach in and of itself and compounded the specific breaches that followed.

### 3.    Brown breached both its Title IX and Non-Title IX Policies/Procedures in multiple ways

In adjudicating David's case, Brown breached terms included in both its Title IX and Non-Title IX Policies/Procedures, and David thus has a strong breach of contract case regardless of which set applies. As set forth above, the expressed "purpose" of both Brown's Title IX and Non-Title IX Policies/Procedures is "to provide a prompt, impartial, and unbiased response" to complaints of sexual misconduct. Brown starts with fundamental promises to a "procedure . . . grounded in fairness and support for all parties . . .., procedural protections that ensure nondiscrimination, adequate notice, and meaningful opportunities to participate," and a "presum[ption] that the Respondent is not responsible for the alleged Prohibited conduct until a determination is made at the conclusion of this procedure." Title IX Procedure § 1.0, Non-Title IX

---

[19] The incongruity of Brown's decision to have two different sets of policy/procedure to handle the same kinds of alleged sexual misconduct, only one set of which is designed to comply with Title IX, is heightened by the fact that both policies start by quoting Title IX, and proceedings under both policies are handled by Brown's Title IX Office, are overseen by Brown's Title IX Program Officer (identified as the Title IX Coordinator for Brown), and use hearing panel members selected from Brown's Title IX Council. While maintaining separate policies is not prohibited by Title IX, Brown must apply its Title IX Policy when it jurisdictionally applies. Brown made the decision to police, investigate and disciplineits students' conduct in the neighborhoods that surround campus and should not be permitted to avoid the impact of this exercise of control.

Procedure § 1.0. David reasonably expected Brown to honor both those promises and the more specific provisions of its Policies/Procedures, but Brown has violated his reasonable expectations throughout the proceeding.

First, given Brown's overall promises, David could not reasonably have expected Brown to blindly accept Jane's word and treat him as guilty at every step. That started when Brown immediately removed him from campus and suspended him without performing any investigation into Jane's allegations. *Id.* at ¶ 238. It continued when Brown allowed the Investigator to disregard evidence of Jane's inconsistencies and outright lies; misrepresent David's statements dozens of times in a blatant attempt to ensure he would be found responsible; and mischaracterize his detailed factual corrections to the report as "preferences to verbiage" that "didn't constitute material substantive facts." It continued with the Investigator blowing every deadline in a case that is prescribed in Brown's policies to last 75 days vs. the over 9 months it actually took to finish the case (despite how little investigating occurred). It continued when the Hearing Panel made its decision based on the Investigator's false and incomplete report and Jane's false statements, without questioning them to ensure it had all the relevant facts and without giving David the opportunity to do so. And it culminated in the Appeals Officer's rejection of David's appeal in a decision that deferred entirely to the investigator's false record and that attempted to shift blame for Donna Davis's investigative failures to David.

That nothing in the process aligned with David's reasonable expectations is further reinforced by the following additional specific provisions of the Procedures:

- In Sections 2.9.2 and 2.9.3, Brown promised safeguards to ensure a thorough, fair and accurate investigation and a thorough, fair and accurate report. It did not honor them. The parties were promised the right to provide evidence to the Investigator. The

Investigator was required to "gather, assess, and synthesize the relevant evidence in a report that sets forth the facts determined to have occurred", and was given the authority to make credibility determinations based on "evidence" and "facts." Instead, the investigator *made things up* and refused to include specific facts that showed Jane's lack of credibility.

- The parties were promised an opportunity to review and comment on the draft investigation report to ensure its completeness and accuracy, but Brown rejected all of David's detailed corrections and additions (while accepting 19 changes from Jane). The Title IX Program Officer is specifically charged with ensuring the "thoroughness and accuracy of the report." David asked the Program Officer to ensure that the report was corrected, but she refused.

- Brown promised that the officials involved in the process would "be free from conflicts and receive training on identifying and mitigating explicit and implicit bias." Title IX Procedure § 2.7; Non-Title IX Procedure § 2.7. David has provided multiple examples showing that Brown's Investigator and other officials skewed the process to Jane's benefit and his detriment.

