## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

DAVID SMITH,                                    )
          Plaintiff,                       )       Case No.: 1:22-cv-00329
          vs.                              )       **JURY TRIAL**
BROWN UNIVERSITY,                               )       **DEMANDED**
DAVIS CONSULTING GROUP, LLC, and                )
DONNA DAVIS, Individually                       )
          Defendants.                      )
_____)

### DAVID SMITH'S OPPOSITION TO BROWN UNIVERSITY'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNTS III, IV AND V

Brown University ("Brown") seeks judgment on David Smith's claims for Negligent Hiring and Supervision (Count III), Negligence (Count V), and for violating Rhode Island's Unfair Trade Practices and Consumer Protection Act ("RIDTPA")[1] (Count IV) based solely on the allegations in the Complaint.  Brown, however, can only short circuit the litigation process if it establishes that there is ***no set of facts*** that entitles David to relief under these claims.  Brown has not met this high bar and its motion should be denied.

*First*, Brown argues that it is entitled to judgment on the Negligent Hiring and Supervision (Count III) and Negligence (Count V) claims because its relationship with David is exclusively contractual, so it owes no additional duties to David outside that contract.  In other words, Brown claims it can avoid tort liability simply because it maintains written policies and procedures for its students.  Brown's myopic view is entirely divorced from the law and the egregious facts presented in David's Complaint, which go well beyond the bounds of the contractual duties that Brown owed to David.

There is no dispute that, as this Court has previously held, a negligence claim cannot be based on the breach of a contractual duty.  This case, however, is not a simple breach of contract

---

[1] 6 R.I. Gen. Laws Ann. § 6-13.1-1.2.

claim.  Brown did not just fail (as this Court preliminarily determined) to follow the required procedures or uphold the basic promises of fairness within the Title IX and its Non-Title IX policies that form the basis of David's Breach of Contract claim.  The University and its agents actively, knowingly, willfully and intentionally sought to harm David in their relentless and merciless pursuit to find him responsible *for an act that he did not commit,* and did so with reckless indifference toward the impact of their actions.  The conduct by Brown and its agents is negligence (at minimum), not a breach of contract.  The Complaint includes specific factual allegations that challenge far more than the procedural deficiencies and the lack of fairness David received during his disciplinary proceeding.  Brown went well beyond breaking its contract by manufacturing fraudulent admissions, suppressing exonerating evidence, willfully and knowingly ignoring the mountain of exculpatory facts, and failing to protect David's well-being.  Brown created a hostile campus environment for David and intentionally failed to enforce the terms of the Mutual No Contact Order put in place.  Brown also cannot ignore the duties of supervision it assumed legally when it went out of its way to hire and retain a third-party investigator (Donna Davis), with whom David has no contractual relationship.

Brown's fraudulent conduct and failure to act breached duties owed to David—such as the duty to prevent misconduct and fraud by its agents and to create a safe environment for students—beyond those contractual obligations established in the Title IX and Non-Title IX Policies.  That some (but not all) of the alleged misconduct occurred within the context of David's disciplinary proceeding does not bar David's negligence claims because the *duties* that Brown breached are separate and independent from the contractual obligations it owed to David to ensure a fair process.

*Second*, Brown seeks judgment on David's RIDTPA Claim (Count IV) because the "Rhode Island Supreme Court has never applied the RIDTPA to the university-student relationship." (Mot. at 4).  But Rhode Island law supports holding universities such as Brown to the standards articulated in the RIDTPA.  Moreover, David's claim is not novel.  Other courts have allowed students to assert similar claims against their universities under analogous state consumer protection statutes.  That the Rhode Island Supreme Court has not applied the RIDTPA in this particular circumstance is no reason to enter judgment before the Court has an opportunity to consider the merits based on a complete factual record, particularly given the unique and deeply troubling allegations raised here.  The promises Brown made to its most important consumers—its students who pay tuition—were so flagrantly and wantonly trampled and the consumer (David) so plainly abused that Brown should be answerable under the statutory scheme that the state legislature enacted to protect these very consumers.

The allegations in the Complaint present more than sufficient facts to entitle David to relief under Counts III-V.  For all the reasons that follow, Brown's motion should be denied.