- Brown promised to, "[i]n all stages of the process, . . . appl[y] the preponderance of the evidence standard (more likely than not) when determining whether the Policy has been violated." Title IX Procedure § 2.3; Non-Title IX Procedure § 2.3. Instead, Brown reached a preordained result, based on misrepresentations and distortions of the evidence. To be clear, David is not arguing that the Investigator had to *agree* with his account of the facts — but he reasonably expected the Investigator to present his

account accurately and completely to the Hearing Panel through her Investigation Report. Under the Procedures, the Investigator "does not make a final determination to whether a policy violation has occurred" — that is the role of the Hearing Panel. But given that the Investigator presented Jane's account as fact and distorted David's account into a virtual admission, the Investigator essentially preempted the Panel and lied in order to ensure a finding of responsibility.

Second, given Brown's overall promises and the specific provision in Section 2.9.2 giving him the right to provide names of potential witnesses, David could not reasonably have expected that Brown would deny him the ability to talk to potential witnesses to determine if anyone who attended the party and observed Jane Roe had relevant information to share. Nothing in the Policies/Procedures allowed Brown to impose such a restriction, and Brown did not impose a similar restriction on Jane. Because the Investigator did not independently seek out witnesses, the gag order on David further ensured that the investigation would be incomplete and the report skewed to support Jane. The investigator interviewed Jane Roe's two best friends and did not challenge any aspects of their account despite obvious inconsistencies in their testimony. In contrast, the investigator interviewed one of David's friends (the only witness he could identify) and went out of her way to discredit his testimony. The Investigator interviewed only these three witnesses David and Jane identified during her six-month period to deliver her report, ignoring numerous witnesses she identified herself. David was directed not to contact potential witnesses due to the imposed "gag order," materially hindering his defense and putting a restriction on him that doesn't exist in Brown's written policies.

Third, given Brown's overall promises and the specific provisions for appeal, David reasonably expected the Appeals Officer to correct the material procedural errors, lack of evidence,

and blatant bias that infected the process and inevitably led to an unsupported (and unsupportable) decision against him. In an opinion that essentially blamed David for any shortcomings in the investigation (despite Brown's obligation to provide thorough investigation), the appeal panel rejected every argument David asserted with virtually no analysis of the issues he raised.

In sum, after insisting on adjudicating David under inapplicable procedures designed to limit his defense, Brown compounded that error by conducting an inadequate investigation, suppressing relevant evidence, and allowing its investigator to produce an incomplete, inaccurate and highly misleading report. Brown steadfastly refused to correct the investigator's failures and then precluded David from meaningfully presenting his position (and the evidence supporting it) to the Hearing Panel by limiting him to a seven-minute oral statement. Finally, Brown used the incomplete and inaccurate investigation report as the foundation for its decision, and then refused to correct any of its errors on appeal. None of this was in line with David's reasonable expectations. And none of this was consistent with Brown's implied covenant to discharge its contractual obligations in good faith.

Under Rhode Island law, David will likely succeed on his breach of contract claims. Brown's persistent efforts to make its own contractual promises meaningless are a clear contractual violation under the principles set forth above in Section II(A)(1). Cases in which courts have granted injunctive relief against Brown support David's position.

In *Doe v. Brown Univ.*, 210 F. Supp. 3d 310 (D.R.I. 2016), this Court granted a suspended student a preliminary injunction after previously granting a TRO. After a bench trial, the Court entered judgment on breach of contract claims in plaintiff's favor, ordering Brown "to vacate its finding and sanction against [plaintiff] and expunge his record accordingly." Among other things, the Court held that Brown breached contractual provisions comparable to those in

Brown's current Procedures through conduct comparable to that in David's case: the investigation report "did not adequately present [respondent's] evidence;" the investigator selectively gathered and presented evidence regarding topics identified as relevant; the investigator went beyond her stated role by commenting on the sufficiency of the evidence and "effectively telling the panel that she thought they should find [plaintiff] responsible" (per the Court, this was "particularly problematic" given that the investigator refused to ask for or present exculpatory evidence); a panel member (following Brown's training) disregarded evidence that was not consistent with Complainant's alleged lack of consent and bore on her credibility; and the hearing panel failed to give plaintiff "every opportunity to articulate relevant concerns . . ." *Id. at* 336-42.