## **BACKGROUND**

David's allegations—which must be accepted as true for Brown's motion—make clear that this is not a standard, run-of-the-mill challenge to a student disciplinary proceeding alleging an erroneous outcome in which Brown's decision making was influenced by bias (though that clearly occurred).  Rather, this case is an extreme outlier because the conduct goes beyond simple broken promises.  Indeed, Brown along with its third-party investigator, Defendants

Donna Davis and Davis Consulting Group, LLC, engaged in both negligent and fraudulent conduct.[2]  Consider, for example, these allegations:[3]

- Brown retained Ms. Davis, with whom David Smith has no contractual relationship, to conduct the investigation of the allegations brought by Jane Roe, and did so without performing adequate due diligence into her problematic background.  (Compl. ¶¶ 6, 111-15).

- Ms. Davis fraudulently manufactured evidence to secure a finding of responsibility against David, lying about David's clear testimony in excess of 60 times.  In several reported—but false—admissions, Ms. Davis asserted that David acknowledged that he did not obtain consent from Jane Roe when in fact David had emphatically claimed the opposite.  (Compl. ¶¶ 1, 14, 17-19, 116-22, 140). The tape of that conversation will be moved into evidence uncontrovertibly depicting the extensive fraud.

- Ms. Davis also blatantly and repeatedly misrepresented and mischaracterized David Smith's testimony in her investigation report and refused to include a description of his primary defense to the allegations.  She did this knowing that her report would constitute the entirety of the evidentiary record submitted to

---

[2]  David intends to seek leave to amend his Complaint to assert a fraud allegation against all Defendants.

[3]  This Court is already familiar with the allegations in David's Complaint, having previously determined that David demonstrated "a high likelihood of success on the merits" of his contract claim.  (ECF No. 16).  For brevity, David only focuses on those facts that are relevant to responding to Brown's motion.  To be clear, however, David's Complaint identifies with specificity the contractual provisions at issue in his Breach of Contract claim (Count I) such as: Brown's indefensible application of the wrong sexual misconduct policy to David's case; its failure to afford David with a presumption of innocence when initially suspending him; limiting David's participation in the hearing to a seven minute statement and a lack of any semblance of cross-examination when he was promised a "meaningful opportunity to participate."  (Compl. ¶¶ 251-58).

David's hearing panel and that these misrepresentations would guarantee her desired finding against him.  (Compl. ¶¶ 1, 14, 19, 139, 143, 169).

- David informed Brown's Title IX Coordinator of all these issues and provided a detailed 50-page redline based on his recorded interview with Ms. Davis that identified the over 60 misrepresentations and mischaracterizations, which the Title IX Coordinator and Brown ultimately willfully ignored. (Compl. ¶¶ 14, 116, 137-38).

- By contrast, Ms. Davis conspired with Jane Roe to bolster Jane's testimony 19 times.  These 19 changes were made with a transparent intent to attempt to address the vulnerabilities in her constantly changing and irrational stories that David had pointed out.  Ms. Davis also helped Jane Roe cover up the fact that she had altered an audio recording and only provided out-of-order and out-of-context snippets of the lengthier tape, carefully removing exculpatory statements made by David that eroded her claim.  (Compl. ¶¶ 149, 159-63).

- Ms. Davis wrongfully instructed David that he could not speak to witnesses to hamper his defense.  Ms. Davis's instruction was inconsistent with Brown's written policies, which do not address the parties' ability to speak with witnesses. On multiple occasions, David objected in writing both to Ms. Davis and to Brown that he had been precluded from speaking with witnesses, pointing out that Brown's policies did not support that instruction.  Brown ignored his objections. When David raised this as a basis for appeal, Brown falsely blamed *David* for misunderstanding the policy, without acknowledging the explicit instructions he was given that ran counter to Brown's policies.  (Compl. ¶¶ 7-8, 12-13, 124, 127,

133, 206-08, 212).  These instructions were also the opposite of those given to Jane, who not only spoke with many possible witnesses and friends, but who also enlisted her friend to covertly record David.  Brown not only chose not to discipline Jane Roe for this prohibited behavior, but the University also accepted a filtered, spliced version of the covert recording that eliminated those portions that supported David's innocence.  (Id. ¶¶ 2, 12, 21).