In *Stiles*, another case granting a Brown student injunctive relief, the Court held that Brown's promise to presume respondents not responsible and its guarantee of "'meaningful opportunities to participate'" in the Title IX process "reasonably includes any important phase of the process that will affect John's rights, such as his continuing education, access to campus, or participation in school sponsored activities." Slip Op. at 4. Here, as in *Stiles*, Brown "failed to demonstrate anything that would indicate they afforded the plaintiff a presumption that he was not responsible for the alleged conduct as required by contract. Instead, it focused on the nature of the unproven allegations and removed him from campus and suspended him . . ." *Id*. at 5. In *Stiles*, the Court noted that Brown made no investigation before making its decision. But its reasoning applies equally here, where Brown conducted its purported investigation, purported hearing, and purported appeal process in a way designed to reach a preordained result. Just as Stiles was "likely to succeed on his claim that Brown could not fairly determine if there were 'reasonable cause to believe' that the plaintiff would likely continue his alleged prohibited

conduct or otherwise be a threat to the university community," David is likely to succeed on his claim that a decision based on a blatantly false and incomplete report, with no meaningful opportunity to offer his defense, violated his reasonable expectations and thus breached his contract with Brown. *See also Doe v. Brown Univ.*, 166 F. Supp. 3d 177 (D.R.I. 2016) (No. 15-144; denying motion to dismiss claims for breach of contract and breach of covenant of good faith and fair dealing; citing plaintiff's immediate removal from campus in face of promise to assume innocence, failure to give plaintiff opportunities to respond to evidence, improper redaction of plaintiff's evidence, and refusal to consider pictures showing lack of bruising on complainant); *Doe v. Brown Univ.*, No. 15-144 (D.R.I. Nov. 1, 2018) final judgment in same case, declaring that "the investigation and procedures related to the disciplinary suspension Defendant imposed upon [plaintiff] breached his contractual rights under Rhode Island law and that the suspension and all findings are hereby null and void and expunged from Plaintiff's record, as if they had never occurred;" ordering Brown "to vacate its disciplinary findings and the resulting sanction of suspension imposed against Plaintiff and expunge his record accordingly"); *see also Doe v. Johnson & Wales University*, No. 18-CV-00106-MSM-LDA, 2019 WL 6324905 (D.R.I. Nov. 26, 2019) (denying university's motion for summary judgment on counts for breach of contract and covenant of good faith and fair dealing, reasoning that under Rhode Island law whether promises of a fair process entitled plaintiff to specific procedural protections, including a right to question witnesses, was a jury question).[20]

Finally, courts in other jurisdictions have not hesitated to grant injunctive relief on facts comparable to, or even less egregious than, those here. *See, e.g., Rensselaer Polytechnic*, 2020 WL

---

[20] The promises on which David relies here were more explicit and detailed than those the Court addressed in *Johnson & Wales*, and Brown's actions to deny him a fair process were more extensive.

6118492 (where university adopted a Title IX policy to comply with the 2020 regulations, but insisted on adjudicating a sexual misconduct complaint against plaintiff under its non-Title IX policy with reduced rights, Court enjoined university from even continuing with the proceeding); *Doe v. Univ. of Notre Dame*, 2017 WL 1836939, at \*9-11 (N.D. Ind. May 8, 2017), *vacated per settlement* (court found likely success on breach of contract claim where university promised a "prompt, fair and impartial investigation and resolution" and, among other things, collected evidence selectively, refused to consider evidence pertinent to the accuser's credibility and motives, left the presentation of respondent's case "to the student himself, but with severe limitations" (including no opportunity to ask questions)); *Ritter v. State of Oklahoma*, No. CIV-16-0438-HE, 2016 WL 2659620, at \*3 (W.D. Okla. May 6, 2016) (granting preliminary injunction and staying student's expulsion; though policy promised an "equitable resolution of the complaint," plaintiff was "given limited opportunity to rebut the charges made against him"; "it is critical that the accused have a reasonable opportunity to present his version of the events"). *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at \*3 (D. Vt. Sept. 16, 2015) (finding likely success on merits because college instituted and prosecuted investigation and adjudication in violation of its policies and procedures; granting injunction); *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at \*12-13 (S.D. Ind. Aug. 22, 2014) (granting preliminary injunction to student suspended for purported sexual misconduct and finding likely success on contract claims; university promised that complaints would be "responded to properly and sensitively, investigated appropriately, and addressed competently," but court noted that "very little evidence" supported the decision, investigation consisted almost exclusively of interviews of witnesses suggested by complainant, with no attempt "to ferret out other students who might have additional information," and Board questions at hearing were incomplete).