- Brown knowingly suppressed dispositive medical expert reports David submitted to counter Jane Roe's fantastical claims.  Brown provided no rationale for its decision to withhold this evidence, and nothing in Brown's policies permits the exclusion of relevant evidence. (Compl. ¶¶ 20, 164-68).  The importance of these suppressed medical reports cannot be overstated, as they vitiated the only purported physical evidence that Jane offered to support her false claims. Without such evidence, Jane's accusations became that much more implausible since she affirmatively consented, never said "no" or acted in any manner other than enthusiastic affirmative consent, and only decided two weeks later that she did not consent after being confronted by a friend, housemate, and teammate of David Smith with whom she also was having a sexual relationship.

- Brown's Title IX Coordinator actively participated in Brown's knowing, intentional and willful misconduct by ignoring David's pleas for her to review the actual facts and thus serving as Ms. Davis's accomplice in this fraud.  Ultimately, because of the Title IX Coordinator's actions (and inactions), David was found responsible for an act that he did not commit.  (Compl. ¶¶ 1, 14, 16-18, 116, 135-44, 159-64).

- The false representations in the report based on Brown's and Ms. Davis's fraudulent and negligent conduct formed the basis of the hearing panel's findings against David.  The appeal panel ignored all the warnings of fraud and manipulation of evidence that David had raised.  Rather than probe the alleged fraud and negligent conduct of which it was made aware, the hearing and appeal panels stood idly by and allowed it to fester into the basis for a finding of responsibility.  (Compl. ¶¶ 119-213).

- Brown assumed a duty to enforce the terms of a Mutual No-Contact Order and has failed to do so, causing extreme distress to David.[4] (Compl. ¶¶ 214-22). Brown has ignored David's complaints of open hostility from complete strangers on campus and failed to offer any support or resources to help him manage the situation.  (Id. ¶¶ 224-28).

This troubling conduct is separate and apart from Brown's contractual breach of its flawed disciplinary process.  Even if Brown had adhered to the correct Title IX Policy and had provided David with the proper procedures as required, Brown and its agents still would have breached their duties to David based on their negligent and fraudulent misconduct.  This malignant activity by Brown and its third-party agent Ms. Davis was negligence and fraud in its purest form— trickery, lies and deception intended to ensure that David was found guilty regardless of the evidence with the clear intent to remove David from school or ensure that he does not graduate on time.

---

[4] David's Complaint alleges at least one No Contact Order violation by Jane Roe that Brown failed to address. (Compl. ¶¶ 214-23).  However, David will soon amend his Complaint to add another, more flagrant failure by Brown to enforce its Order.  In early December, Jane Roe attended a party hosted by David's fraternity in a blatant, brazen, and direct violation of the express terms of the No-Contact Order directing her to avoid such parties.  David submitted to Brown a photograph of Jane at his party along with other supporting evidence to demonstrate the violation.  Despite this clear evidence of the violation, Brown has done nothing to discipline Jane for her conduct.

## ARGUMENT

The standard of review for a Rule 12(c) motion is well-settled: "The Court is compelled to accept all factual allegations as true without crediting any conclusory legal allegations. The First Circuit has further held that a court may only grant a Rule 12(c) motion if it appears beyond doubt that the plaintiff can ***prove no set of facts*** in support of his claim which would entitle him to relief." Stafford v. CSL Plasma, Inc., 504 F. Supp. 3d 9, 11–12 (D.R.I. 2020) (McConnell, J.) (internal citation and quotation omitted) (emphasis added). The unique and unprecedented facts of this case establish that Brown violated duties beyond the contractual obligations it owed to David. To be clear, Brown did not enter into a contract with David that it would i) negligently supervise, ii) commit negligence (much less outright fraud), or iii) violate the RIDTPA all in an effort to destroy David Smith's life. As a result, there is no basis to enter judgment for Brown on David's negligent hiring and supervision, negligence, or consumer protection claims at this early stage of the litigation.

### A. Brown Breached Duties Owed to David Beyond the Promises Contained in Its Sexual Misconduct Policies and Caused Compensable Emotional Harm to David

Brown wrongfully asserts that it cannot be held liable for Negligent Hiring and Supervision (Count III) and Negligence (Count V) "[b]ecause the university-student relationship is contractual" and therefore Brown does not owe David any duties beyond those articulated in its student handbooks and other written policies. (Mot. at 2). Brown relies on two decisions—Doe v. Brown, 166 F. Supp. 3d 177, 196 (D.R.I. 2016) and Soenen et. al. v. Brown Univ., C.A. No. 21-325-JJM-PAS (ECF Doc. No. 34 at 3)—that rejected negligence claims because the plaintiffs' negligence claims relied on the same duties that arose from Brown's contractual obligations. David recognizes, embraces, and does not at all dispute this Court's prior holding that a negligence and breach of contract claim cannot be based on a breach of the same legal

duty.  But that is not remotely the case here.  Rather, as outlined above, David has pled

substantial facts to show that Brown breached duties separate and apart from its obligation to

provide a fair process under the Title IX and Non-Title IX Policies that form the basis of David's

breach of contract claim. That David could not practically be granted a fair process with only

seven minutes to defend himself, in addition to being stripped of any ability to cross-examine