**B.      David Will Suffer Irreparable Harm Without Judicial Intervention**

Brown's decision to find David responsible for sexual assault and suspend him is now part of his permanent immutable academic record and will be disclosed to any future academic institution to which he may apply should he choose to continue his education. Despite his academic and athletic accomplishment as a 3.9 GPA varsity starter, such a finding will severely limit, if not destroy entirely, David's ability to complete his education at any comparable school. Beyond the impact that Brown's erroneous decision will have on his academic and career prospects, the damage and stigma to David's reputation will be immeasurable. If he continues his education at Brown, he will always have to explain the delay in receiving his degree to any future employer or graduate program. David's truthful disclosure of the sexual assault finding against him will undoubtedly preclude him from opportunities he otherwise would have enjoyed. Monetary damages will not adequately compensate David for the harm he is guaranteed to suffer if this Court does not grant injunctive relief.[21] This Court must consider the multiple intangible and reputational harms that Brown's conduct unjustifiably imposes on David. Here, when coupled with the strong showing on the merits, the irreparable harms that David will suffer, and that will become permanent without a preliminary injunction, entitle him to immediate injunctive relief. Such relief

---

[21]    The fact that David seeks monetary relief in conjunction with injunctive relief does not mean that monetary relief alone is adequate. *See Doe v. Rensselaer Polytechnic Inst.*, No. 1:20-CV-1185, 2020 WL 6118492, at *13 (N.D.N.Y. Oct. 16, 2020) ("A harm is not irreparable only where damages are unavailable; a harm is irreparable because damages cannot adequately capture the value of the thing the plaintiff has lost.").

is necessary to preserve the status quo and permit this Court to issue an effective remedy upon full adjudication of this case. *See CMM Cable Rep., Inc.*, 48 F.3d at 620.

### 1.    David will lose irreplaceable educational and academic opportunities

Students have "paramount" interests "in completing their education, as well as avoiding unfair or mistaken exclusion from the educational environment, and the accompanying stigma." *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 66 (1st Cir. 2019) (internal citations omitted). Brown's unjustifiable actions cut short David's ability to continue his trajectory as an exemplary Brown student. His education will only continue to suffer if he is not permitted to resume classes with his fellow students in Fall 2022. *Id.* at ¶¶ 80, 145. At stake is David's very ability to pursue his education and timely obtain a Brown undergraduate degree. *Id.* at ¶ 145. If the suspension is not stayed, his education will be interrupted, and he will have an educational gap, even if – as he fully expects – he prevails in this action. *Id.* at ¶ 81. His academic transcript will forever be marred by that gap, which he will have to explain to every university (*e.g.*, in transfer or graduate school applications), prospective employer, professional licensing body, etc. *Id.* Numerous courts have determined that is exactly the type of irreparable harm to a college student's academic and professional career that a preliminary injunction is intended to prevent.[22]

---

[22]    *See, e.g.*, *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017) (affirming grant of preliminary injunction for suspended student: "Were we to vacate the injunction, Doe would be suspended for a year and suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing. Accordingly, this factor weighs in favor of preliminary relief"); *Stiles,* Slip Op. at 5-6 (finding irreparable harm based on "lasting, negative ramifications" of transcript notation showing even a one semester suspension); *Doe v. Univ. of Connecticut*, 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020) (plaintiff faced irreparable harm because suspension would "forever change the trajectory of his education and career," where plaintiff, who had "a 3.5 GPA and an umblemished record," "would need to explain a gap on his résumé in future applications to schools or jobs" and "would also need to explain the suspension notation on his UCONN transcript, and a truthful explanation would seriously hinder his prospects") (internal quotation marks omitted); *Notre Dame*, 2017 WL 1836939, at *12 (gap in education constitutes

### 2.      David will lose irreplaceable athletic opportunities, from which he could never recover

Brown's unjustifiable actions have stripped David of his ability to participate and compete in collegiate athletics. David is an extraordinarily accomplished member of a Brown varsity sports team and is now at the pinnacle of his athletic career going into his senior year. Courts have routinely found that loss of the opportunity to play collegiate sports on a continuous and uninterrupted basis, risking loss of continued training and athletic development, constitute clear irreparable harm.[23] David will suffer such harm if not allowed to resume his athletic training this semester.

### 3.      David will lose future employment opportunities

Brown's actions jeopardize a prestigious job offer that David received after completing a grueling and competitive internship at a nationally recognized firm this past summer. *Id.* at ¶ 223.