Jane Roe, is a contractual matter about which this Court has already given guidance.  However,

this contractual matter is completely separate from Brown's intentional, willful, and deliberate

fraudulent behavior that was designed to guarantee a finding of responsibility based on the fraud

and deception by Brown's third-party investigator and complicit Title IX office, hearing panel

and appeal panel.  Even if the process itself were fair and Brown had followed it as required

(which they did not), these parties were going to make sure David was found guilty even if they

had to manufacture the evidence to do so, which they did.  Again, David Smith and Brown did

not enter into any contract that would allow Brown and its agents to manufacture evidence,

knowingly commit fraud, withhold exculpatory evidence, alter exonerating evidence, and so

forth, with the sole goal of destroying an innocent, stellar student-athlete's life.

 Rhode Island law—which governs David's negligence claims—emphatically rejects

Brown's bright-line, formulaic rule that colleges cannot be liable to students in tort.  The Rhode

Island Supreme Court instead applies a case-by-case approach to negligence that analyzes all

relevant factors and the foreseeability of harm to the plaintiff:

> [T]he determination of whether a duty exists is a legal issue for the
> court to decide. In the making of this determination, ***no clear-cut
> formula exists***. Rather, under our ad hoc approach we consider all
> relevant factors, including the relationship of the parties, the scope
> and burden of the obligation to be imposed upon the defendant,
> public policy considerations, and notions of fairness. Finally, as this
> court has frequently noted, ***the risk reasonably to be perceived***

> ***defines the duty to be obeyed***, and risk imports relation; it is risk to
> another or to others ***within the range*** of apprehension."

E.g., Hennessey v. Pyne, 694 A.2d 691, 697 (R.I. 1997) (internal citation and quotation omitted)

(emphasis added); Selwyn v. Ward, 879 A.2d 882, 887 (R.I. 2005) (emphasizing that "[t]his

Court determines whether a duty exists on a case-by-case basis," and that "*[t]he linchpin in the*

*analysis of whether a duty flows from a defendant to a plaintiff is foreseeability*." (emphasis

added)).

The foreseeability of harm associated with Brown's alleged negligent and fraudulent

conduct in the Complaint is patently obvious and adequate to show that Brown breached a duty

independent of its contractual obligations to David.  It was foreseeable that David would

experience severe emotional distress and reputational harm when Brown's investigator, with

Brown's knowledge and assistance:

- Intentionally falsified David's testimony over 60 times including by attributing to him
  false admissions that acknowledged, among other things, that Jane Roe did not consent
  (Compl. ¶¶ 1, 14, 17-19, 116-22, 140);

- assisted Jane Roe in covering up her efforts to alter audio recordings of David in which
  she presented out-of-order and out-of-context snippets of a lengthier taped conversation
  between David and one of Jane's friends, carefully removing statements made by David
  that supported his defense and eroded her claims (Compl. ¶¶ 149, 159-163);

- refused to present David's defense to the hearing panel and wrote a report that
  misrepresented the words he stated in interviews and in written submissions over 60
  times (Compl. ¶¶ 1, 14, 19, 139, 143, 169);

- blocked David from gathering evidence that the investigator herself was obligated to
  collect (i.e. relevant witness testimony) by instructing David that he could not speak with

witnesses, while allowing Jane Roe to do so—a problem which David raised with

Brown's Title IX Coordinator multiple times but was ignored (Compl. ¶¶ 2, 7-8, 12-13,

21, 124, 127, 133, 206-08, 212); and,

- suppressed exonerating medical evidence that dispositively countered a central allegation
  of Jane Roe's testimony that she was bruised and injured from David's alleged behavior.
  This evidence was submitted directly to Brown's Title IX Coordinator who, together
  with Ms. Davis, was directly responsible for the suppression of this evidence (Compl. ¶¶
  20, 164-68).