---

irreparable harm to [plaintiff's] reputation and resumé for purposes of career prospects and possible further academic advancement;" "[t]he questions the gap raises, and the explanation it requires, are potentially damaging to [plaintiff] in a manner not compensable by money damages and not repaired by permanent injunctive relief that might be granted after a decision on the merits in [plaintiff's] favor"); *Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 1179955, at *9 (S.D. Ohio Mar. 13, 2015) (finding that suspension caused irreparable harm because it "effectively denied [plaintiff] the benefit of the work already performed in the classes this semester and delayed the completion of his degree," and plaintiff would "forever have this disciplinary action on his academic record, which may impact his ability to enroll at another institution, or affect his future career possibilities"); *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014) (finding that suspension caused irreparable harm because plaintiff "will forever have either a gap or a senior-year transfer on his record," which would inevitably lead to questions "by future employers or graduate school admissions committees," and that monetary damages were inadequate to erase the "stigma" this would cause); *Byrnes v. Johnson Cty. Cmty. Coll.*, No. CIV.A. 10-2690-EFM, 2011 WL 166715, at *4 (D. Kan. Jan. 19, 2011) (finding that expulsion causing "absence from the nursing school for the Spring 2011 term irreparably harms [plaintiff] by imposing a minimum of a one year delay in her nursing education and therefore her opportunity to earn a living as a registered nurse").

[23]   *See, e.g., Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) (finding that suspension of football player, depriving him of "opportunity to participate in sports on a continuous and uninterrupted basis," constituted irreparable harm);

David's job offer is contingent, however, upon him completing his undergraduate degree in the Spring of 2023. Neither will happen if he is not allowed to resume classes immediately. Moreover, as noted, he will have to explain to every future potential employer why there is a gap on his transcript related to his absence from Brown caused by the suspension, which will require David to explain his suspension for sexual assault. The direct loss of a job and potential loss of future job opportunities are clear examples of irreparable harm.[24]

In sum, David will suffer multiple forms of irreparable harm if his suspension is not stayed. This Court would be unable to adequately remedy these damages at the end of this proceeding, since, even if David prevails in this lawsuit, the harms caused by the suspension will already have become permanent, and cannot be adequately compensated with money. They are precisely the type of irreparable harms that preliminary injunctions are intended to prevent.

### C. Any Alleged Hardship to Brown from a Preliminary Injunction Is Far Outweighed by the Hardship David Will Suffer Without an Award of Injunctive Relief

The irreparable harms that David will suffer far outweigh any hardship Brown could encounter if a temporary restraining order and preliminary injunction is granted.[25] A school's primary function is to provide an education, and, in the context of disciplinary proceedings, they (at least "[i]n theory"), share with students an interest in *fair* and *accurate* adjudications. *Haidak*,

---

*Ganden v. National Collegiate Athletic Association*, 1996 WL 680000, at *6–7 (N.D. Ill. Nov. 21, 1996) (noting that because collegiate athletes have only a limited span of competitiveness, losing a year of competition would irreparably inhibit their development as athletes).

[24] *See, e.g.*, *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) (finding that plaintiff suffered irreparable harm where he would lose one job offer as a result of his suspension and "would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap").

[25] *See Stiles*, Slip Op. at 6*; Middlebury Coll.*, 2015 WL 5488109, at *4 ("The harm Middlebury will suffer if Plaintiff is allowed to remain a student for the fall semester is not as great as the harm Plaintiff will suffer if he is not permitted to return to campus but ultimately prevails in the case."); *DePauw Univ.*, 2014 WL 4197507, at *14 (finding balance of harm firmly in student's favor).

933 F.3d at 66. Brown faces no hardship by allowing David to continue his academic and athletic career uninterrupted until this case is resolved. "After all, [a university's] interest in punishing those it finds in violation of its sexual misconduct policy should be no greater than its interest in ensuring that its accused students are not unjustly punished to their lifelong detriment. . . . Delaying one hearing [or, in David's case, deferring one sanction] in light of some sobering evidence of discrimination against a male is an insubstantial loss for defendant, and certainly not an all-consuming one. But plaintiff only has one reputation, one career, and one life." *Doe v. Rensselaer Polytechnic Inst.*, No. 1:20-CV-1185, 2020 WL 6118492, at *13 (N.D.N.Y. Oct. 16, 2020).

Brown's interests in protecting Jane's safety as well as that of the campus community are adequately served through other means, particularly the No-Contact Order that has been in place since David's original interim suspension. The No-Contact Order will remain in place, and there is no evidence that it is inadequate as they co-existed this past semester under such an order. *Id.* at ¶ 142. David has complied with it, and Jane has indicated that no protective measures are necessary to make her feel safe, since, after she filed her complaint, she has spent hours in David's home, threatening him in front of his friends, and reached out to David and even initiated an in-person meeting with him. Moreover, David has a good disciplinary record spanning his entire three years at Brown, and neither Brown nor its Threat Assessment Team unearthed even a shred of evidence suggesting that he is a threat to campus safety. *Id.* at ¶ 96.[26]  And perhaps most importantly, given that Brown reduced David's suspension to one-semester, the university has already determined

---

[26] *See Stiles,* Slip Op. at 6.