Multiple times in writing, David advised Brown's Title IX Coordinator, who is responsible for

overseeing sexual misconduct disciplinary processes at Brown, that this misconduct was

occurring, but she did nothing to intervene.  These allegations, which must be accepted as true at

this phase of the litigation, are sufficient to establish a foreseeability of harm that is separate

from Brown's contractual obligations.  See McCormick v. Dresdale, No. 09-474 S, 2010 WL

1740853, at *2 (D.R.I. Apr. 28, 2010) (denying motion to dismiss negligence claim and

"imposing a duty on Brown university to conduct a reasonable investigation [into rape

allegations] . . . when confronted with alleged criminal activities by its students").  That some of

these allegations may also support David's breach of contract claim against Brown does not

change the analysis because "it's not uncommon for the same set of facts surrounding a

particular event to support multiple, yet distinct claims."  Marrero v. Univ. of Phoenix of Puerto

Rico Campus, 07-2190, 2009 WL 10720024, at *3 (D.P.R. Feb. 4, 2009).  It is premature at this

stage to determine as a matter of law that David can prove *no set of facts* to support a claim of

negligence against Brown.

11

In addition to the foreseeability of harm to David, the allegations raised in the Complaint also show that Brown breached its duty to prevent faculty/administrator misconduct.  In Johnson v. Schmitz, a Yale University graduate student sued Yale based on dishonest conduct by a faculty member.  119 F. Supp. 2d 90, 96 (D. Conn. 2000).  As relevant here, the plaintiff raised breach of contract and negligence claims because his faculty advisor misappropriated the theory underlying his doctoral thesis, the plaintiff advised Yale's administration of the misappropriation, and Yale failed to protect him from the academic misappropriation of his ideas.  Id. at 91–92.  The plaintiff asserted breach of contract against Yale based on "distributed documents" for failing to "safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in accordance with its own procedures."  Id. at 96.  Despite its recognition that "the basic legal relation between a student and a private university or college is contractual in nature," the district court allowed plaintiff's negligence claim to proceed in tandem.  Id. at 93.  The district court reasoned that "if, as [plaintiff] alleges, Yale's rules for protecting its students were inadequate or if Yale failed to enforce them adequately to protect him, it is foreseeable that one of its graduate students could suffer emotional distress and economic harm."  Id. at 99–100.  Using language that is particularly appropriate for this case, the district court held that a duty existed for a university to protect its students from faculty misconduct:

> Plaintiff alleges that Yale negligently failed to protect him against faculty misconduct, which caused him to be injured by faculty wrongdoing. In addition, a legitimate legal objective would be served by finding a duty. An important function of the tort system is the prophylactic factor of preventing future harm. Universities are in the best position to prevent this kind of faculty misconduct in the future.

Id. at 100 (internal quotation and citation omitted).

This duty to protect students against faculty misconduct applies equally to Brown based on the unique and disturbing factual allegations in David's Complaint.  Brown was on notice that its third-party investigator and own Title IX Coordinator were engaging in dishonest and fraudulent misconduct, and yet Brown failed to protect David.  David pointed this out multiple times, including to Brown's hearing and appeal panels, and received only silence.  The panel members disregarded this reckless and abusive behavior.  They did not ask David a single question about his reasons for, or proof of, the alleged fraud and ignored his 50-page submission detailing the lies contained in Ms. Davis's report.  As such, like the plaintiff in Johnson, David has articulated a sufficient basis to establish that Brown breached a duty to protect him from egregious misconduct by its associated persons, entirely separate from the contractual relationship between David and Brown.

Even if this Court were to find that the allegations of fraudulent and deceptive conduct by Brown's Title IX Investigator and Ms. Davis fall within the contractual obligations Brown owed to David (which they do not), the Complaint also offers other factual allegations entirely unrelated to the sham investigation and disciplinary proceeding that would support a negligence claim.  Rhode Island recognizes that Brown, like all schools, has a duty to ensure the safety and well-being of its students.  See Liu v. Striuli, 36 F. Supp. 2d 452, 467 (D.R.I. 1999) ("There can be no doubt that as a matter of law, the College owes its students a duty to employ faculty and staff who are not reasonably foreseen to be dangers to the well-being of the student body."); Dextraze v. Bernard, 253 A.3d 411, 417 (R.I. 2021) (recognizing "duty to adequately supervise the students in its care" and holding that "plaintiffs presented compelling evidence that the school district failed to exercise the degree of care required to protect its students in circumstances where a known disruptive and aggressive student presented a reasonably

13

foreseeable harm to other students").  As alleged in the Complaint, Brown has breached its duty to ensure David's well-being on campus.