-60-

that he is safe to return to campus as of January 1st, 2023.  There is nothing to suggest that he is not safe now.

The costs to Brown of allowing David to resume his education are little, whereas the costs to David of disallowing that are great. The balance of hardships favors a temporary injunction and preliminary injunction.

### D.    Granting a Preliminary Injunction Will Serve the Public Interest

The public interest is served by staying the suspension. "The public interest, and in particular the university community, is best served by the school applying its disciplinary procedures according to the terms of its policies," *Stiles,* Slip Op. at 7, and "fairly to both complainants and respondents in disciplinary actions." *DePauw Univ.*, 2014 WL 4197507, at *14. "[I]t is always in the public's interest that a student be treated fairly before being disciplined." *Ritter*, 2016 WL 2659620, at *3 (W.D. Okla. May 6, 2016); *see also Rensselaer Polytechnic*, 2020 WL 6118492, at *13–14 ("granting Doe's injunction would align with the public interest": "Although [university correctly noted . . . that Roe's rights need to be protected in this case as well, that protection cannot come at the expense of Doe's in the absence of a fair determination of his culpability"); *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp.3d 533, 588 (E.D. Va. 2016) ("[L]eaving in place a wrongfully imposed sanction and the record of such is plainly contrary to the public interest.").

David has demonstrated substantial issues regarding the veracity of Jane's complaint, the unfairness and corruption of his entire disciplinary process, and the lack of evidence to support Brown's decision. Granting the temporary restraining order and preliminary injunction will serve the public interest, while also allowing David to continue his academic and athletic career.

E.      **The Circumstances Warrant Expedited Consideration and Issuance of a Temporary Restraining Order**

Because Brown finalized David's suspension on the first day of classes of the current fall semester, David is currently missing critical coursework necessary for his majors.  Every day that the suspension remains in place makes it less likely he will be able to catch up and complete his degree on time. If too much time passes, and David misses too many assignments, there is no guarantee that his professors will allow him to continue on in his fall classes.  We respectfully ask the Court to allow David to resume his studies so that he may retain the chance of graduating on time, maintaining his hard-fought job offer after graduation, and to participate in the final year of his athletic career at Brown.

## III.    CONCLUSION

For the reasons set forth herein, David Smith respectfully requests that, pending resolution of this case on the merits, this Court restrain and enjoin Brown from enforcing its suspension against David Smith; denying him class attendance and participation; denying him the ability to continue practicing, training, and competing in varsity athletics; and denying him any of the rights and privileges guaranteed to members of the Brown University Community, except to the extent specifically included in the no-contact order.

Dated:  September 9, 2022

By: /s/ Maria F. Deaton                By:  /s/ Patricia M. Hamill
    Patrick C. Lynch, Esq. (#4867)          Patricia M. Hamill, Esq. (*pro hac pending*)
    Maria F. Deaton, Esq. (#7286)          Andrew S. Gallinaro, Esq. (*pro hac pending*)
    Lynch & Pine, Attorneys at Law         Conrad O'Brien, PC
    One Park Row, Fifth Floor             1500 Market Street, Suite 3900
    Providence, RI 02903                Centre Square, West Tower
    (401) 274-3306                    Philadelphia, PA 19102
    plynch@lynchpine.com              (215) 864-9600
    mdeaton@lynchpine.com            phammill@conradobrien.com
                                 agallinaro@conradobrien.com

By:  */s/ Douglas F. Gansler*
     Douglas F. Gansler, Esq. (*pro hac pending*)
     Cadwalader, Wickersham & Taft LLP
     700 Sixth Street, N.W.
     Washington, DC 20001
     (202) 862-2300
     douglas.gansler@cwt.com

## CERTIFICATE OF SERVICE

I, Maria F. Deaton, certify that on September 9, 2022, this document was electronically filed through the Court's CM/ECF system and is available for viewing and downloading to all registered counsel of record.

/s/ Maria F. Deaton
Maria F. Deaton, Esq. (#7286)
Lynch & Pine, Attorneys at Law
One Park Row, Fifth Floor
Providence, RI 02903
(401) 274-3306
mdeaton@lynchpine.com