David alleges that he "began to experience open hostility from complete strangers on campus," including students "flipping him off" and "call[ing] him a rapist."  (Compl. ¶¶ 224-25).  While David reported these concerns to Brown, and its accompanying mental health ramifications, Brown "did not offer him support or resources to help him manage the situation." (Id. ¶ 227).  Brown has thus created a hostile campus environment in breach of its duty to ensure the well-being of its students like David.  See, e.g., Dextraze, 253 A.3d at 417.

Brown has also maintained Mutual No Contact Orders (NCOs) between David and Jane since the initiation of the underlying disciplinary proceedings.  A university such as Brown assumes a special duty when imposing no contact orders between students on campus to ensure the orders are enforced.  See Cavalier v. Cath. Univ. of Am., 306 F. Supp. 3d 9, 40 (D.D.C. 2018).  In Cavalier, the court allowed a student's negligence claim to survive "to the extent [plaintiff] challenges the University's failure to enforce its no-contact order."  Id. at 40.  The court reasoned that "by affirmatively representing to [plaintiff] that a no-contact order was in place between her and Doe and that, should [plaintiff] report Doe's violations of that order, it would take the necessary steps to enforce it, the University knew, or should have known, that it was 'undertaking' an obligation in a 'situation[ ] where the emotional well-being of [plaintiff] was at the core of its responsibility.'"  Id. (citation omitted).

David has raised the same allegations here.  Brown entered an NCO between David and Jane Roe that precludes contact between the two.  (E.g., Compl. ¶ 214).  Despite the existence of the NCO, and Brown's agreed undertaking to enforce the NCO's terms, Brown has failed to address Jane's repeated violations, which have placed David under extreme duress.  (E.g., id. ¶¶

216-23).  The mutual NCO is meant to protect both students, but Brown does not consider David worthy of protection from Jane.  Brown has thus breached its duty to David.

Regarding David's Negligent Hiring and Supervision claim, a student-university contract is insufficient to bar such a claim against Brown.  See Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 613–14 (D. Mass. 2016) (finding that plaintiff's "status as a student does not necessarily preclude his [negligent retention and supervision] claim").  This claim can survive where the individuals selected by a university to conduct an investigation engaged in egregious conduct that caused harm to the plaintiff beyond economic losses associated with the breach of contract claims.  For example, Pennsylvania, like Rhode Island, generally views the relationship between colleges and students as contractual and enforces written disciplinary procedures as contractual promises.  See e.g. Reardon v. Allegheny College, 926 A.2d 477, 480 (Pa. Super. 2007) (Pennsylvania courts "review the agreement between the parties concerning disciplinary procedures[] contained within a portion of the student handbook . . . as we would any other agreement between two private parties").  Nevertheless, a Pennsylvania district court held that a student adequately pled a negligence claim against the University of Pennsylvania by alleging that: "Penn owed him 'a duty of reasonable care in selecting, training, and supervising investigators to implement the Disciplinary Procedures'" and that Penn violated that duty by allowing its investigative team "'to conduct a sham investigation, discriminate against the Plaintiff based on gender and racial stereotypes, produce flawed and biased reports, and reach unwarranted and erroneous conclusions.'" Jackson v. Trustees of Univ. of Pennsylvania, No. CV 17-4645, 2019 WL 309729, at *9 (E.D. Pa. Jan. 23, 2019).  The facts in David's Complaint go far beyond the allegations in Jackson and support a claim of negligent supervision with even greater force.

There is no dispute that Ms. Davis is not a Brown employee and that David never had any contractual relationship with her.  Ms. Davis is a third party to whom Brown outsourced its investigation responsibilities, creating a tri-partite relationship in which David was at the mercy of Ms. Davis's conduct and actions.  The fact that a malevolent investigation by Ms. Davis might cause significant harm to David was thus eminently foreseeable by Brown.  And that is precisely what occurred, to David's extreme and enduring detriment.  It is necessary to impose upon Brown a duty to use reasonable care to vet, train, and supervise Ms. Davis, which Brown failed to do.

Accordingly, David has pled sufficient facts to support a finding that Brown can be liable for Negligence and Negligent Hiring and Supervision notwithstanding its contractual obligations outlined in the Title IX and Non-Title IX policies.

### B.     Brown Is Subject to Liability Under Rhode Island's Unfair Trade Practices and Consumer Protection Act

Brown also seeks judgment on David's RIDTPA claim on the sole theory that the "Rhode Island Supreme Court has never applied the RIDTPA to the university-student relationship" and that doing so here "would have significant public policy implications beyond this litigation." (Mot. at 4).  Brown, however, fails to specify the "significant public policy implications" that should prevent this Court from applying the RIDTPA here.

Indeed, this Court has already rejected a similar argument in Doe v. Rhode Island School of Design, 432 F. Supp. 3d 35 (D.R.I. 2019) (McConnell, J.).  There, a RISD student sued the school for negligence "for failing to provide her with reasonably safe housing accommodations" while participating in a study abroad program.  Id. at 40–41.  The Court considered, as a matter of first impression under Rhode Island law, whether a special relationship existed between a university and its students participating in the study abroad program.  Id. at 42.  This Court

16

analyzed the question under existing Rhode Island common law and appropriately concluded that such a relationship existed.  Id. at 42–43.  In doing so, the Court rejected the school's argument that this finding would cause "unspecified 'serious implications' that concern the university."  Id. at 44.  This Court reasoned that its ruling only confirmed what the university's employees already knew: students expected the university to provide reasonably safe accommodations.  Id.

So too here.  This Court can apply the RIDTPA to Brown under existing case law and the plain meaning of the RIDTPA.  Brown should be subject to the RIDTPA because the statute "is a remedial act and it should be liberally construed."  Long v. Dell, Inc., 984 A.2d 1074, 1081 (R.I. 2009).  David is also a "consumer" entitled to RIDTPA protection because there is no dispute that there was a contract between David and Brown for services and that David paid consideration (non-refundable tuition) for these services.  See Kelley v. Cowesett Hills Assocs., 768 A.2d 425, 431 (R.I. 2001) (identifying whether a contract exists for the relevant services and whether any consideration was exchanged in deciding whether an individual is a "consumer" protected under the RIDTPA).  The Complaint also contains a litany of allegations showing how Brown engaged in acts that were "unfair or deceptive" to David.  6 R.I. Gen. Laws Ann. § 6-13.1-1(6)(xiii).

David's claim is also not novel, as Brown suggests.  Brown cites a single Connecticut district court decision rejecting an Unfair Trade Practices Act claim,[5] but conveniently omits several other courts, including two Connecticut state appellate courts, that recognized Unfair Trade Practices Act claims in more analogous cases.  See Haque v. Swarthmore College, No. 15-cv-1355, (E.D. Pa. Feb. 3, 2016) (Memorandum Opinion attached as Exhibit A); Day v. Yale

---

[5]  Ironically, Brown relies on an out-of-circuit decision shortly after chiding David for referring to out-of-jurisdiction authority in his Complaint.

Univ. Sch. of Drama, 2000 WL 295612, at *4 (Conn. Super. Mar. 7, 2000); Osberg v. Yale Univ.

2009 WL 659072, at *6 (Conn. Super. Feb. 11, 2009).

Haque involves facts that closely parallel this case.  There, the plaintiff challenged a

wrongful sexual assault finding entered against him by Swarthmore College and asserted that the

college's investigator used misleading tactics to entrap him into making self-incriminating

statements, suppressed and misrepresented witness testimony, and suppressed an expert report

submitted by the plaintiff as part of his defense.  (Ex. A at 3-4).  The plaintiff in that case further

alleged that he received improper instructions from the investigator that he could not retain an

attorney to act as his advisor.  (Id.)  The plaintiff's consumer protection claim asserted that "he

accepted Swarthmore's offer of enrollment and paid the related tuition and housing

fees,[believing that] Swarthmore would uphold its obligations, covenants and warranties to

Plaintiff as described in its policies.  (Id. at 33).  The court determined that the totality of the

facts alleged in the complaint were sufficient to state a claim under Pennsylvania's Unfair Trade

Practices and Consumer Protection Law.  (Id. at 34).  Here, David also alleges that he paid

tuition to Brown and that a corrupt investigator purposefully created a false and incriminating

record against him, suppressed evidence, misrepresented testimony, and gave David improper

instructions to hamper his defense—all of which he can prove with a recording coupled with his

written submissions.  (E.g., Compl. ¶¶ 359, 361).  Based on the reasoning in Haque, and the

nearly identical facts alleged here, there is no basis to reject David's RIDTPA claim at this early

stage before the benefit of discovery.

While Haque is on-point, apposite authority based on its analogous facts, at least two

Connecticut state court decisions provided additional support for the recognition of a RIDTPA

claim.  Both cases upheld deceptive trade practice claims in circumstances where a university

was alleged to have withheld the decision to dismiss a student from an artistic program in order to extract further tuition payments from the affected student.  Brown engaged in analogous behavior here when it delayed its appeal decision until the day after David's non-refundable tuition payment was due.  In Day v. Yale Univ. Sch. of Drama, the state appellate court upheld a claim under Connecticut's Unfair Trade Practices Act where Yale accepted a student into its performing arts program, took his tuition for two years, and failed to warn him that his performances was not adequate for the program before dismissing him.  2000 WL 295612, at *8. The plaintiff there alleged that he had obtained passing grades and praise from his professors, which was deceptive given Yale's ultimate decision to dismiss him.  Id.  The Court agreed and found that plaintiff "pleaded more than a simple breach of contract."  Id.; see also Osberg, 2009 WL 659072, at *6 (holding under similar facts that Yale's dismissal of a student from its fine arts program could constitute an unfair trade practice).

Here, Brown delayed the issuance of its decision on David's appeal for a month—well beyond the five-day review period set forth in Brown's policy—and issued its decision *the day after* David was required to make his non-refundable fall tuition payment, despite David reaching out during the review period to ask that the decision be issued prior to his return to campus so that he could avoid the tuition payment.  (Compl. ¶¶ 31, 193-200).  Brown ignored that request, took David's money, and suspended him the next day.  Moreover, despite repeated pleas for Brown to issue its appeal decision before classes resumed, Brown rendered its appeal decision on the first day of classes.  Indeed, Brown's timing seemed purpose-built to maximize the humiliation and distress to David, who had driven the seven hours to Providence the night before and attended his first two classes of the semester before learning of the denial of his

appeal.  The circumstances surrounding the delayed release of Brown's decision further emphasize the need for discovery on David's RIDTPA claim.

Finally, even if the Court agrees that David's RIDTPA claim is novel, that alone is not enough to justify judgment under Rule 12(c).  Quite the opposite, a "court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions."  McGary v. City of Portland, 386 F.3d 1259, 1270 (9th Cir. 2004) (internal quotation and citation omitted).  The parties should have "additional time to utilize the pretrial discovery procedures and more completely investigate the issues presented, thus facilitating and insuring a consideration and adjudication of the case on its merits."  See 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1367 (3d ed. 2008).

## CONCLUSION

Brown has failed to establish that there is no set of facts that entitles David to relief under Counts III-V of his Complaint.  For all the foregoing reasons, David respectfully requests that the Court deny Brown's Motion for Judgment on the Pleadings.

Dated:  February 27, 2023

By: /s/ Maria F. Deaton
    Patrick C. Lynch, Esq. (#4867)
    Maria F. Deaton, Esq. (#7286)
    Lynch & Pine, Attorneys at Law
    One Park Row, Fifth Floor
    Providence, RI 02903
    (401) 274-3306
    plynch@lynchpine.com
    mdeaton@lynchpine.com

By: /s/ Douglas F. Gansler

By: /s/ Patricia M. Hamill
    Patricia M. Hamill, Esq. (pro hac vice)
    Andrew S. Gallinaro, Esq. (pro hac vice)
    Conrad O'Brien, PC
    1500 Market Street, Suite 3900
    Centre Square, West Tower
    Philadelphia, PA 19102
    (215) 864-9600
    phamill@conradobrien.com
    agallinaro@conradobrien.com

Douglas F. Gansler, Esq. (*pro hac vice*)
Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W.
Washington, DC 20001
(202) 862-2300
douglas.gansler@cwt.com

## **CERTIFICATE OF SERVICE**

I, Maria F. Deaton, certify that on February 27, 2023, this document was electronically filed through the Court's CM/ECF system and is available for viewing and downloading to all registered counsel of record.

*/s/ Maria F. Deaton*
Maria F. Deaton, Esq. (#7286)
Lynch & Pine, Attorneys at Law
One Park Row, Fifth Floor
Providence, RI 02903
(401) 274-3306
mdeaton@lynchpine.com